UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

HYAXIOM, INC., F/K/A
DOOSAN FUEL CELL AMERICA, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA;
U.S. CUSTOMS & BORDER PROTECTION;
TROY A. MILLER,
PERFORMING THE DUTIES OF THE
COMMISSIONER,

Defendants.

Court No. 21-00057

**NONCONFIDENTIAL**

**MEMORANDUM IN SUPPORT OF PLAINTIFF HYAXIOM, INC'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE FIRST AMENDED COMPLAINT**

Christopher M. Loveland
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006-6801
Telephone: 202.747.1900
Facsimile: 202.747.1901
cloveland@sheppardmullin.com

Of Counsel:

J. Scott Maberry
Lisa C. Mays
Adam A. Bartolanzo
SHEPPARD MULLIN RICHTER & HAMPTON LLP

Dated: December 9, 2022

*Attorneys for HyAxiom, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

TARIFF PROVISIONS IN ISSUE .......... 3

QUESTIONS PRESENTED .......... 5

STATEMENT OF FACTS .......... 5

SUMMARY OF THE ARGUMENT .......... 9

ARGUMENT .......... 14

I. STANDARD OF REVIEW .......... 14

II. HTS 8405 IS THE CORRECT CLASSIFICATION OF THE PC50 SUPERMODULE .......... 15

A. GRI 1 And Section XVI, Note 2(a) Mandate That The PC50 Supermodule Be Classified Under HTS 8405, Even If The PC50 Supermodule Also May Be Considered A "Part" Under HTS 8503 .......... 15

B. The PC50 Supermodule Is "Included" In HTS Heading 8405 Because The Heading Is *Eo Nomine* And Because The PC50 Supermodule Has The "Essential Character" Of A Water Gas Generator Under GRI 2(a) .......... 19

1. The Primary Function Of The Steam Methane Reformer Is To Generate Water Gas .......... 21

2. The Other Components Of The PC50 Supermodule Support The Water Gas Generation Function Of The Steam Methane Reformer And Thus Are Cleary Suitable For Use Together With The Reformer .......... 25

a. Integrated Low Shift Reactor .......... 26

b. Thermal Management System / Water Treatment System .......... 27

c. Air Processing System .......... 28

d. Frame .......... 28

III. CBP'S CLASSIFICATION OF THE PC50 SUPERMODULE UNDER HTS 8503 IS WRONG AS A MATTER OF LAW .......... 29

A. The PC50 Supermodule Is Not An Incomplete Fuel Cell Generator Or Similar To The "Generator Unit" In NY E86434 Because The Supermodule Lacks The "Essential Character" Of A Fuel Cell Generator .......... 29

B. CBP's Classification Relies Upon A Misinterpretation Of EN 84.05 To Exclude The PC50 Supermodule From HTS 8405 Even Though The Heading Is An *Eo Nomine* Designation That, By Operation Of GRI 2(a), Includes All Forms Of Incomplete Or Unfinished Water Gas Generators .......... 31

C. CBP's Reliance On The Post-Importation Use Of The PC50 Supermodule In The Completed Powerplant Ignores The GRIs And Seeks To Apply The Defunct "More Than" Doctrine Instead ....35

IV. IN THE ALTERNATIVE, THE PC50 SUPERMODULE SHOULD BE CLASSIFIED UNDER HTS 8405 BY OPERATION OF GRI 3 ....37

CONCLUSION ....38

CERTIFICATE OF COMPLIANCE ....40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Airflow Tech., Inc. v. United States*
35 CIT 1540, 804 F. Supp. 2d 1292 (2011) ....21

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ....14

*Arko Foods Int'l, Inc. v. United States*
654 F.3d 1361 (Fed. Cir. 2011) ....22

*Arko Foods Int'l, Inc. v. United States*
33 CIT 1891, 679 F. Supp. 2d 1369 (2009) ....31

*Avecia, Inc. v. United States*
30 CIT 1956, 469 F. Supp. 2d 1269 (2006) ....33

*Bauerhin Techs. Ltd. P'ship v. United States*
100 F.3d 774 (Fed. Cir. 1997) ....16

*Bausch & Lomb, Inc. v. United States*
148 F.3d 1363 (Fed. Cir. 1998) ....14

*Baxter Healthcare Corp. v. United States*
22 CIT 82, 998 F. Supp. 1133 (1998) ....22

*Carl Zeiss, Inc. v. United States*
195 F.3d 1375 (Fed. Cir. 1999) ....36

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ....14

*Cont'l Auto. Sys., Inc. v. United States*
589 F. Supp. 3d 1215 (CIT 2022) ....23

*Deckers Corp. v. United States*
752 F.3d 949 (Fed. Cir. 2014) ....33

*ENI Tech., Inc. v. United States*
33 CIT 1219, 614 F. Supp. 2d 1337 (2009) ....19

*Estee Lauder, Inc. v. United States*
36 CIT 1, 815 F. Supp. 2d 1287 (2012) ....14

*Filmtec Corp. v. United States*
27 CIT 1730, 293 F. Supp. 2d 1364 (2003) ....22

*Gerber Food (Yunnan) Co. v. United States*
33 CIT 186, 601 F. Supp. 2d 1370 (2009)....................19

*Home Depot v. United States*
435 F. Supp. 3d 1311 (CIT 2020)....................11

*Jarvis Clark Co. v. United States*
733 F.2d 873 (Fed. Cir. 1984)....................14

*JVC Co. of Am., Div. of US JVC Corp. v. United States*
234 F.3d 1348 (Fed. Cir. 2000)....................14, 36

*Mita Copystar Am. v. United States*
21 F.3d 1079 (Fed. Cir. 1994).................... *passim*

*Mitsubishi Int'l Corp. v. United States*
182 F.3d 884 (Fed. Cir. 1999).................... *passim*

*Moen Inc. v. United States*
294 F. Supp. 3d 1337 (CIT 2018)....................15

*Nidec Corp. v. United States*
68 F.3d 1333 (Fed. Cir. 1995).................... *passim*

*Park B. Smith, Ltd. v. United States*
347 F.3d 922 (Fed. Cir. 2003)....................15

*Pomeroy Collection, Ltd. v. United States*
32 CIT 526, 559 F. Supp. 2d 1374 (2008)....................22

*Rubie's Costume Co. v. United States*
337 F.3d 1350 (Fed. Cir. 2003)....................18

*Schlumberger Tech. Corp. v. United States*
845 F.3d 1158 (Fed. Cir. 2017)....................9, 37

*Sharp Microelectronics Technology, Inc. v. United States*
20 CIT 793, 932, F. Supp. 1499 (1996)....................22

*Sigma-Tau HealthScience, Inc. v. United States*
838 F.3d 1272 (Fed. Cir. 2016)....................33

*Wilton Indus., Inc. v. United States*
31 CIT 863, 493 F. Supp. 2d 1294 (2007)....................39

**Statutes**

19 U.S.C. § 1202 .......... *passim*

28 U.S.C. § 1581(a) .......... 1, 38

28 U.S.C. § 2643(a)(1) .......... 38

28 U.S.C. § 2643(c)(1) .......... 38

**USCIT Rules**

USCIT R. 56(a) .......... 14

**CBP Rulings**

HQ 956226
(Sept. 13, 1994) (*available at* https://rulings.cbp.gov/ruling/956226) .......... 21

HQ H007677
(Dec. 22, 2008) (*available at* https://rulings.cbp.gov/ruling/H007677) .......... 18

HQ H135337
(May 20, 2011) (*available at* https://rulings.cbp.gov/ruling/H135337) .......... 21, 22

HQ H243584
(May 9, 2016) (*available at* https://rulings.cbp.gov/ruling/H243584) .......... 17, 18

NY 854572
(July 26, 1990) (available at https://rulings.cbp.gov/ruling/854572) .......... *passim*

NY E86434
(Sept. 20, 1999) (*available at* https://rulings.cbp.gov/ruling/E86434) .......... *passim*

NY J81394
(Feb. 28, 2003) (*available at* https://rulings.cbp.gov/ruling/J81394) .......... 26

NY N273793
(Apr. 7, 2016) (*available at* https://rulings.cbp.gov/ruling/N273793) .......... 18

**INTRODUCTION**

This is a tariff classification case resulting from the denial by Defendant U.S. Customs & Border Protection ("CBP") of an April 30, 2020 protest filed by Plaintiff HyAxiom, Inc. ("HyAxiom")[1] regarding a January 9, 2020 Notice of Action. HyAxiom imported two articles known as PC50 supermodules on November 2, 2018 under Entry No. CWL-2016022-3, which it classified under Harmonized Tariff Schedule ("HTS" or "HTSUS") heading 8405. The January 9, 2020 Notice of Action reclassified the PC50 supermodules "from HTS 8405.10.0000/Free to 8503.00.9550/3%."[2] On February 12, 2021, HyAxiom timely challenged CBP's denial of HyAxiom's protest pursuant to 28 U.S.C. § 1581(a).[3] As set forth in greater detail below, summary judgment should be granted in favor of HyAxiom on Count I of its First Amended Complaint ("FAC") because the PC50 supermodules are properly classifiable under HTS 8405, covering (*inter alia*) water gas generators, when the statutory General Rules of Interpretation ("GRIs") are properly applied.

**THE IMPORTED MERCHANDISE IN ISSUE**

This case involves the importation of two articles known as PC50 supermodules. SMF ¶¶ 5, 61. The term "supermodule" refers to the fact that the imported item consists of multiple components assembled and imported together. *Id.* ¶ 5. The main components of the PC50 supermodule are:

a. The steam methane reformer ("SMR"), which generates water gas from steam and methane. *Id.* ¶ 29a.

---

[1] HyAxiom was formerly known as Doosan Fuel Cell America, Inc.

[2] *See* Statement of Material Facts for which There is No Genuine Issue to be Tried ("SMF") ¶ 106.

[3] HyAxiom subsequently amended its Complaint on November 18, 2022. ECF No. 41.



b. The integrated low shift reactor ("ILS") (also known as the low temperature shift reactor), which [REDACTED] *Id.* ¶ 29b. The ILS performs the latter function through a process known as the water gas shift reaction (also known as the low temperature shift reaction). *Id.* Together, the SMR and ILS comprise the main components of what is known as the fuel processing system ("FPS") in the PC50 supermodule. *Id.*

c. The thermal management system ("TMS") and water treatment system ("WTS"), which [REDACTED] *Id.* ¶ 29c.

d. The air processing system ("APS") (without the blower), which [REDACTED] *Id.* ¶ 29d.

e. The frame, which provides a support structure for the supermodule components and protects them from damage during transportation. *Id.* ¶ 29e.

Each of the foregoing components is necessary for the generation of hydrogen-rich water gas. *See id.* ¶¶ 31-58. The hydrogen from this water gas is subsequently used as a fuel in the completed PureCell® Model 400 powerplant to generate electricity, but only after electrical generating components such as the fuel cell stacks, the Electrical Systems Module ("ESM"), and the blower are installed in HyAxiom's facility in Connecticut. *Id.* ¶¶ 1, 4, 10, 16, 59-60. In its imported state, the primary function of the PC50 supermodule is to generate water gas, not electricity. *Id.* ¶ 6.

[REDACTED]



*Id.* ¶ 30.

The country of origin and of exportation of the two PC50 supermodules in Entry No. CWL-2016022-3 was Thailand, *id.* ¶ 62; the date of exportation was October 2, 2018, *id.*; the date of entry was November 2, 2018, *id.* ¶ 61; and the port of entry was New York/Newark, New Jersey (Entry Port No. 4601). *Id.* ¶ 63.

**TARIFF PROVISIONS IN ISSUE**

CBP classified the subject PC50 supermodules under HTSUS 8503.00.95/3%,[4] which provides as follows:

[4] The HTSUS, which includes the GRIs and Section Notes, is codified at 19 U.S.C. § 1202 and is available at: International Trade Commission, *Harmonized Tariff Schedule* (2022 Revision 10), https://hts.usitc.gov/current (last visited December 8, 2022). All citations herein are to the 2022 edition of the HTSUS, as there have been no changes to the relevant portions of the HTSUS since date of entry of the subject PC50 supermodules.

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 8503.00 | | Parts suitable for use solely or principally with the machines of heading 8501 or 8502: | | | | |
| 8503.00.95 | | Other | | 3%[36] | Free (A*, AU, B, BH, CL, CO, D, E, IL, JO, KR, MA, OM, P, PA, PE, S, SG) | 35% |

The classification for which it is claimed that the PC50 supermodules are properly dutiable is HTSUS 8405.10.00/Free, which provides as follows:

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 8405.10.00 | 00 | Producer gas or water gas generators, with or without their purifiers; acetylene gas generators and similar water process gas generators, with or without their purifiers | No. | Free[1/] | | 45% |

The following provisions of the GRIs and HTSUS Section Notes are pertinent to the classification of the PC50 supermodules:

GRI 1:

> The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions:

GRI 2(a):

> Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article. It shall also include a reference to that article complete or finished (or failing to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.

GRI 3(a)-(b):

> When, by application of Rule 2(b) or for any other reason, goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows:

> (a) The heading which provides the most specific description shall be preferred to the headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.
>
> (b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

HTSUS Section XVI, Note 2(a):

> Subject to note 1 to this section, note 1 to chapter 84 and to note 1 to chapter 85, parts of machines (not being parts of the articles of heading 8484, 8544, 8545, 8546 or 8547) are to be classified according to the following rules:
>
> (a) Parts which are goods included in any of the headings of chapter 84 or 85 (other than headings 8409, 8431, 8448, 8466, 8473, 8487, 8503, 8522, 8529, 8538 and 8548) are in all cases to be classified in their respective headings….

## QUESTIONS PRESENTED

1. Whether the imported PC50 supermodules are properly classifiable under HTSUS 8405.10.00?

2. Whether CBP's classification of the imported PC50 supermodules under HTSUS 8503.00.95 in the January 9, 2020 Notice of Action was wrong as a matter of law?

## STATEMENT OF FACTS

HyAxiom is a U.S.-based manufacturer of hydrogen fuel cell generators. SMF ¶ 1. A hydrogen fuel cell generator is a machine that uses hydrogen as a fuel to produce electricity. *Id.* HyAxiom began manufacturing stationary hydrogen fuel cell generators in the United States

after it acquired the assets of United Technologies Corporation ("UTC") Power during the bankruptcy proceedings of ClearEdge Power in July 2014. *Id.* ¶ 2. HyAxiom manufactures a stationary fuel cell generator known as the PureCell® Model 400 powerplant at its facility in Connecticut. *Id.* ¶¶ 3, 57, 59. The design of the PureCell® Model 400 powerplant is based on the design of the PureCell® Model 200 powerplant that was previously manufactured by a division of UTC Power, Carrier Corporation. *Id.* ¶ 3.

In order to manufacture the PureCell® Model 400 powerplant in the United States, HyAxiom imports the PC50 supermodule. *Id.* ¶ 5. The PC50 supermodule consists of the SMR welded together with other components (*i.e.*, the ILS, TMS/WTS, APS and frame), all of which are designed to generate and/or support the generation of hydrogen-rich water gas, which is the fuel used by the PureCell® Model 400 to generate electricity. *See id.* ¶¶ 29-58. Not included in the PC50 supermodule in its imported state are several key components that are essential for the generation of electricity, including the fuel cell stacks, the ESM, and the blower. *Id.* ¶¶ 59-60. Those additional components are installed at HyAxiom's facility in Connecticut after the PC50 supermodule is imported. *Id.* ¶¶ 57, 59-60.

On November 2, 2018, HyAxiom imported two PC50 supermodules under Entry No. CWL-2016022-3. *Id.* ¶ 61. Consistent with its company practice, including how it previously entered the PC50 supermodules since it began importing them in February 2015, HyAxiom entered the two PC50 supermodules under HTSUS No. 8405.10.00. *Id.* ¶ 64.

On January 4, 2019, CBP issued a CF-28 Request for Information to HyAxiom with respect to Entry No. CWL-2016022-3, requesting "[d]escriptive or illustrative literature or information explaining what the merchandise is, where and how it is used, and exactly how it operates." *Id.* ¶ 65. HyAxiom complied by providing a description of the PC50 supermodule that

explained that the PC50 supermodule is designed "to deliver hydrogen" for stationary power generation and "contains a fuel processing system for converting natural gas to hydrogen" for that purpose. *Id.* ¶ 67.

On June 4, 2019, CBP issued a CF-29 Proposed Notice of Action to HyAxiom with respect to Entry No. CWL-2016022-3, initially proposing to classify the PC50 supermodules under HTSUS heading 8502.20 / 2% – a heading that CBP now concedes was inapplicable to the imported merchandise.[5] *Id.* ¶¶ 69-70, 72. HyAxiom responded to the Proposed Notice of Action and CBP's questions related to the subject entry by submitting additional information regarding the function and contents of the PC50 supermodule. *Id.* ¶¶ 73-75, 81-90. The information HyAxiom submitted again explained that the primary function of the PC50 supermodule is "for converting natural gas to hydrogen," [REDACTED] *Id.* It is undisputed in this action that $CO + 3H_2$ (*i.e.*, carbon monoxide plus hydrogen) is a water gas. *Id.* ¶ 6. Notwithstanding the information submitted by HyAxiom in support of the classification as entered, CBP issued a Notice of Action dated January 9, 2020 that misclassified the PC50 supermodule under HTSUS 8503.00.95/3%. *Id.* ¶ 106.

On April 30, 2020, HyAxiom timely protested the Notice of Action. *Id.* ¶ 110. HyAxiom's protest explained that the "PC50 supermodule, as imported, is a gas generator that converts natural gas and steam into a water gas that is mostly hydrogen." *Id.* ¶ 111. HyAxiom further explained why CBP's proposed reclassification of the PC50 supermodule under HTS

---

[5] Because neither party contends HTS 8502 applies to the classification of the subject supermodule, it is not pertinent to the resolution of this dispute.

8503 is incorrect and how, under the mandatory GRIs and HTS Section XVI, Note 2(a), the PC50 supermodule is properly classifiable under HTS 8405 on the grounds that the supermodule has the "essential character" of a water gas generator. *Id.* ¶ 113. In addition, HyAxiom described how the PC50 supermodule is functionally equivalent to the PC25 reformer module at issue in classification ruling letter New York ("NY") 854572 (July 26, 1990), which classified the PC25 reformer module under HTS 8405. *Id.*

NY 854572 was issued by CBP on July 26, 1990 to Carrier Corporation, which at that time was a division of UTC Power. *Id.* ¶ 21. UTC Power was later acquired by HyAxiom. *Id.* ¶ 2. NY 854572 involved the classification of two parts of a stationary hydrogen fuel cell powerplant manufactured by UTC Power known as the PureCell® Model 200 powerplant, which also was known at the time of the ruling as the PC25 powerplant. *See id.* ¶¶ 17-23. One of the articles considered in NY 854572 was the steam methane reformer module, which is described in the ruling letter as "the unit that converts natural gas and steam into a gas that is mostly Hydrogen." *Id.* ¶ 24. NY 854572 classified the PC25 reformer module under HTSUS 8405.10.00. *Id.*

With the exception of some enhancements designed to accommodate the greater generating power of the PureCell® Model 400 powerplant, and a few cost reduction and lifespan efficiency improvements, the SMR in the PC50 supermodule is identical to the SMR module at issue in NY 854572. *See id.* ¶¶ 18, 28. In addition, the PC50 SMR performs the same primary function as the PC25 SMR – namely, generating a hydrogen-rich water gas through the process of steam methane reforming for use as fuel by the fuel cells (which are installed only post-importation) in a hydrogen fuel cell generator. *See id.* ¶ 27a-b. Despite the functional equivalence of the PC25 SMR and the PC50 SMR, however, CBP denied the protest on August

18, 2020, and reaffirmed its reclassification of the PC50 supermodule under HTS heading 8503. *Id.* ¶ 141.

CBP does not dispute that (1) "[t]he steam methane reformer in the FPS produces the chemical reactions to convert steam and natural gas into a water gas," or that (2) as imported, the PC50 supermodule is missing key components that are essential to the generation of electricity, including the fuel cell stacks, the ESM, and the blower. *Id.* ¶¶ 29a, 32, 71, 79, 104. Yet, CBP has persisted in misclassifying the PC50 supermodule as a "part" of an electrical generator under HTS 8503 instead of as an incomplete or unfinished article possessing the "essential character" of a water gas generator under HTS 8405, as the GRIs require. *Id.* ¶¶ 95-96, 100, 106, 127, 136, 140-41.

## SUMMARY OF THE ARGUMENT

Because this action arises under the HTSUS, classification of the subject supermodules is governed by the GRIs, which are applied in numerical order. *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1163 (Fed. Cir. 2017). GRI 1 instructs that "classification shall be determined according to the terms of the headings and any relative section … notes…." Here, there is a section note directly relevant to the classification of the PC50 supermodule: Section XVI, Note 2(a).

Section XVI, Note 2(a) requires that "[p]arts which are goods included in any of the headings of chapter 84 or 85 (other than headings 8409, 8431, 8448, 8466, 8473, 8487, 8503, 8522, 8529, 8538 and 8548) are in all cases to be classified in their respective headings…." Thus, even if an article could be included under HTS heading 8503, provided that the article also falls under a Chapter 84 or 85 heading "other than" HTS 8503, then Section XVI, Note 2(a)

requires that article to be classified under that other heading "***in all cases***."[6] (Emphasis added). Thus, as applied to the instant case, if the PC50 supermodule falls within a Chapter 84 or 85 heading (here, it falls within heading 8405), then it must be classified within heading 8405 even if it could also be classified more specifically as a part of a machine under heading 8503. As stated by the U.S. Court of Appeals for the Federal Circuit, when an article "falls under an appropriate general heading" of Chapter 84 (such as HTS 8405), it must in all cases be classified under that heading, "***even if it could also be classified more specifically as part of a machine***" under HTS 8503. *Mitsubishi Int'l Corp. v. United States*, 182 F.3d 884, 887 (Fed. Cir. 1999) (emphasis added).

The PC50 supermodule is "included" in HTS 8405 for purposes of Section XVI, Note 2(a). HTS heading 8405 covers, *inter alia*, "water gas generators, with or without their purifiers…." And it is undisputed that HTS heading 8405 is an *eo nomine* heading. SMF ¶¶ 8-9. Accordingly, *all* water gas generators are "included" in HTS 8405, *regardless* of the form they may take. *Nidec Corp. v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995) (holding that, "[a]bsent limiting language or indicia of contrary legislative intent," an *eo nomine* heading "covers all forms of the article"). In addition, GRI 2(a) provides that "[a]ny reference in a heading to an article shall be taken *to include* a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article." (Emphasis added). Thus, an incomplete or unfinished article having the "essential character" of a water gas generator is "included" in HTS 8405.

---

[6] *See* Explanatory Notes to Section XVI, Note (II) Parts (Section Note 2) (*see* Exhibit C.15 at 3-4); *see also* Section II.A, *infra*.

**Protected Information Redacted**

Here, the PC50 supermodule – while it cannot generate water gas in its imported state – nonetheless has the "essential character" of a complete or finished water gas generator. The SMR is the most important and indispensable component of the PC50 supermodule. SMF ¶ 31. The primary function of the SMR is to generate water gas. *Id.* ¶¶ 31-33. The SMR performs this function by [REDACTED] *Id.* This primary function of the SMR is not subject to any genuine dispute of material fact, having been admitted to by the Government in its interrogatory answers.[7] *Id.* ¶ 29a (quoting Defendant's Response to Interrogatory No. 1, which states: "'The steam methane reformer in the FPS produces the chemical reactions to convert steam and natural gas into a water gas.'"). Thus, the supermodule's "essential character," imparted upon it by its most indispensable component (*i.e.*, the SMR), is of a water gas generator under HTS 8405.

While the PC50 supermodule includes components other than the SMR, that does not negate the "essential character" of the supermodule as a water gas generator. As provided in the Explanatory Notes to HTS 8405 [hereafter, "EN 84.05"], which guide interpretation of the scope of the heading,[8] "purifiers and other auxiliary apparatus[es]" that are fitted to water gas generators "are classified with the generators when presented therewith, provided they are clearly suitable for use together." (Emphasis omitted). Here, each additional component of the

[7] *See, e.g.*, *Home Depot v. United States*, 435 F. Supp. 3d 1311, 1333-34 (CIT 2020) (holding answers to interrogatories may be relied upon as admissions by party-opponent for purposes of summary judgment).

[8] *See Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994).

PC50 supermodule is presented with the SMR, and is clearly suitable for use with the SMR, because they perform purifying or other auxiliary functions to support the SMR's water gas generation function:

- The ILS [redacted] SMF ¶ 41. In addition, the ILS [redacted] through the water gas shift reaction. *Id.* ¶ 42. Further, the ILS's [redacted] *See id.* ¶¶ 47-48.

- The TMS/WTS [redacted] *Id.* ¶¶ 49-50. The TMS also [redacted] while the WTS [redacted] *Id.* ¶¶ 51-53.

- The APS pipes and sensors contained in the PC50 supermodule [redacted] *Id.* ¶¶ 54-56.

- The frame provides structural support and prevents damage to the supermodule during transportation. *Id.* ¶¶ 57-58.

Therefore, because the PC50 supermodule has the "essential character" of a water gas generator in its imported state, GRI 1 and Section XVI, Note 2(a) require classifying the subject PC50 supermodule under HTS heading 8405. CBP's reclassification under HTS 8503 fails to apply the GRIs properly, relying instead upon several unsupported rationales as to why the PC50 supermodules are not included in HTS 8405. Each rationale, however, fails as a matter of law:

First, CBP's stated rationale that the PC50 supermodule is an incomplete fuel cell generator (SMF ¶¶ 100, 140) is incorrect because, as explained above and in more detail in Section II below, the PC50 supermodule in its imported state possesses the "essential character" of a water gas generator, not an electrical generator. Indeed, it is undisputed that several key components necessary for the generation of electricity – including, most significantly, the fuel cell stacks, which CBP previously determined have the "essential character" of a completed fuel cell generator – are not present in the PC50 supermodule in its imported state. *Id.* ¶¶ 60, 74, 84, 102, 104; NY E86434, 1 (Sept. 20, 1999) (*available at* https://rulings.cbp.gov/ruling/E86434) ("In the opinion of this office, the [fuel cell] stack has the essential character of the completed fuel cell power plant.") (*see* Exhibit C.9 at 10).

Second, CBP's reliance upon EN 84.05 to exclude the PC50 supermodule from HTS 8405 (SMF ¶¶ 96, 98, 127-28) requires an incorrect interpretation of the Explanatory Notes and ignores the fact that HTS 8405 is an *eo nomine* heading. *See id.* ¶¶ 8-9. Thus, by operation of GRI 2(a), HTS 8405 covers all forms of incomplete or unfinished water gas generators, such that the PC50 supermodule is therefore properly classified under HTS 8405.

Third, CBP's reliance upon the subsequent use of the PC50 supermodule in the completed PureCell® Model 400 powerplant post-importation (*see id.* ¶ 131) improperly reads a use limitation into HTS 8405 where one does not exist; fails to give effect to GRI 1 and Section

XVI, Note 2(a), even though their application is mandatory; and seeks to apply the defunct "more than" doctrine, even though that doctrine has been "supplanted by the GRIs." *JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1353 (Fed. Cir. 2000).

Consequently, CBP's reclassification under HTS 8503 is incorrect as a matter of law and the correct classification of the PC50 supermodules is under heading HTS 8405. Therefore, HyAxiom's Motion should be granted, and judgment should be entered in HyAxiom's favor on Count I of the FAC.

## ARGUMENT

### I. STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In tariff classification cases, "summary judgment is appropriate when there is no genuine dispute of … what the merchandise is." *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998). Where there are no material facts of genuine dispute surrounding what the merchandise is, classification of the merchandise is a question of law for the Court to decide *de novo*, such that a presumption of correctness does not apply to CBP's classification decision. *See Estee Lauder, Inc. v. United States*, 36 CIT 1, 4, 815 F. Supp. 2d 1287, 1292 (2012) ("Customs' statutory presumption of correctness is irrelevant with regard to classification decisions on summary judgment."). In other words, "the [C]ourt's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand," independent of how CBP may have previously classified the article in question. *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (emphasis in original).

## II. HTS 8405 IS THE CORRECT CLASSIFICATION OF THE PC50 SUPERMODULE

### A. GRI 1 And Section XVI, Note 2(a) Mandate That The PC50 Supermodule Be Classified Under HTS 8405, Even If The PC50 Supermodule Also May Be Considered A "Part" Under HTS 8503

This Court utilizes a two-step process in deciding an issue of classification. *Moen Inc. v. United States*, 294 F. Supp. 3d 1337, 1341 (CIT 2018). First, the Court must ascertain the proper meaning of the terms in the tariff provision. *Id*. Second, the Court must determine whether the merchandise at issue falls within the parameters of the tariff provision. *Id*. Where, as here, "'there is no [genuine] dispute [of material fact] as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.''" *Id*. (citations omitted).

In conducting this analysis, the GRIs (applied in numerical order) must govern classification of the PC50 supermodules under the HTSUS. *Moen Inc.*, 294 F. Supp. 3d at 1341. GRI 1 instructs that, "for legal purposes, classification *shall* be determined according to the terms of the headings and any relative section or chapter notes…." (Emphasis added). Thus, to classify the PC50 supermodules under the HTSUS, recourse first must be made to, *inter alia*, any relative section notes. *See Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 926 (Fed. Cir. 2003) ("Section and Chapter Notes are not optional interpretative rules, but are statutory law, codified at 19 U.S.C. § 1202."). To that end, Section XVI, Note 2(a) (under which Chapters 84 and 85 both fall) states that "[p]arts which are goods included in any of the headings of chapter 84 or 85 (other than headings 8409, 8431, 8448, 8466, 8473, 8487, 8503, 8522, 8529, 8538 and 8548) are in all cases to be classified in their respective headings…." As the Federal Circuit held in *Mitsubishi International Corp. v. United States*, 182 F.3d 884 (Fed. Cir. 1999), Section XVI, Note 2(a) – by its plain terms – mandates that an article falling under any heading in Chapter 84

or 85 (*i.e.*, other than as a "part") must be classified under that heading, *even if* that article could more specifically be classified as a "part" of another machine:

> Accordingly, we hold that [Section XVI] Note 2(a) requires a part that falls under an appropriate general heading to be classified under that heading, ***even if it could also be classified more specifically as part of a machine***.

*Id*. at 887 (emphasis added).[9] Thus, even if the supermodules could fall under HTS 8503, if they nonetheless also are "included" under another heading of Chapter 84 or 85, then the supermodules must be classified under that other general heading and not as a "part" under HTS 8503, as directed by Section XVI, Note 2(a).

This interpretation of Section XVI, Note 2(a) is supported by the Explanatory Notes to Section XVI (hereafter, "EN Section XVI"), which the Federal Circuit in *Nidec Corp. v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995), recognized are "'indicative of the scope of the [HTSUS].'" *Id*. (citation omitted) (discussing EN Section XVI with approval). Specifically, the Explanatory Notes state, in relevant part, that while generally "parts which are suitable for use solely or principally with particular machines or apparatus … are classified in the same headings as those machines or apparatus," Section XVI contains "[s]eperate headings [which are]

[9] In reclassifying the PC50 supermodule as a "part" under HTS heading 8503 in the instant case, CBP improperly relied upon *Bauerhin Technologies Ltd. Partnership v. United States*, 100 F.3d 774 (Fed. Cir. 1997), to conduct a "parts" analysis regarding whether the supermodule was a "separate and distinct commercial entity" from the PureCell® Model 400 powerplant. *See* SMF ¶ 140. But CBP ignored a key holding of *Bauerhin*: a "parts" analysis is not applicable where, as here, there is an HTS section or chapter note governing the classification of the merchandise at issue. *See Bauerhin Techs. Ltd. P'ship*, 110 F.3d at 776-78 (holding car seat inserts were properly classifiable under heading 8404 covering "cushions" where Chapter 94, Note 3(b) required that result, "even though a fact finder might conclude that heading 9401 [covering 'parts' of seats of a kind used for motor vehicles] would ordinarily be the better classification for the imported seat inserts").

provided for" certain parts,[10] including, *inter alia*, "[p]arts of the machines of heading 85.01 or 85.02 (heading 85.03)." EN Section XVI (*see* Exhibit C.15 at 3-4). However, the Explanatory Notes continue by stating that "[t]he above rules do **not** apply to parts which in themselves constitute an article covered by a heading of this Section…; these are in all cases classified in their own appropriate heading even if specially designed to work as part of a specific machine." *Id.* at 4 (emphasis in original). Thus, even if the PC50 supermodules could be classified under HTS 8503, if they also are "included" as a good under another heading of Chapter 84 or 85, then Section XVI, Note 2(a), as explained by the Explanatory Notes, mandates that the PC50 supermodules "are in all cases" to be classified under that heading, "even if specially designed to work as part" of a machine of heading HTS 8501. *Id.* That is because, in that scenario, the rule that the supermodules be classified in the "separate heading[] … provided for … [p]arts of the machines of heading 85.01 or 85.02 (heading 85.03)" would "**not** apply." *Id.* (emphasis in original).

For these reasons, Note 2(a) forecloses classification of the supermodule under the "parts" heading 8503 if the supermodule is "included" in heading 8405 (which, as discussed in Section II.B below, the supermodule is). This interpretation of Section XVI, Note 2(a) is not only supported by the Explanatory Notes and Federal Circuit precedent, but is also consistent with how CBP has interpreted the section note in multiple prior classification rulings, including (but not limited to) the following:

- HQ H243584, 4 (May 9, 2016) (classifying radiator and radiator assembly under HTS 8419 because they were "included" in that heading by operation of Section XVI, Note

[10] *I.e.*, "parts" headings that are separate from the headings of the machines of which the articles are "parts."

2(a), thereby making it immaterial that radiator and radiator assembly may eventually be used as "parts" of bulldozers and front-end loaders that otherwise would have fallen under HTS 8431) (*available at* https://rulings.cbp.gov/ruling/H243584) (*see* Exhibit C.16 at 5);

- NY N273793, 1-2 (Apr. 7, 2016) ("The flywheel is a good included in a specific heading of Chapter 84 [*i.e.*, 8483]. Thus, in accordance with Note 2(a) to Section XVI, classification in [heading] 8466 [covering parts of certain machines] … would not be appropriate.") (*available at* https://rulings.cbp.gov/ruling/N273793) (*see* Exhibit C.17 at 2-3); and
- HQ H007677, 4-8 (Dec. 22, 2008) (applying *Nidec* and Section XVI, Note 2(a) to classify blowout preventers as valves "included" under HTS 8481, notwithstanding fact that preventers could also be classified under HTS 8431 as "parts" used principally and solely in connection with oil and gas drilling activity) (*available at* https://rulings.cbp.gov/ruling/H007677) (*see* Exhibit C.18 at 5-9).[11]

Notably, the National Import Specialists ("NISs") who evaluated the PC50 supermodules for classification purposes also utilized this interpretation of Section XVI, Note 2(a). Before classifying the PC50 supermodules as "parts" under HTS 8503, the NISs first eliminated the PC50 supermodules from consideration from any other heading of Chapter 84 or 85, including HTS 8405 (albeit incorrectly, as explained in Section II below). *See* SMF ¶ 140 ("Section 16 Note 2 requires that 'parts' which can be classified in a specific heading under Chapters 84 and 85 are, in all cases, to be classified in their respective headings. If the 'part' cannot be classified

[11] Prior classification rulings are afforded "a measure of deference proportional to [their] 'power to persuade.'" *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1354 (Fed. Cir. 2003); *see also* SMF ¶¶ 25-26.

in a specific heading describing the article, then it is to be classified as a part of the machine for which it is principally used. Thus, if heading[] 8405 … [is] not [an] appropriate classification[], and the PC50 Supermodule satisfies the prerequisites for consideration as a 'part', Section 16 Note 2(b) instructs us to classify the machine as a part under heading 8503."); *see also id.* ¶ 115.[12]

Consequently, before the PC50 supermodules may be classified as "parts" under HTS 8503, it must first be determined whether the supermodules are "included" under another heading of Chapter 84 or 85. And, as discussed below, when the proper meaning of HTS 8405 is applied to the undisputed facts as an *eo nomine* heading, which, by operation of GRI 2(a), includes all forms of incomplete or unfinished water gas generators, the proper classification of the PC50 supermodules becomes clear: they are classifiable under HTS 8405, *regardless* of whether they also may be classified as "parts" under HTS 8503. *See Mitsubishi Int'l Corp.*, 182 F.3d at 887.

### B. The PC50 Supermodule Is "Included" In HTS Heading 8405 Because The Heading Is *Eo Nomine* And Because The PC50 Supermodule Has The "Essential Character" Of A Water Gas Generator Under GRI 2(a)

HTS heading 8405 covers, *inter alia*, "water gas generators, with or without their purifiers…." The heading is an *eo nomine* heading, which is defined as a heading which "describes a commodity by specific name, usually one common in commerce." *Nidec Corp.*, 68

---

[12] *But see ENI Tech., Inc. v. United States*, 33 CIT 1219, 1231, 614 F. Supp. 2d 1337, 1350 (2009) (adopting alternative interpretation of Section XVI, Note 2(a) as requiring parts included in the "other than" headings to always be classified as such under Note 2(b)). HyAxiom respectfully submits that the alternative interpretation in *ENI Technology, Inc*. is incorrect because it is inconsistent with (1) the plain language of the section note; (2) Federal Circuit precedent in *Nidec* and *Mitsubishi*; (3) EN Section XVI; and (4) CBP's prior classification rulings. In any event, *ENI Technology* is not binding upon this Court. *See Gerber Food (Yunnan) Co. v. United States*, 33 CIT 186, 196, 601 F. Supp. 2d 1370, 1380 (CIT 2009) (holding USCIT opinions are not binding in other USCIT cases).

F.3d at 1336; *see also* SMF ¶ 8 ("'Q. Do you consider HTS 8405 to be an *eo nomine* designation? A. Yes. Q. Why is that? A. Because the heading specifically provides for producer gas or water gas generators.'") (quoting deposition of NIS Huang, who was responsible for HTS 8405 when HyAxiom's protest was considered and denied); *id.* ¶ 9 ("'[T]he heading does provide for what it says, producer or water gas generators.'") (quoting deposition of NIS Martinez, who was responsible for HTS 8405 when the January 9, 2020 Notice of Action was issued).

"Absent limiting language or indicia of contrary legislative intent, [an *eo nomine* heading] covers all forms of the article." *Nidec Corp.*, 68 F.3d at 1336 (holding heading was *eo nomine* where "[n]othing in the language or legislative history of HTSUS or this heading limits the scope of the provision"). Here, heading 8405 describes water gas generators by name. Moreover, nothing in the language of heading 8405 limits the scope of the provision to a particular form of water gas generators, and there is no legislative history indicating Congress intended to so limit the scope of the provision.[13] As a result, HTS heading 8405 is an *eo nomine* heading. Thus, provided that an article falls within the description of "water gas generators" as that term is used in heading 8405, then that article is "*included*" under heading 8405 for purposes of Section XVI, Note 2(a), regardless of whatever form of water gas generator that article may be, and regardless of whether that article "could also be classified as a part of another product." *See Nidec Corp.*, 68 F.3d at 1336 (applying Section XVI, Note 2(a) to classify the subject article under an *eo nomine* heading despite the fact that the article could also be classified as a part of another product).

---

[13] While CBP has argued (incorrectly) that EN 84.05 limits the scope of HTS 8405 to a particular form of water gas generators (*see* Section III.B, *infra*), the Explanatory Notes are guidance only and "do not constitute controlling legislative history…." *Mita Copystar Am.*, 21 F.3d at 1082.

In addition, GRI 2(a) provides that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article." *See Airflow Tech., Inc. v. United States*, 35 CIT 1540, 1563, 804 F. Supp. 2d 1292, 1311 (2011) ("GRI 2(a) essentially functions to expand the scope of any GRI 1 analysis to include certain unfinished articles."). Accordingly, provided that an incomplete or unfinished article has the "essential character" of a water gas generator as entered, then that article is "*included*" in HTS 8405 for purposes of Section XVI, Note 2(a). *See, e.g.*, HQ 956226, 2-3 (Sept. 13, 1994) (applying GRI 2(a) to classify unfinished article as a microwave oven rather than as a "part" of a cooking stove, because by "having the essential character of a complete or finished microwave oven," the article was included in the heading for microwave ovens under Section XVI, Note 2(a), thereby "obviat[ing] any discussion of an alternative parts claim") (*available at* https://rulings.cbp.gov/ruling/956226).

As discussed below, the PC50 supermodule falls under HTS heading 8405 because, while it may not be able to function as a water gas generator upon entry, it nonetheless possesses the "essential character" of a water gas generator in its imported state. Thus, the PC50 supermodule is "*included*" in *eo nomine* heading HTS 8405 for purposes of Section XVI, Note 2(a), notwithstanding its particular form as a "supermodule" comprised of multiple components.

**1. The Primary Function Of The Steam Methane Reformer Is To Generate Water Gas**

"The 'essential character' of an article is 'that which is indispensable to the structure, core or condition of the article, *i.e.*, what it is.'" *Amcor Flexibles Singen Gmbh v. United States*, 425 F. Supp. 3d 1287, 1303 (CIT 2020) (applying GRI 3(b), which like GRI 2(a), also requires classification based on an article's "essential character"); *see also* HQ H135337, 5 (May 20,

2011) ("The longstanding position of CBP is that the term 'essential character' for purposes of GRI 2(a) means the attribute which strongly marks or serves to distinguish what an article is; that which is indispensable to the structure, core or condition of the article.") (*available at* https://rulings.cbp.gov/ruling/H135337).[14] "The essential character for purposes of GRI 2(a) is determined on a case-by-case basis based on the nature of a given article." HQ H135337, *supra*, at 5; *accord. Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1365 (Fed. Cir. 2011) (recognizing "'essential character'" test requires "a fact-intensive analysis" that "'will vary as between different kinds of goods'") (citations omitted).

Here, the most important and indispensable component of the PC50 supermodule is the steam methane reformer. SMF ¶ 31. The Government admitted in its interrogatory answers that

---

[14] *But see Pomeroy Collection, Ltd. v. United States*, 32 CIT 526, 539 n.14, 559 F. Supp. 2d 1374, 1387 n.14 (2008) (noting "there is relatively little caselaw concerning the concept of 'essential character' for purposes of GRI 2(a)," but that the caselaw that does exist articulates conflicting tests, including whether imported article has "ability" to perform same function as completed article and whether identity of completed article to be made from imported article is "fixed and certain" at time of importation). However, the caselaw identified in *Pomeroy* involved classifications of goods that are very different from the PC50 supermodules at issue here. The Court's decision in *Filmtec Corp. v. United States*, 27 CIT 1730, 1734-37, 293 F. Supp. 2d 1364, 1368-69 (2003), applied an "ability" test and involved whether the article at issue fell under an HTS heading covering articles with particular uses. As discussed in Section III.C, *infra*, heading 8405 does not have a use limitation. Likewise, *Sharp Microelectronics Technology, Inc. v. United States*, 20 CIT 793, 800-01, 932 F. Supp. 1499, 1504-05 (1996), is inapposite. There, the Court did not necessarily limit the application of GRI 2(a) to only those articles that have the "ability" to function as their completed counterparts. Indeed, the Court expressly recognized that "'an article need not have stand-alone capability to be classified under an *eo nomine* provision that describes it.'" *Id.* (citation omitted). Rather, the issue in that case was whether display glass had the "essential character" of a completed automatic data processing ("ADP") machine, which the Court held it did not because the display glass lacked a number of different components necessary for a completed ADP machine to process data. *Id.* Here, by contrast, and as discussed in this section below, the PC50 supermodules contain the componentry necessary for the generation of water gas. Finally, the "fixed and certain" test announced in *Baxter Healthcare Corp. v. United States*, 22 CIT 82, 97, 998 F. Supp. 1133, 1145 (1998), applies to a particular type of merchandise only – textile materials. The PC50 supermodules are not textile materials, and the factors that create the essential character of textile materials would be inapposite to identifying the essential character of machines such as the supermodule.

"'[t]he steam methane reformer in the FPS produces the chemical reactions to convert steam and natural gas into a water gas.'" *Id.* ¶ 32 (quoting Def.'s Resp. to Interrog. No. 1). This undisputed function is essential to the PC50 supermodule, because without the reaction that occurs within the SMR, the PC50 supermodule would be unable to perform its primary function of generating hydrogen-rich water gas. *Id.* ¶ 31. [REDACTED] *Id.* ¶ 33. Thus, the gas generated by the SMR fits squarely within the definition of "water gas" in EN 84.05 – *i.e.*, "a mixture of hydrogen and carbon monoxide … having a higher heating power than producer gas."[15] *Id.* ¶ 6; *see Mita Copystar Am.*, 21 F.3d at 1082 (recognizing that Explanatory Notes provide guidance in interpreting scope of HTSUS subheadings); *see also Cont'l Auto. Sys., Inc. v. United States*, 589 F. Supp. 3d 1215, 1224 (CIT 2022) ("Generally, definitions in the ENs are more persuasive than dictionary definitions….").

While the PC50 supermodule may not be able to perform its water gas generating function in its imported state (because it requires, among other things, a natural gas source), that does not negate the fact that the SMR nonetheless performs the essential function of generating a water gas, and thus imparts upon the PC50 supermodule the "essential character" of a completed water gas generator. *See id.* ¶¶ 31-39. Specifically, the SMR in the imported PC50 supermodule contains [REDACTED] which is required for the primary water gas reaction to occur. *Id.* ¶¶ 33-34. In addition, the SMR in the imported supermodule contains [REDACTED]

[15] A copy of EN 84.05 is attached as Exhibit C.14. Because it contains more hydrogen than producer gas, the resultant gas generated in the SMR has a higher heating power than producer gas. SMF ¶ 35.

[redacted] *See id.* ¶¶ 34, 36-39. Thus, because the SMR forms the core of the PC50 supermodule and is designed to generate water gas, the PC50 supermodule has the "essential character" of a water gas generator, even though it is unfinished or incomplete in its imported state. *See* GRI 2(a).

The conclusion that the PC50 supermodule has the "essential character" of a water gas generator is supported further by NY 854572 (attached as Exhibit C.13). In that ruling, CBP classified the PC25 reformer module imported by HyAxiom's predecessor company under HTS 8405, even though that module (like the supermodule at issue here) could not generate water gas in its imported state. *See* SMF ¶¶ 17-28. Accordingly, CBP could have only found the PC25 reformer module classifiable under HTS 8405 as an incomplete or unfinished water gas generator pursuant to a GRI 2(a) analysis. Similar to the PC25 reformer module, the subject PC50 supermodule contains the componentry necessary for "'convert[ing] natural gas and steam into a gas that is mostly Hydrogen'" (*id.* ¶ 24, 111) (citations omitted), including an SMR that is nearly identical to the one evaluated by CBP in NY 854572. *See id.* ¶¶ 17-28.

Therefore, like the PC25 reformer module in NY 854572, the PC50 supermodule has the "essential character" of a water gas generator despite being unfinished or incomplete. And because unfinished or incomplete water gas generators are "included" *eo nomine* in HTS 8405 by operation of GRI 2(a), the subject PC50 supermodules are properly classifiable under that heading in accordance with Section XVI, Note 2(a)'s mandate that "[p]arts which are goods included in any of the headings of chapter 84 … are *in all cases* to be classified in their respective headings…." (Emphasis added).

**2. The Other Components Of The PC50 Supermodule Support The Water Gas Generation Function Of The Steam Methane Reformer And Thus Are Cleary Suitable For Use Together With The Reformer**

While it is undisputed that the PC50 supermodule contains a "'steam methane reformer [which] produces the chemical reactions to convert steam and natural gas into a water gas" (SMF ¶ 32) (citation omitted), it also contains other components in its imported state that support the water gas generating function of the SMR. *See id.* ¶ 29. However, these other components do not preclude the supermodule from possessing the "essential character" of a water gas generator. That is because HTS 8405 is an *eo nomine* heading covering all forms of water gas generators. As a result, an article presented with multiple components may still fall under that heading, provided the components support the generation of water gas, as EN 84.05 (which provides guidance on how to interpret HTS 8405[16]) expressly recognizes:

> For certain uses, … producer or water gases must be cleaned of impurities such as dust, tars, sulphurous[[17]] compounds, etc., and sometimes reheated or cooled. For this purpose, the generators are often fitted with purifiers … , coolers, dryers, reheaters, etc. Such purifiers and other auxiliary apparatus are classified with the generators when presented therewith, provided they are clearly suitable for use together.

(Emphasis omitted).

Thus, as long as components performing purifying or other auxiliary[18] functions are (1) presented with producer or water gas generating components and (2) are clearly suitable for use

[16] *See Mita Copystar Am.*, 21 F.3d at 1082.

[17] "Sulphurous" is the United Kingdom spelling of sulfurous. *See* "Sulphurous," CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/sulphurous (last visited December 6, 2022) (attached as Exhibit C.22).

[18] "Auxiliary" means "offering or providing help[;] functioning in a subsidiary capacity." "Auxiliary," MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/auxiliary (last visited December 6, 2022) (attached as Exhibit C.5); *see also* SMF ¶ 129.

together with those components, then the subject merchandise is included in HTS 8405. *See, e.g.*, NY J81394, 1 (Feb. 28, 2003) (classifying gasifier system as a producer gas generator under HTS 8405 even though system "also include[d] cleanup or purification equipment" that did not generate but rather supported generation of producer gas) (*available at* https://rulings.cbp.gov/ruling/J81394). Here, as set forth below, each of the other components of the PC50 supermodule satisfies the criteria of HTS 8405 because they support the water gas generating function of the SMR, with which they are presented at entry.

### a. Integrated Low Shift Reactor

The ILS in the PC50 supermodule is clearly suitable for use together with the SMR because it supports the SMR's water gas generating function in multiple ways.

First, the ILS [redacted] SMF ¶¶ 36, 41, 87-88; *see also* EN 84.05 (identifying purifiers which clean "impurities such as … *sulphurous compounds*" as examples of components that may be "clearly suitable for use together" with water gas generating components for classification under HTS 8405) (emphasis added).

Second, the ILS [redacted] through a process known as the water gas shift reaction.[19] SMF ¶ 42.

---

[19] Notably, the water gas shift reaction occurring in the ILS does not eliminate all water gas from the gaseous mixture generated by the SMR. SMF ¶¶ 42-46. Instead, as its name implies, the reaction adjusts or "shifts" the ratio of hydrogen and carbon monoxide in the water gas to generate a more hydrogen-rich, purified fuel gas for use in the fuel cell stacks of the completed PureCell® Model 400 powerplant. *See id.* Thus, [redacted] some water gas remains because not all carbon monoxide is eliminated from the reformed gas. *See id.* In any event, the undisputed fact remains that [redacted] in the SMR generates water gas. *Id.* ¶ 32. As EN 84.05 recognizes, the purifying functions performed by the ILS in connection with that water gas do not remove the supermodules from classification under HTS 8405.

Third, because the water gas shift reaction [REDACTED], the ILS includes [REDACTED] *Id.* ¶ 47. [REDACTED] *See* EN 84.05 (stating water gas generators "are often fitted with … *coolers*," and identifying such coolers as examples of components that may be "clearly suitable for use together" with water gas generating components for classification under HTS 8405).

Finally, the ILS contains [REDACTED] SMF ¶ 48.

**b. Thermal Management System / Water Treatment System**

The TMS and WTS are [REDACTED] SMF ¶¶ 49-50. [REDACTED] *Id.* ¶ 49; *see also* EN 84.05 (stating that water gases must "sometimes [be] reheated or cooled," and identifying "coolers, … reheaters, etc.," as examples of components that may be "clearly suitable for use together" with water gas generating components for classification under HTS 8405). In addition, the TMS is clearly suitable for use together with the SMR because [REDACTED] *Id.* ¶ 51. [REDACTED] *Id.* The WTS also is clearly suitable for use together with the SMR because [REDACTED]

[REDACTED] *Id.* ¶ 52. [REDACTED] [REDACTED] *See id.* ¶¶ 38-39, 53.

**c. Air Processing System**

The APS [REDACTED] *See* SMF ¶¶ 54-55. The APS components included in the PC50 supermodule as imported are the pipes and sensors of the APS without the blower, which is integrated post-importation. *Id.* ¶ 56. [REDACTED] *Id.* Because the SMR forms the core of the FPS (*see id.* ¶ 32), these APS components are clearly suitable for use together with the SMR.

**d. Frame**

Finally, the frame of the PC50 supermodule is clearly suitable for use together with the SMR because it provides a support structure for the supermodule components to prevent them from damage during transportation.[20] SMF ¶¶ 57-58.

* * *

Accordingly, as demonstrated above, the PC50 supermodule has the "essential character" of a water gas generator because the primary function of its most important and indispensable component – the steam methane reformer – is to generate water gas. Each of the remaining components of the supermodule are clearly suitable for use together with the SMR because they support the water gas generation function performed by the SMR, either by purifying the gas, adjusting the temperature of the gas, or performing another related auxiliary function.

---

[20] The PC25 reformer module at issue in NY 854572 also included a frame that provided structural support and prevented damage during transportation, albeit for a single module instead of a supermodule. SMF ¶ 27c; *see also* Section II.B.1, *supra*.

Consequently, the PC50 supermodule is included in HTS 8405 by operation of GRI 2(a) and must be classified under that heading pursuant to Section XVI, Note 2(a). Therefore, summary judgment should be granted in HyAxiom's favor on Count I of the FAC.

## III. CBP'S CLASSIFICATION OF THE PC50 SUPERMODULE UNDER HTS 8503 IS WRONG AS A MATTER OF LAW

As demonstrated above, the PC50 supermodule is properly classifiable under HTS 8405 as an incomplete or unfinished water gas generator based on an analysis of the GRIs to the undisputed facts. In evaluating the PC50 supermodule, however, CBP misclassified the PC50 supermodule under HTS 8503, bypassing Section XVI, Note 2(a)'s mandate that "goods included in any of the headings of chapter 84 … are *in all cases* to be classified in their respective headings" (emphasis added), and conducting an improper "parts" analysis instead. CBP arrived at this result by improperly ruling out HTS 8405 for the supermodule and settling on HTS 8503 by default. *See* SMF ¶¶ 78-107, 116-42. But as discussed below, none of the rationales relied upon by CBP in excluding the PC50 supermodule from HTS 8405 and classifying it under HTS 8503 instead have any merit. Therefore, because CBP's alternate classification of the supermodule under HTS 8503 is wrong as a matter of law, summary judgment should be entered in HyAxiom's favor.

### A. The PC50 Supermodule Is Not An Incomplete Fuel Cell Generator Or Similar To The "Generator Unit" In NY E86434 Because The Supermodule Lacks The "Essential Character" Of A Fuel Cell Generator

In classifying the PC50 supermodule under HTS 8503, CBP stated that the PC50 supermodule "can be described as an incomplete fuel cell generator." SMF ¶ 100; *see also id.* ¶ 140. But the PC50 supermodule is not an incomplete fuel cell generator because it lacks the component which gives a fuel cell generator its "essential character" – namely, the fuel cell stack. *See id.* ¶¶ 102, 104. Indeed, that is exactly what CBP held in classifying a fuel cell stack

under HTS 8501: "In the opinion of this office, the stack has the essential character of the completed fuel cell power plant." NY E86434, *supra*, at 1-2 (*see* Exhibit C.9 at 10-11).[21] A fuel cell stack is a stack of fuel cells, which are devices used for the generation of electricity that consist of a negative electrode (or anode) and a positive electrode (or cathode) sandwiched around an electrolyte. SMF ¶ 60a. While the fuel cell stacks are the heart of HyAxiom's completed PureCell® Model 400 powerplant and are essential to the generation of electricity, they are installed *only after* the PC50 supermodule is imported and arrives at HyAxiom's manufacturing facility in Connecticut. *Id.* ¶¶ 59, 60a. CBP does not dispute that the PC50 supermodule, as imported, contains no fuel cell stacks. *See id.* ¶¶ 79, 91, 104. Thus, CBP's description of the supermodule as an incomplete fuel cell powerplant to rationalize its decision to classify the supermodule under HTS 8503 is wrong as a matter of law.

Nevertheless, CBP maintains that "'the PC50 supermodule is similar in function to the generator unit that was classified in NY E86434 under heading 8503, HTSUS.'" *Id.* ¶ 103 (citation omitted). However, the "generator unit" in NY E86434 was an "enclosed unit" that consisted of every other component of the P2B Proton Exchange Membrane Fuel Cell powerplant except the fuel cell stack. *Id.* ¶ 105. Accordingly, the "generator unit" in NY E86434 would have included an electrical system and a blower. *Id.* The PC50 supermodule, by contrast, is missing these key components for the generation of electricity. *Id.* ¶¶ 60b-c, 105. [redacted]

[21] In addition to being wrong as a matter of law, CBP's characterization of the PC50 supermodule as an incomplete fuel cell powerplant to classify it under HTS 8503 makes no sense. Applying GRI 2(a), the proper classification of an incomplete fuel cell powerplant would be HTS 8501 (covering electrical generators), *not* HTS 8503 (covering parts of electrical generators). *See* NY E86434, *supra*, at 1-2 (Exhibit C.9 at 10-11).

[REDACTED] *Id.* ¶ 60b. [REDACTED]

[REDACTED] *Id.* ¶ 60c.

While these components may be essential to the generation of electricity, they (like the fuel cell stacks) are installed *only after* the PC50 supermodule is imported and arrives at HyAxiom's facility in Connecticut. *Id.* ¶¶ 57, 59-60. CBP does not dispute that the PC50 supermodule, as imported, does not contain the ESM or the blower. *See id.* ¶¶ 59, 60b-c, 79, 104. Consequently, CBP's attempt to rely upon NY E86434's classification of a "generator unit" that (unlike the subject supermodules) included these components is misplaced. *See, e.g.*, *Arko Foods Int'l, Inc. v. United States*, 33 CIT 1891, 1900-01, 679 F. Supp. 2d 1369, 1378 (2009) (rejecting CBP's reliance upon ruling letter to classify article where article differed significantly from merchandise at issue in letter).

### B. CBP's Classification Relies Upon A Misinterpretation Of EN 84.05 To Exclude The PC50 Supermodule From HTS 8405 Even Though The Heading Is An *Eo Nomine* Designation That, By Operation Of GRI 2(a), Includes All Forms Of Incomplete Or Unfinished Water Gas Generators

In excluding the PC50 supermodule from consideration under HTS 8405, CBP relied upon what it perceived were differences between the supermodule and the description of producer and water gas generators provided in EN 84.05. SMF ¶¶ 93, 96-98, 127-28. Specifically, the NIS initially responsible for evaluating the supermodule under HTS 8405 stated that "the endothermic chemical reactions that occur in each catalyst bed of the subject supermodule's system" differed from the "combustion" process utilizing "[a] thick bed of fuel" described in EN 84.05. *Id.* ¶¶ 96-98. Further, in denying HyAxiom's protest, the NIS who had taken over responsibility for evaluating the supermodule under HTS 8405 relied upon what he contended were differences from EN 84.05's description of water gas generators – namely, that instead of having "air and a spray of water or steam … blown in alternate phases into the

apparatus," [redacted]

*Id.* ¶ 127. The NIS also stated that the supermodule differed from the generators described in EN 84.05 because it was not "self-contained." *Id.* These rationales rely upon a misinterpretation of EN 84.05 that unreasonably restricts the scope of HTS 8405.

First, the language relied upon by CBP about "combustion" and burning of "[a] thick bed of fuel" comes from EN 84.05's description of producer gas generators, not water gas generators. *See* EN 84.05; SMF ¶¶ 97-98. Even then, EN 84.05 does not state that HTS 8405 applies exclusively to generators that produce gas by means of combustion of solid fuel alone. Rather, EN 84.05 uses non-limiting language. *See* EN 84.05 (describing producer gas generators as "*usually* consist[ing] of a closed cylinder … enclosing a grate" upon which "a bed of fuel is burned," and stating that "generators *may* be adapted for burning many kinds of solid fuel") (emphasis added).

Second, and relatedly, while it provides illustrative guidance on the kinds of water gas generators that may be covered by the heading, EN 84.05 contains no language that limits HTS 8405 to a particular form of water gas generators exclusively. Nor should EN 84.05 contain such language, because as discussed above (Section II.B, *supra*) and as admitted by CBP (SMF ¶¶ 8-9), HTS 8405 is an *eo nomine* heading that covers all forms of water gas generators. Thus, the mere fact that the SMR utilizes [redacted]

[REDACTED] – rather than combusting solid fuels and blowing air and a spray of water or steam in alternate phases into the apparatus – is immaterial.[22]

Third, CBP's view that only water gas generators requiring a combustion process are covered by HTS 8405 (*see* SMF ¶¶ 98, 128) ignores the well-settled principle that tariff provisions are "written for the future," such that the HTSUS must be interpreted flexibly to reflect advancements in technology. *See Avecia, Inc. v. United States*, 30 CIT 1956, 1991, 469 F. Supp. 2d 1269, 1299 (2006) ("'[It is] inconceivable that Congress would have intended to foreclose from classification … future innovations[.]'") (quoting *Simmon Omega, Inc. v. United States*, 83 Cust. Ct. 14, 36-37 (1979)). This is particularly true for *eo nomine* headings like HTS 8405. *See Deckers Corp. v. United States*, 752 F.3d 949, 957 (Fed. Cir. 2014) ("*Eo nomine* designations include all forms of an article, including future improvements to that article. *Eo nomine* terms are thus forward-looking, such that they include technological advancements….") (internal citations omitted). Here, commercial water gas generation technology has existed for two hundred years. SMF ¶ 11. While many early water gas generators did rely upon a combustion process, it was a very rudimentary and inefficient way of generating water gas. *Id.* Reformed gas generated from combustion contains low levels of hydrogen compared to more modern gas generation processes. *Id.* Thus, it only makes sense for HyAxiom to utilize steam methane reforming rather than combustion in the design of the PC50 supermodule, because as a newer, more efficient technology, steam methane reforming generates water gas that is much

[22] Even if EN 84.05 did limit the forms of water gas generators covered by HTS 8405 (and it does not), that still does not change the fact that the statutory HTS heading is *eo nomine*. Thus, even assuming, *arguendo*, that EN 84.05 did contain language limiting the forms of water gas generators included in HTS 8405, such language would not be controlling. *See Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1281 (Fed. Cir. 2016) (holding that portions of Explanatory Notes which contradict their HTS headings "must be disregarded").

richer in hydrogen and thus acts as a much better fuel in a hydrogen fuel cell powerplant. *See id.* ¶¶ 1, 10, 12-14, 16. HyAxiom should not be faulted for incorporating a more technologically advanced form of water gas generation in its PC50 supermodule than the one for which CBP advocates.



Fourth, CBP's reliance upon

as differentiators to the water gas generators covered by HTS 8405 fails to read EN 84.05 as a whole. EN 84.05 recognizes that water gas generators may also be fitted with "purifiers and other auxiliary apparatus[es]," including "coolers," provided they are "clearly suitable for use together." As discussed above (Section II.B.2, *supra*),

SMF ¶¶ 41-46.

*Id.* ¶ 47. Thus, these functions of the ILS are entirely consistent with EN 84.05's guidance on the scope of HTS 8405.

Finally, CBP's reliance upon the phrase "self-contained" in EN 84.05 is misplaced. Nowhere does EN 84.05 state that *only* self-contained water gas generators are covered by HTS 8405. If CBP's interpretation were correct, then HTS 8405's inclusion of water gas generators "with or without their purifiers," and EN 84.05's statement that water gas generators may be presented with or without purifiers and other auxiliary apparatuses, would make no sense. As admitted by the NIS initially responsible for evaluating the supermodules under HTS 8405 during her deposition, without these components, certain water gas generators may not be "self-contained" because (as EN 84.05 explains) these components are necessary "[f]or certain uses"

of the water gas. *See* SMF ¶¶ 125-26. Yet, both the heading itself and EN 84.05 recognize that such articles may be classified under HTS 8405, even though they are presented without their purifiers and other auxiliary apparatuses. Moreover, CBP's interpretation would vitiate the mandatory effect of GRI 2(a), which expands any reference to an article in a heading to include incomplete or unfinished articles having the "essential character" of that complete or finished article.[23] *See* Section II.B, *supra*.

Accordingly, because CBP's interpretation of EN 84.05 as excluding the PC50 supermodule from HTS 8405 is wrong as a matter of law, this Motion should be granted, and judgment should be entered in favor of HyAxiom on Count I of the FAC.

### C. CBP's Reliance On The Post-Importation Use Of The PC50 Supermodule In The Completed Powerplant Ignores The GRIs And Seeks To Apply The Defunct "More Than" Doctrine Instead

CBP justified its classification of the PC50 supermodule under HTS 8503 because "'[u]nlike the gas generators of heading 8405, HTSUS, the PC50 supermodule includes subsystems and components that are not just used in the production of gas but are intended and designed to be components of a fuel cell generator.'" SMF ¶ 131 (citation omitted). It is undisputed that the PC50 supermodule is designed to be integrated into the PureCell® Model 400 powerplant and that, as a result, it contains components supporting both the gas generating functions of the FPS and other components of the powerplant installed post-importation. [REDACTED]

[REDACTED]

[REDACTED] *Id.* ¶ 54. But the mere fact that the PC50 supermodule is intended for use in a fuel cell

---

[23] The PC25 reformer module at issue in NY 854572 (like the PC50 supermodule) could not generate water gas in its imported state but rather required integration with other components, including the fuel cell stacks, the ESM, and the blower, before it could function as a water gas generator. SMF ¶ 27b. Thus, even though the PC25 reformer module was not "self-contained," CBP had no issue classifying that article under HTS 8405. *See* Section II.B.1, *supra*.

powerplant post-importation does not defeat the fact that, as imported, the PC50 supermodule qualifies as a water gas generator included in HTS 8405.

HTS 8405 is an *eo nomine* heading (*see* Section II.B, *supra*), and "a use limitation should not be read into an *eo nomine* provision unless the name itself inherently suggests a type of use." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). Nothing in the name "water gas generator" as it is used in HTS 8405 suggests a type of use. EN 84.05 confirms this, explaining that HTS 8405 applies to all water gas generators, "*whatever the intended use of the gas produced….*" (Emphasis added).

Not only does CBP's classification inappropriately read a use limitation into HTS 8405, but CBP's reliance upon the post-importation use of the supermodule sidesteps the mandatory application of the GRIs. As explained above, GRI 1 and Section XVI, Note 2(a) mandate that the PC50 supermodule be classified under HTS 8405, even though the supermodule may be a "part" of and, by extension, used in a completed powerplant. *See* Section II.B, *supra*. Rather than apply the GRIs, however, CBP seeks to impose a "more than" justification for refusing to classify the PC50 supermodule under HTS 8405 – *i.e.*, because the supermodule does "more than" support the generation of water gas, it cannot be classified as a water gas generator under HTS 8405. Indeed, the NISs responsible for evaluating the subject PC50 supermodules under HTS 8405 and HTS 8503 admitted they relied upon such a "more than" rationale in reaching their conclusions. SMF ¶¶ 99, 131-32. But as the Federal Circuit has recognized, the "more than" doctrine previously employed in classifying imports under the former Tariff Schedules of the United States has been superseded by the GRIs. *See JVC Co. of Am., Div. of US JVC Corp.*, 234 F.3d at 1353 (recognizing that the "more than" doctrine was "supplanted by the GRIs" and thus "does not apply to cases arising under the HTSUS"). Thus, CBP's reliance upon the post-importation

use of the PC50 supermodules for excluding them from HTS 8405 and classifying them under HTS 8503 instead fails as a matter of law.

## IV. IN THE ALTERNATIVE, THE PC50 SUPERMODULE SHOULD BE CLASSIFIED UNDER HTS 8405 BY OPERATION OF GRI 3

As discussed above, because the PC50 supermodule has the "essential character" of a water gas generator in its imported state, it is included in HTS 8405 for purposes of Section XVI, Note 2(a), and therefore must be classified under that heading pursuant to GRI 1, even if it may be considered a "part" of an electrical generator under HTS 8503. *See* Section II, *supra*. Accordingly, no further analysis is required, as the GRIs are to be applied in numerical order. *See Schlumberger Tech. Corp.*, 845 F.3d at 1163. But even if the mandatory effect of GRI 1 and Section XVI, Note 2 were set aside and the PC50 supermodules were properly described by both headings, application of GRI 3 further supports classifying the PC50 supermodule under HTS 8405 instead of HTS 8503.

First, GRI 3(a) provides that when goods are on their face classifiable under two or more headings, the heading that provides "the most specific description shall be preferred" to the heading that provides a more general description. Here, classification under HTS 8503 would only describe the PC50 supermodule in a more general sense as a "part" of the completed powerplant. By contrast, HTS 8405 provides the more specific description of the supermodule, describing its primary function of generating water gas. Thus, GRI 3(a) dictates classifying the supermodule under HTS 8405.

Second, even assuming, *arguendo*, that after application of GRI 3(a) a determination of whether HTS 8405 or HTS 8503 applies to the supermodule still cannot be made, GRI 3(b) definitively establishes HTS 8405 as the proper heading. GRI 3(b) provides that goods "made up of different components … which cannot be classified by reference to 3(a) … shall be classified

as if they consisted of the … component which gives them their essential character….” As discussed above, the component of the supermodule which imparts its “essential character” is the SMR. *See* Section II.B.1, *supra*. It is undisputed that the primary function of the SMR of the PC50 supermodule is to generate water gas. *See* SMF ¶¶ 29a, 31-33. Therefore, GRI 3(b) also dictates classifying the PC50 supermodule under HTS 8405.

**CONCLUSION**

For the foregoing reasons, the subject PC50 supermodules are properly classifiable under HTS 8405. CBP’s alternate classification under HTS 8503 is incorrect as a matter of law. Accordingly, HyAxiom’s Motion should be granted and judgment should be entered in HyAxiom’s favor on Count I of the FAC, as follows:

A. A declaration that the January 9, 2020 Notice of Action classifying the PC50 supermodules imported in Entry No. CWL-2016022-3 under HTS 8503.00.95, and the denial of HyAxiom’s April 30, 2020 protest of the Notice of Action, are unlawful, null and void[24];

B. A declaration that the correct classification of the PC50 supermodules imported in Entry No. CWL-2016022-3 is HTS 8405.10.00;

C. Reliquidation of Entry No. CWL-2016022-3 at the 0% tariff duty rate applicable to HTS 8405.10.00; and

D. A refund in the amount of $5,789.19, representing the excess amount of duties paid in relation to Entry No. CWL-2016022-3, plus interest at the applicable rate, to be paid by Defendants to HyAxiom.[25]

---

[24] *See* 28 U.S.C. § 2643(c)(1) (“[T]he Court of International Trade may … order any other form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments….”).

[25] *See* 28 U.S.C. § 2643(a)(1) (“The Court of International Trade may enter a money judgment … against the United States in any civil action commenced under [28 U.S.C.] section 1581….”);

Respectfully submitted,

/s/ *Christopher M. Loveland*
Christopher M. Loveland
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006-6801
Telephone: 202.747.1924
Facsimile: 202.747.3832
cloveland@sheppardmullin.com

Of Counsel:

J. Scott Maberry
Lisa C. Mays
Adam A. Bartolanzo
SHEPPARD MULLIN RICHTER & HAMPTON LLP

Dated: December 9, 2022

*Attorneys for HyAxiom, Inc.*

---

*see also, e.g.*, *Wilton Indus., Inc. v. United States*, 31 CIT 863, 921, 493 F. Supp. 2d 1294, 1345-46 (2007) (ordering reliquidation of imports under correct HTSUS headings and repayment of excess duties paid in partial grant of summary judgment in favor of importer).

**CERTIFICATE OF COMPLIANCE**

I, Christopher M. Loveland, counsel on behalf of Plaintiff HyAxiom, Inc., f/k/a Doosan Fuel Cell America, Inc., relying upon the word count feature of the Word processing program used to prepare the foregoing memorandum, certify that this memorandum complies with the word count limitation under the Court's Chambers Procedures, and contains 12,309 words.

/s/ *Christopher M. Loveland*
Christopher M. Loveland