UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Pages 2, 4-19,** |
| TROY A. MILLER, | : | **26-29, 33-37, 39, 41** |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>ORDER</u>

Upon consideration of defendants' cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, other papers on file, and upon due deliberation, it is hereby

**ORDERED** that defendants' cross-motion for summary judgment is hereby granted; and it is

**ORDERED** that plaintiff's motion for summary judgment is hereby denied; and it is further

**ORDERED** that judgment is entered for defendants and this action is dismissed.


_____
JUDGE


Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

_____

|  |  |  |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Pages 2, 4-19,** |
| TROY A. MILLER, | : | **26-29, 33-37, 39, 41** |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |

_____ :

## <u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendants, the United States *et al.*, respectfully move for an order granting defendants' cross-motion for summary judgment, denying plaintiff's motion for summary judgment, and dismissing this action. The reasons for our cross-motion are set forth in the accompanying memorandum, defendants' response to plaintiff's Rule 56.3 statement of facts not in dispute, and defendants' Rule 56.3 statement of undisputed materials facts.

WHEREFORE, defendants respectfully request that an order be entered granting

defendants' cross-motion for summary judgment, denying plaintiff's motion for summary

judgment, entering judgment for defendants, dismissing this action, and granting defendants such

other and further relief as may be just and appropriate.

                                        Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        PATRICIA M. McCARTHY
                                        Director

                        By:     /s/ Justin R. Miller
                                        JUSTIN R. MILLER
                                        Attorney-In-Charge
                                        International Trade Field Office

                                        /s/ Aimee Lee
                                        AIMEE LEE
                                        Assistant Director

Of Counsel:                             /s/ Alexander Vanderweide

Michael A. Anderson                     ALEXANDER VANDERWEIDE
Office of the Assistant Chief Counsel   Senior Trial Counsel
International Trade Litigation           Civil Division, U.S. Dept. of Justice
U.S. Customs and Border Protection      Commercial Litigation Branch
                                        26 Federal Plaza
                                        New York, New York 10278
                                        Tel. (212) 264-9230 or 0482
                                        Attorneys for Defendants

Dated: March 15, 2023

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Pages 2, 4-19,** |
| TROY A. MILLER, | : | **26-29, 33-37, 39, 41** |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

Of Counsel:

Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

ALEXANDER VANDERWEIDE
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza
New York, New York 10278
Tel. (212) 264-9230 or 0482
Attorneys for Defendants

Dated: March 15, 2023

## TABLE OF CONTENTS

BACKGROUND ...................................................................................................................3

    The PC50 ...................................................................................................................4

    Model 400 Components and Systems...............................................................11

    External Components...........................................................................................16

QUESTION PRESENTED ...........................................................................................17

SUMMARY OF ARGUMENT ....................................................................................17

ARGUMENT .................................................................................................................20

  I.    STANDARD OF REVIEW ................................................................................20

  II.    THE APPLICABLE LEGAL FRAMEWORK ...............................................21

      A.  General Rules of Interpretation ...............................................................21

      B.  HTSUS Section XVI Notes 2(a) and (b) ..................................................22

  III.    THE PC50 IS NOT A WATER GAS GENERATOR OF HTSUS
        HEADING 8405 ...................................................................................................23

      A.  Water Gas Generators of HTSUS Heading 8405 ...................................23

      B.  The PC50 Is Not A Water Gas Generator ...............................................26

      C.  The PC50 Is Not An Incomplete Water Gas Generator ........................29

  IV.    THE PC50 IS A PART SUITABLE FOR USE SOLELY WITH AN
        ELECTRIC GENERATOR  ...............................................................................38

CONCLUSION...............................................................................................................41

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................................20

*Aves. In Leather, Inc. v. United States*,
423 F.3d 1326 (Fed. Cir. 2005)..................................................................................21

i

*BASF Corp. v. United States,*
482 F.3d 1324 (Fed. Cir. 2007)...................................................................... 21

*Bauerhin Technologies Limited Partnership v. United States,*
110 F. 3d 774 (Fed. Cir. 1997)....................................................................... 40

*Bausch & Lomb, Inc. v. United States,*
148 F.3d 1363 (Fed. Cir. 1998).............................................................. 20, 23

*BenQ Am. Corp. v. United States,*
646 F.3d 1371 (Fed. Cir. 2011)..................................................................... 22

*CamelBak Prod., LLC v. United States,*
649 F.3d 1361 (Fed. Cir. 2011).............................................................. 33, 34

*Casio, Inc. v. United States,*
73 F.3d 1095 (Fed. Cir. 1996)....................................................................... 33

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)........................................................................................ 20

*Clarendon Marketing, Inc. v. United States,*
144 F.3d 1464 (Fed. Cir. 1998)..................................................................... 20

*Cummins Inc. v. United States,*
454 F.3d 1361 (Fed. Cir. 2006)..................................................................... 22

*Drygel, Inc. v. United States,*
541 F.3d 1129 (Fed. Cir. 2008)..................................................................... 24

*Home Depot U.S.A., Inc. v. United States,*
915 F.3d 1374 (Fed. Cir. 2019)..................................................................... 34

*La Crosse Technology, Ltd. v. United States,*
723 F.3d 1353 (Fed. Cir. 2013)..................................................................... 34

*LeMans Corp. v. United States,*
660 F.3d 1311 (Fed. Cir. 2011)..................................................................... 24

*Len-Ron Mfg. Co., Inc.  v. United States,*
334 F.3d 1304 (Fed. Cir. 2003 ............................................................... 22, 25

*Link Snacks, Inc. v. United States,*
742 F.3d 962 (Fed. Cir. 2014)....................................................................... 22

*Lonza Inc. v. United States,*
46 F.3d 1098 (Fed. Cir. 1995)....................................................................... 23

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................... 20

*Mita Copystar America v. United States*,
21 F.3d 1079 (Fed. Cir. 1994)............................................................... 31

*Nat'l Advanced Sys. v. United States*,
26 F.3d 1107 (Fed. Cir. 1994)............................................................... 22

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998)............................................................. 21

*Phone-Mate, Inc. v. United States*,
690 F. Supp. 1048 (Ct. Int'l Tr. 1988)
*aff'd*, 867 F.2d 1404 (Fed. Cir. 1989).................................................. 20

*Pomeroy Collection, Ltd. v. United States*,
559 F. Supp. 2d 1374 (Ct. Int'l Trade 2008) ............................ 21, 31, 32

*Rollerblade, Inc. v. United States*,
112 F.3d 481 (Fed. Cir. 1997)............................................................... 31

*Sharp Microelectronics Tech., Inc. v. United States*,
122 F.3d 1446 (Fed. Cir. 1997)............................................................. 23

*Simod Am. Corp. v. United States*,
872 F.2d 1572 (Fed. Cir. 1989)............................................................. 31

*Texas Apparel Co. v. United States*,
698 F. Supp. 932 (Ct. Int'l Tr. 1988),
*aff'd*, 883 F.2d 66 (Fed. Cir. 1989),
*cert. denied*, 493 U.S. 1024 (1990)..................................................... 20

*United States v. Pan Pac. Textile Group Inc.*,
276 F. Supp. 2d 1316 (Ct. Int'l Tr. 2003) ............................................ 20

*United States v. Pompeo*,
43 C.C.P.A. 9 (1955) ............................................................................. 40

*United States v. Willoughby Camera Stores*,
Inc, 21 C.C.P.A. 322 (1933) ................................................................. 40

*Warner-Lambert Co. v. United States*,
407 F.3d 1207 (Fed. Cir. 2005).......................................................22, 25

*Worthington v. Robbins*,
139 U.S. 337 (1891)............................................................................... 31

**Harmonized Tariff Schedule of The United States**

General Rules of Interpretation 1 ...................................................................................................*passim*

General Rules of Interpretation 2 (a) ............................................................................................*passim*

Chapter 70

   Heading 7013 ...................................................................................................................................... 31

Chapter 84

   Heading 8405 ...............................................................................................................................*passim*

      Subheading 8405.40.10 .................................................................................................................. 3

      Subheading 8405.10.0000 ........................................................................................................... 37

      Subheading 8405.40.0040 ........................................................................................................... 37

Chapter 85

   Heading 8501 ...............................................................................................................................*passim*

   Heading 8502 ..............................................................................................................2, 3, 38, 40

   Heading 8503 ...............................................................................................................................*passim*

      Subheading 8503.00.95 .................................................................................................................. 3

Section XVI Note 2 ........................................................................................................................... 40

Section XVI Note 2(a) ..............................................................................................................18, 22, 23

Section XVI Note 2(b) ....................................................................................................2, 18, 22, 23, 38

Explanatory Note 84.05 ....................................................................................................23, 25, 32, 34, 35

**Rules**

USCIT Rule 56 ................................................................................................................................ 1, 20

USCIT Rule 56(c) .................................................................................................................................. 20

**Other Authorities**

HQ 088351 (March 26, 1991).................................................................................26

NY 854572 (July 26, 1990) ..................................................................36, 37, 38

NY E84772 (July 20, 1990) ..............................................................................39

NY J80297 (February 4, 2003) .........................................................................39

NY E86434 (September 20, 1999).....................................................................39

N276834 (July 14, 2016) ..................................................................................39

## TABLE OF ACRONYMS

- PC50 = PC50 supermodule (imported merchandise at issue)

- Model 400 = PureCell® Model 400 hydrogen fuel-cell powerplant (aka PC50 Doosan PureCell® System)

- FPS = Fuel Processing System

- TMS = Thermal Management System

- WTS = Water Treatment System

- APS = Air Processing System

- FCS = Fuel Cell Stacks

- SMR = Steam Methane Reformer

- ILS = Integrated Low Temperature Shift Converter

- ESM = Electronics System Module (aka Electrical Control Module)

- WGSR = Water Gas Shift Reaction (aka Low Temperature Shift Reaction)

- CVS = Cabin Ventilation System

- ESA = Electrical System Assembly

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Pages 2, 4-11, 13-** |
| TROY A. MILLER, | : | **20, 27-30, 34, 36-42** |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT), defendants, United States *et al.* (the Government), hereby submit this memorandum in support of their cross-motion for summary judgment and response in opposition to plaintiff's, HyAxiom, Inc. f/k/a Doosan Fuel Cell America, Inc. (HyAxiom), motion for summary judgment.

The subject PC50 supermodule (PC50) is an assemblage of systems and components, that after import, is incorporated into HyAxiom's PureCell® Model 400 hydrogen fuel-cell powerplant (Model 400). The PC50 cannot function in its imported condition. But when integrated with additional components into a complete Model 400, the PC50 contributes to the powerplant's production of electricity and useable heat. Because the PC50 is dedicated solely for incorporation into a finished Model 400—an electric generator of Harmonized Tariff

Schedule of the United States (HTSUS) heading 8501[1]—HTSUS Section XVI Note 2(b) instructs that the imported PC50 is to be classified in HTSUS heading 8503 as "Parts suitable for use solely or principally with the machines of heading 8501 or 8502."

Contrary to HyAxiom's claims, the imported PC50, when incorporated into a Model 400, neither generates a "water gas" nor operates as a "water gas generator" to enable classification under HTSUS heading 8405 as a water gas generator. Rather, among its vital and varied functions, the PC50:

(1) contributes to converting natural gas (methane) into a hydrogen-rich fuel for the Model 400's fuel cell stacks (added after the PC50 is imported) through catalytic steam reformation, which the fuel cell stacks use to produce electricity, heat, and water;



---

[1] The parties agree that a complete Model 400 is an electric generator of HTSUS heading 8501. *See, e.g.,* ECF No. 43-25, Pl. Ex. B.8, Protest Memo at 8.

(8) provides structural support and protection for the PC50's components, as well as the additional components of the Model 400 that are not included with the PC50, including the fuel cell stacks; and

(9) contains attachment points for the Model 400's exterior enclosure.

As a result, the imported PC50 is not classifiable as a water gas generator of HTSUS heading 8405, as HyAxiom contends. Accordingly, our cross-motion for summary judgment should be granted, plaintiff's motion for summary judgment should be denied, and this action should be dismissed.

## **BACKGROUND**

This matter concerns Entry No. CWL-2016022-3, filed at the Port of New York/Newark on November 2, 2018, which contained two PC50s. ECF No. 12, Entry Papers. The entry automatically liquidated on November 1, 2019, as entered by HyAxiom under HTSUS subheading 8405.10.00, a duty-free provision that provides, in relevant part, for "Producer gas or water gas generators, with or without their purifiers." *Id.* On January 9, 2020, U.S. Customs and Border Protection (CBP) issued HyAxiom a Notice of Action, which rate-advanced and reclassified the entry at issue under HTSUS subheading 8503.00.95; this subheading provides for "Parts suitable for use solely or principally with the machines of heading 8501 or 8502: Other: Other," dutiable at 3% *ad valorem*. ECF No. 43-39, Pl. Ex. C.12, 01/09/20 NOA. HyAxiom protested the reclassification, CBP denied the protest, and HyAxiom summonsed the denial to this Court. ECF No. 12, Protest; ECF No. 1, Summons.

As stated above, the PC50 is an essential component of the Model 400 hydrogen fuel-cell powerplant; without the PC50, and other components that are integrated with the PC50 after importation, the Model 400 (aka PC50 Doosan PureCell® System) could not generate energy.

3

ECF No. 43-1, Pl. Mot. at 6, 7, 12, 30, 35; Def. Ex. A, Pl. Responses to Def. 2nd Set of

Interrogatories (2nd Rogs Resp.); Def. Ex. B, Deposition Transcript of Pl. Rule 30(b)(6) agent,

Dr. Sathya Motupally (DSM), at 24-25, 31-32, 92-93, 115, 121-22; Def. Ex. C, Deposition

Transcript (Vol. 1) of Pl. Rule 30(b)(6) agent, Sridhar Kanuri (Kanuri 1), at 22-23, 30-31; Def.

Ex. D, Deposition Transcript (Vol. 2) of plaintiff's expert witness, Sridhar Kanuri (Kanuri 2), at

280-81, 318-19, 366-67.  [██  ███████████████████████████████  ██].

Def. Ex. B, DSM at 14, 77-79, 83.

The PC50's components, along with their functions, are described below.  We also

describe the components and systems that are not included with the PC50, but along with the

PC50, are integral to a complete and functioning Model 400 powerplant.  Finally, as relevant to

the Model 400's operations, we also identify and describe the external inputs and components

required for the powerplant to function.

**The PC50**

The imported PC50 consists of the following systems: Fuel Processing System (FPS),

Thermal Management System (TMS), and certain components of a Water Treatment System

(WTS) (other components of the WTS are added to the Model 400 after import, as noted below).

*See generally* Pl. Mot.; Def. Ex. A, 2nd Rogs Resp.; Def. Ex. B, DSM; Def. Ex. C, Kanuri 1; Def.

Ex. D, Kanuri 2; Def. Ex. E, Expert Report of Sridhar Kanuri (Kanuri Report); Def. Ex. F, PC50

Supermodule PowerPoint (PC50 PPT); Def. Ex. G, Pl. Resp. to R&R's Questions (R&R Resp.).

These systems are, in turn, comprised of various components and subsystems.  *Id.*  The PC50

also includes a frame, wiring and other connections, valves, sensors, and piping.  *Id.*  A diagram

of the imported PC50 is shown as follows:



Pl. Mot. at 3; Def. Ex. E, Kanuri Report at 8.

Fuel Processing System (FPS)

The FPS consists of a Steam Methane Reformer (SMR), an Integrated Low Temperature

Shift Converter (ILS), [███████████████████████████████████████████████

████████████████████████]. *See generally* Pl. Mot.; Def. Ex. A, 2nd Rogs Resp.;

Def. Ex. B, DSM; Def. Ex. C, Kanuri 1; Def. Ex. D, Kanuri 2; Def. Ex. E, Kanuri Report; Def.

Ex. F, PC50 PPT; Def. Ex. G, R&R Resp.  These components contribute to converting natural

gas (methane) into a hydrogen-rich fuel for the Model 400's fuel cell stacks (FCS, which are not

part of the imported PC50, discussed further below) through catalytic steam reformation, which

the FCS use to produce electricity, heat, and water.  *Id.*

[████████ █████]

[█████████████████████████████████████████████]

████████████████████████████████████████████████████



]. Def. Ex. B, DSM at 71, 87; Def. Ex. C, Kanuri 1 at 40-41, 66, 103-104; Def. Ex. F, PC50 PPT at 2, 5; Def. Ex. G, R&R Resp. at 4, 7.  The ESM, discussed further below, is not a component of the imported PC50, but rather, is installed in the Model 400 by HyAxiom at its Connecticut facilities.

*Integrated Low Temperature Shift Converter (ILS) Part 1*

The ILS performs multiple functions at various stages of the Model 400's operation.

]. Pl. Mot. at 27; Def. Ex. A, 2nd Rogs Resp. at 8; Def. Ex. B, DSM at 104; Def. Ex. C, Kanuri 1 at 37-38, 66-67, 76-77, 105, 110-11; Def. Ex. G, R&R Resp. at 4, 7.

]. Pl. Mot. at 2, 12, 26; Def. Ex. A, 2nd Rogs Resp. at 8; Def. Ex. B, DSM at 27-28, 35-36; Def. Ex. C, Kanuri 1 at 25-26, 33-34, 36, 66-67, 69-70, 106, 110-11, 132, 207; Def. Ex. D, Kanuri 2 at 304, 322; Def. Ex. E, Kanuri Report at 9, 15, 24, 29; Def. Ex. G, R&R Resp. at 4, 6, 7.  (Additional ILS functions are described below).

]. Def. Ex. C, Kanuri 1 at 67-68, 169; Def. Ex. G, R&R Resp. at 4, 7.

*Steam Methane Reformer (SMR)*

██████████████████████████████████████████████████

████ ████ ]. Pl. Mot. at 11, 23-24, 32; Def. Ex. C, Kanuri 1 at 60, 69-70, 79, 85, 129, 150;

Def. Ex. D, Kanuri 2 at 365; Def. Ex. G, R&R Resp. at 6. ███ ██████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████ ]. Pl. Mot. at 23; Def. Ex. A, 2nd Rogs Resp. at 15; Def. Ex. C, Kanuri 1 at 25, 35, 58-59,

68-69, 72-73, 75, 83-84, 87, 107-08, 111-12, 152-53, 157, 173-75, 223; Def. Ex. D, Kanuri 2 at

363-65, 404; Def. Ex. E, Kanuri Report at 32; Def. Ex. G, R&R Resp. at 4, 7.

*ILS Part II*

██████████████████████████████████████████████

██████████████████████████████████████ ████ ]. Pl. Mot. at 2, 12,

26-27, 34; Def. Ex. A, 2nd Rogs Resp. at 7-8; Def. Ex. C, Kanuri 1 at 34-35, 70-71, 76-80, 85-86,

92, 107-08, 110-11, 120-21, 130-32, 134-35, 150, 160-63, 165-66, 207; Def. Ex. D, Kanuri 2 at

294-95, 323, 326-27, 376; Def. Ex. E, Kanuri Report at 9, 15, 24; Def. Ex. G, R&R Resp. at 4, 6,

7. ███████████████████████████████████████████

███████████████████ ████ ]. *Id.* The SMR gas output undergoes a Water Gas Shift

Reaction (WGSR, aka a Low Temperature Shift Reaction) in the ILS. *Id.* ████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ ]. *Id.* This

resulting mixture is a hydrogen-rich fuel ███████████████████████████████



██████████████████ ] is consumed in the FCS to generate electricity, heat, and water. *Id.*; *see also* Def. Ex. C, Kanuri 1 at 155-56.  [████████████████████████

████████████████████████████████████ ████ ]. *Id.*; *see also* Pl. Mot. at 23; Def. Ex. A, 2nd Rogs Resp. at 15; Def. Ex. C, Kanuri 1 at 25, 58-59, 68-69, 72-73, 75, 83-84, 87, 112, 152-53, 157, 173-75, 223; Def. Ex. D, Kanuri 2 at 363-65, 404; Def. Ex. E, Kanuri Report at 32.

Thermal Management System (TMS) and Water Treatment System (WTS)

The TMS [████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████ ███ ]. *See generally* Pl. Mot.; Def. Ex. A, 2nd Rogs Resp.; Def. Ex. B, DSM; Def. Ex. C, Kanuri 1; Def. Ex. D, Kanuri 2; Def. Ex. E, Kanuri Report; Def. Ex. F, PC50 PPT; Def. Ex. G, R&R Resp.  The TMS consists of [████████████████████

█████████████████████████████ ████ ]. *Id.*  The WTS [████ ██

████████████████████████████████████████

█████████████████████████ ]. *Id.*

[███████ ]

[██ ████████████████████████████

████████████████████████████ ████ ]. Def. Ex. C, Kanuri 1 at 39-40, 73-76, 80, 87, 108-09; Def. Ex. D, Kanuri 2 at 361-62, 398-99, 432; Def. Ex. G, R&R Resp. at 4, 7, 9.  [████ ██████████████████████████

███████████████████████████ ████ ]. *Id.*

[████████ ████ ]



[████ █████████████████████████████████ ██].  Def. Ex. C, Kanuri 1 at 87-90; Def. Ex. D, Kanuri 2 at 361-62; Def. Ex. E, Kanuri Report at 26; Def. Ex. F, PC50 PPT at 5; Def. Ex. G, R&R Resp. at 5-9.  [████████████████████████████████████

█████████████████████████████████████████████

███████████████████ ███].  *Id.*; *see also* Def. Ex. A, 2nd Rogs Resp. at 9; Def. Ex. B, DSM at 86; 111; Def. Ex. C, Kanuri 1 at 50-51; 109, 114-15, 164, 169-71; Def. Ex. D, Kanuri 2 at 361-62; Def. Ex. E, Kanuri Report at 25.

[███████ ███] *and WTS*

[██████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███].  Pl. Mot. at 12; Def. Ex. A, 2nd Rogs Resp. at 9; Def. Ex. B, DSM at 29, 102-03; Def. Ex. C, Kanuri 1 at 50-51, 87-89, 99, 136, 166, 170-72; Def. Ex. D, Kanuri 2 at 392; Def. Ex. E, Kanuri Report at 25; Def. Ex. G, R&R Resp. at 5, 9.  [███████████████████████

██████████████████████ ███].  Def. Ex. D, Kanuri 2 at 412, 415-17.  Although the WTS's [████ ████████████████████████████████████

██████████████████████████████████████████

████████████].  Def. Ex. B, DSM at 102-03; Def. Ex. C, Kanuri 1 at 89-90, 115, 166-67, 170, 186; Def. Ex. G, R&R Resp. at 9.

[█████████████████████████ ██████████ ]

[█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████ ███].  Def. Ex. C, Kanuri 1 at 50, 55, 87-102; Def. Ex. G, R&R Resp. at

5-6, 8. [███] ████████████████████████████████████████████████████

████████████████████████████████████████████████████ ]. *Id.* [███

████████████████████████████████████████████████████████████

████████████████████████████████████████████ ]. *Id.* [████ ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ ]. *Id.*

   [████████ ]

[███] █████████████████████████████████████████████████████

████████████████████████████████████████████ ]. Def.

Ex. C, Kanuri 1 at 45, 62, 67-68, 88, 93-99, 102, 168-69; Def. Ex. D, Kanuri 2 at 381-82; Def.

Ex. F, PC50 PPT at 2, 5; Def. Ex. G, R&R Resp. at 5, 8, 9. [████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ ]. *Id.* [████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ ]. *Id.* [████████████████

███████████████████ ]. *Id.*

   [████████████████ ]

[████████████████████████████████████████████████████████

████████ ████ ]. Def. Ex. B, DSM at 74-75; Def. Ex. C, Kanuri 1 at 45-47, 49, 163-65; Def.

Ex. D, Kanuri 2 at 285, 320-21; Def. Ex. F, PC50 PPT at 2, 5; Def. Ex. G, R&R Resp. at 5, 8.



[                                                                                ]. *Id.* Once the Model 400 [                                                                                

                                                                                ]. *Id.*; *see also* Def. Ex. C, Kanuri 1 at 158; Def. Ex. D, Kanuri 2 at 287.

[                                                                                

                                                                                ]. Def. Ex. B, DSM at 75-76; Def. Ex. C, Kanuri 1 at 47-49; Def. Ex. F, PC50 PPT at 2, 3, 6. In doing so, [

                                                                                

                                                                                ]. *Id.*

> Frame

The frame provides protection and a support structure for the PC50 during transport, and extends beyond the components of the PC50 to support, protect, and accommodate the installation of the balance of components and systems (*i.e.*, ESM and FCS) that constitute the Model 400. Pl. Mot. at 2-3, 12, 28; Def. Ex. A, 2nd Rogs Resp. at 10, 11, 16; Def. Ex. C, Kanuri 1 at 23-24, 33, 141-42, 178, 210-11, 219-20; Def. Ex. D, Kanuri 2 at 284-85, 409-10; Def. Ex. E, Kanuri Report at 8-9, 17, 21, 26, 33; Def. Ex. F, PC50 PPT at 2; Def. Ex. G, R&R Resp. at 3. The frame also provides attachment points and support for the exterior enclosure of the Model 400. *Id.*

> **Model 400 Components and Systems**

In addition to the components that comprise the PC50, the Model 400 also consists of a number of components and systems that are installed by HyAxiom at its Connecticut facilities

after the PC50 is imported, and are integral to both the operation of the PC50 and the Model 400 as a whole.  The Model 400's components and systems are depicted and described below, including the PC50 (labeled "Supermodule" in the below diagram):



Def. Ex. E, Kanuri Report at 10.

<u>Air Processing System (APS)</u>

The APS consists of [███████████████████]. Def. Ex. C, Kanuri 1 at 173.

Although the piping is part of the imported PC50, [███████████████]. Pl. Mot. at 2,

6, 9, 12, 28, 31, 35; Def. Ex. A, 2nd Rogs Resp. at 6, 11; Def. Ex. B, DSM at 122-24; Def. Ex. C,

Kanuri 1 at 22-24, 186-89, 209-11; Def. Ex. D, Kanuri 2 at 279-80, 318-19; Def. Ex. E, Kanuri

Report at 13, 19, 21. [██████████████████████] hydrogen-

rich fuel fed into the FCS to generate electricity, heat, and water. *Id.*; *see also* Def. Ex. A, 2nd

Rogs Resp. at 9-10; Def. Ex. C, Kanuri 1 at 48, 173-77, 185, 220; Def. Ex. D, Kanuri 2 at 283-

84, 298, 303, 321-22, 362-64, 392-93, 404; Def. Ex. E, Kanuri Report at 9, 26. [███]



████████ ███]. *Id.* [█████████████████

█████████████████████

██████████████████]. *Id.*

<u>Electronic Systems Module (ESM)</u>

The ESM includes [██████████████████

█████████████████████

████████████████]. Pl. Mot. at 30-31; Def. Ex. A, 2nd Rogs Resp. at 10-

11; Def. Ex. C, Kanuri 1 at 63-66, 104, 109-10, 156, 178-85; Def. Ex. D, Kanuri 2 at 280-81,

296, 314-22; 374-75, 390, 403, 422-25, 429; Def. Ex. E, Kanuri Report at 9, 16-17, 19, 21; Def.

Ex. G, R&R Resp. at 2, 7. [████████████████

█████████████████████

███████████]. *Id.*

The ESM also includes [████████████████████████████████████████

████████████████████████████████████]   ████████]. *Id.*  The [████████

████████████████████████████████████████████████████████████████

████████]. *Id.*  It does so by [████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████]. *Id.*

Fuel Cell Stacks (FCS)

The Model 400's FCS are comprised of multiple stacks of fuel cells that, with the

hydrogen-rich fuel from the FPS [████████████████████████████████████████

████████] in the fuel cells to generate electricity, heat, and water.  Pl. Mot. at 26, 30; Def. Ex. A,

2nd Rogs Resp. at 8, 11; Def. Ex. B, DSM at 14, 26, 28, 34, 81-82, 84-86, 105, 124; Def. Ex. C,

Kanuri 1 at 34-35, 39-40, 43, 48, 51-52, 61-62, 65, 72, 74, 121, 157, 163, 174-75, 179, 185; Def.

Ex. D, Kanuri 2 at 272-76, 311, 386-87, 429-32; Def. Ex. E, Kanuri Report at 5-6, 16-18, 23-25;

Def. Ex. G, R&R Resp. at 4, 7.  The energy generated by the FCS [████████████████████

████████████████████████████████████████████████████]. *Id.*  As explained

above, [████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████]. *See supra* at 5-10.

As such, the FCS is essential to the operation of the PC50's systems, as well as the operation of the completed Model 400.

<u>Miscellany</u>

HyAxiom must perform certain operations on the Model 400 at its Connecticut facilities before the powerplant can be operational.  These operations include [█████████████



], and adding the external enclosure to the powerplant.  Def. Ex. A, 2nd Rogs Resp. at 11-12; Def. Ex. C, Kanuri 1 at 22-24, 187-91; Def. Ex. D, Kanuri 2 at 285-87, 291-92, 303, 378; Def. Ex. E, Kanuri Report at 9, 11.

As seen in the next figure of a completed Model 400 with enclosure, [████   ██████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ ████ ].



Def. Ex. E, Kanuri Report at 12.

**External Components**

In addition to the PC50's components, and those installed into the Model 400 by HyAxiom upon the PC50's importation, the Model 400 also requires, to be operational,

[███████]  ███████████████████████████████████████

████████████████ ██████ ].

[██████]

Glycol is a liquid cooling agent that is used to transfer heat between a hot and cold source.  Def. Ex. B, DSM at 73.  For the Model 400 [█ 



]. Def. Ex. B, DSM at 107-08; Def. Ex. C, Kanuri 1 at 43-45, 50, 52-53, 62, 81-82, 112-14, 117-18; Def. Ex. D, Kanuri 2 at 281-82, 289-90, 297, 303, 319, 388-89; Def. Ex. G, R&R Resp. at 1, 5, 8, 9.  We note that the TMS in the imported PC50 [

]. *Id.*

]. Def. Ex. A, 2nd Rogs Resp. at 9; Def. Ex. B, DSM at 106-07; Def. Ex. C, Kanuri 1 at 53-54, 101-03, 112-14; Def. Ex. D, Kanuri 2 at 281-82, 317, 319-20, 388-89, 394-95; Def. Ex. E, Kanuri Report at 25; Def. Ex. G, R&R Resp. at 5, 8.  For Model 400 [

]. Def. Ex. B, DSM at 80-81, 107; Def. Ex. D, Kanuri 2 at 281-82; 316-17, 319-20.

**QUESTION PRESENTED**

Whether the imported PC50 is classified under HTSUS heading 8405 as a water gas generator or heading 8503 as a part used solely or principally with an electric generator.

**SUMMARY OF ARGUMENT**

The imported PC50 is a part of an electric generator and not an incomplete water gas generator as HyAxiom contends.  The PC50, an assemblage of multi-functional systems and

17

components, is always incorporated after import into a Model 400, a hydrogen fuel-cell

powerplant that generates electricity and heat.  Because a complete Model 400 is an electric

generator of HTSUS heading 8501, and the PC50 is a component used solely with a machine of

heading 8501, the PC50 is classifiable under HTSUS heading 8503 as a part of a machine of

heading 8501.  Section XVI Note 2(b).  The PC50 is not an unfinished or incomplete electric

generator because consistent with General Rule of Interpretation (GRI) 1, longstanding

definitions of a "part," and CBP rulings, the fuel cell stacks impart the essential character of fuel

cell electric generators, and the imported PC50 does not include fuel cell stacks.  Accordingly,

the PC50 is accurately classified under HTSUS heading 8503 as a part suitable for use solely

with an electric generator of HTSUS heading 8501.

In our discussion below, before turning to our analysis of the PC50 as a part of an electric

generator, in accordance with Section XVI Note 2(a), we first explain that the PC50 is not a

water gas generator of HTSUS heading 8405.  Because the PC50 is not operational as imported,

HyAxiom contends that, pursuant to GRI 2(a), it is an incomplete water gas generator, of which

the PC50's SMR imparts to the PC50 the essential character of a complete water gas

generator.  HyAxiom's analysis is critically flawed for a number of reasons.

First, the PC50, when incorporated into a functional Model 400 after importation, does

not contribute to the production of a "water gas," a term that is commonly and commercially

defined, and described by the applicable Explanatory Note, as a hydrogen and carbon monoxide

gas produced by passing air and steam over burning fuel.  Instead, when functioning in a Model

400, the PC50 contributes to the generation of a hydrogen-rich fuel—a synthesis gas—that

consists primarily of [██████████████████████████████████

████████████████████ ].  Moreover, in contrast to water gas generators of HTSUS

18

heading 8405, which pass air and steam over burning solid fuels to generate a water gas, the PC50, in an operational Model 400, catalytically reforms natural gas into a hydrogen-rich fuel that is reacted in the FCS to generate electricity, heat, and water.

Further, HyAxiom isolates one component of the PC50, the SMR, to consider whether that sole component has the essential character of a complete water gas generator, in contravention of GRI 2(a) and well-settled law that goods are to be classified in their condition as imported. HyAxiom neglects to analyze whether the actual imported article—the PC50, with its various components and systems performing multiple functions in an operational Model 400—has the essential character of a complete water gas generator, which it does not.

Apart from the fact that the PC50 does not operate like a water gas generator or produce water gas, it also possesses features and functions that substantially exceed water gas generators of HTSUS heading 8405. In addition to catalytically reforming natural gas for a fuel that, when reacted in the FCS, generates electricity, heat, and water, the PC50 in a functioning Model 400 also [█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████]; provides structural support and protection for the PC50's components, as well as the additional components of the Model 400 that are not included with the PC50; and contains attachment points for the Model 400's exterior enclosure.

**ARGUMENT**

**I.      STANDARD OF REVIEW**

Under USCIT Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  On a motion for summary judgment, the Court determines whether there are any factual disputes that are material to the resolution of the action.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Tr. 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) (citations omitted).  "The court may not resolve or try factual issues on a motion for summary judgment." *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Tr. 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) (citation omitted).  In determining whether a genuine issue of fact exists, the Court reviews the evidence submitted, drawing all inferences against the moving party.  *See United States v. Pan Pac. Textile Group Inc.*, 276 F. Supp. 2d 1316, 1319 (Ct. Int'l Tr. 2003); *Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This Court may resolve a classification issue by means of summary judgment.  *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  Summary judgment is appropriate where the nature of the merchandise is not in question and the sole issue before the Court is the proper classification of the merchandise.  *See id.*  In the absence of genuine factual issues, the propriety of summary judgment turns on the proper construction of the HTSUS, which is a question of law.  *See Clarendon Marketing, Inc. v. United States*, 144

F.3d 1464, 1466 (Fed. Cir. 1998).  Here, there are no material facts in dispute to preclude

summary judgment in favor of the Government.

## II.     THE APPLICABLE LEGAL FRAMEWORK

### A.     General Rules of Interpretation

Merchandise imported into the United States is classified under the HTSUS.  The tariff

classification of merchandise under the HTSUS is governed by the principles set forth in the

GRIs and the Additional U.S. Rules of Interpretation.  *See Orlando Food Corp. v. United States*,

140 F.3d 1437, 1439 (Fed. Cir. 1998); *BASF Corp. v. United States*, 482 F.3d 1324, 1325-26

(Fed. Cir. 2007).

GRI 1 provides, in relevant part, that "for legal purposes, classification shall be

determined according to the terms of the headings and any relative Section or Chapter Notes and,

provided such headings or Notes do not otherwise require, according to the {remaining GRIs.}"

As interpreted by its Explanatory Note, GRI 1 establishes that "the terms of the headings and any

relative section or Chapter Notes are paramount, *i.e.*, they are the first consideration in

determining classification."  *See also The Pomeroy Collection, Ltd. v. United States*, 559 F.

Supp. 2d 1374, 1385 (Ct. Int'l Trade 2008)*.*  In pertinent part, GRI 2(a) provides that "{a}ny

reference in a heading to an article shall be taken to include a reference to that article incomplete

or unfinished, provided that, as entered, the incomplete or unfinished article has the essential

character of the complete or finished article."  The HTSUS section and chapter notes "are not

optional interpretive rules," but instead have the force of statutory law.  *Aves. In Leather, Inc. v.*

*United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (internal quotation marks omitted).

It is well-established that the determination of whether a particular product falls within a

tariff classification is a two-step process: first, the meaning of terms within the provision must be

ascertained, and second, a determination must be made as to whether the merchandise at issue

falls within the description of such terms as properly construed. *See Nat'l Advanced Sys. v.*

*United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994). "When there is no dispute as to the nature of

the merchandise, then the two-step classification analysis 'collapses entirely into a question of

law.'" *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965-66 (Fed. Cir. 2014) (quoting

*Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

Where, as here, relevant terms are undefined in the tariff statute, they "are {to be}

construed according to their common {and} commercial meanings." *BenQ Am. Corp. v. United*

*States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (internal quotation marks omitted). To ascertain

the "common {and} commercial meanings" of a particular tariff term the court "may rely on its

own understanding of the term as well as upon lexicographic and scientific authorities." *Len-*

*Ron Mfg. Co., Inc.  v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003). That is, the "court

may consult dictionaries, scientific authorities, and other reliable information sources." *Warner-*

*Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

**B.**     **HTSUS Section XVI Notes 2(a) and (b)**

In accordance with GRI 1, the terms of the headings and any relative Section or Chapter

Notes must be considered. In light of the competing provisions of HTSUS headings 8405 and

8503, Notes 2(a) and (b) to Section XVI frame the present dispute, and provide, in relevant part,

as follows:

> 2.     Subject to note 1 to this section, note 1 to chapter 84 and to
> note 1 to chapter 85, parts of machines (not being parts of the
> articles of heading 8484, 8544, 8545, 8546 or 8547) are to be
> classified according to the following rules:
>
>   (a) Parts which are goods included in any of the headings
> of chapter 84 or 85 (other than headings 8409, 8431, 8448, 8466,

22

8473, 8487, 8503, 8522, 8529, 8538 and 8548) are in all cases to
be classified in their respective headings;

       (b) Other parts, if suitable for use solely or principally with
a particular kind of machine, or with a number of machines of the
same heading (including a machine of heading 8479 or 8543) are
to be classified with the machines of that kind or in heading 8409,
8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as
appropriate…

The parties do not dispute that the PC50 is a part of a machine (the Model 400); however,

the parties dispute whether Section XVI Note 2(a) or (b) directs the classification of the imported

merchandise.  HyAxiom contends that, pursuant to Note 2(a), the subject PC50 is a part included

in HTSUS heading 8405, and therefore, is to be classified in that heading.  *See generally* Pl. Mot.

at 16.  However, we contend that Note 2(b) instructs that the PC50—which is a part suitable for

use solely or principally with a particular kind of machine (the Model 400)—is "to be classified

with the machine of that kind" (HTSUS heading 8501) "or in heading…8503…as appropriate…"

As discussed below, the imported PC50 is not a water gas generator of HTSUS heading 8405,

and the PC50 is correctly classified in HTSUS heading 8503.

### III.   THE PC50 IS NOT A WATER GAS GENERATOR OF HTSUS HEADING 8405

#### A.   Water Gas Generators of HTSUS Heading 8405

Heading 8405, HTSUS, provides, in applicable part, for "Producer gas or water gas

generators, with or without their purifiers."  Although producer and water gas generators are not

defined by the tariff, the Explanatory Note[2] to HTS heading 84.05 (84.05 EN) describes such

generators, in relevant part, as follows:

---

[2] It is long settled that "[w]hile the Explanatory Notes do not constitute controlling legislative
history, they do offer guidance in interpreting HTS subheadings."  *Lonza Inc. v. United States*,
46 F.3d 1098, 1109 (Fed. Cir. 1995).  The Explanatory Notes significantly clarify the reach of
the HTSUS subheadings and can manifest legislative intent.  *Bausch & Lomb*, 148 F.3d 1363;
*Sharp Microelectronics Tech., Inc. v. United States*, 122 F.3d 1446 (Fed. Cir. 1997).  The
"Explanatory Notes that accompany each Chapter of the HTSUS, while not legally binding, are

This heading covers self-contained apparatus and plant for generating any kind of gas (e.g., producer gas, water gas and mixtures thereof, or acetylene) whatever the intended use of the gas produced (lighting, industrial heating, feeding gas engines, welding or cutting metals, chemical synthesis, etc.)…

### (A) PRODUCER GAS GENERATORS

These usually consist of a closed cylinder, generally fitted with a refractory lining or a water-cooled double wall enclosing a grate (either of fixed, shaking or revolving type), with provision for passing a current of air (or of air and steam) by suction or blowing. A thick bed of fuel is burned on the grate and the flow of air and steam is regulated so that combustion is incomplete.  The decomposition of the water and the incomplete combustion of the fuel yield carbon monoxide and hydrogen. The resultant mixture of carbon monoxide, hydrogen and nitrogen (producer gas) is drawn off at the top of the apparatus.

In certain generators of the "reversed combustion" type, the air is blown from the top to the bottom and along the sides of the cylinder and the gas is collected at the bottom of the apparatus, below the grate. This allows for more complete combustion of tars, etc.

### (B) WATER GAS GENERATORS

These are of similar construction, but are arranged so that air and a spray of water or steam are blown in alternate phases into the apparatus. The gas resulting from the water phase is a mixture of hydrogen and carbon monoxide (water gas) having a higher heating power than producer gas. It may be collected separately from the producer gas obtained during the air phase or the two gases may be mixed.

**Both producer gas and water gas generators** may be adapted for burning many kinds of solid fuel (e.g., coal, coke, charcoal, wood, vegetable or other waste).

---

"persuasive" and are "generally indicative" of the proper interpretation of the tariff provision*." LeMans Corp. v. United States*, 660 F.3d 1311, 1316 (Fed. Cir. 2011) (citation omitted).  In fact, "absent persuasive reasons to disregard" the text of a relevant Explanatory Note, the Explanatory Notes are routinely employed to determine the meaning of a tariff term.  *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008).

> For certain uses, particularly for supplying gas engines, producer or water gases must be cleaned of impurities such as dust, tars, sulphurous compounds, etc., and sometimes reheated or cooled. For this purpose, the generators are often fitted with purifiers (comprising perforated cones, coke beds, scrubbers, etc.), coolers, dryers, reheaters, etc. Such purifiers and other auxiliary apparatus are classified with the generators when presented therewith, **provided** they are clearly suitable for use together.  When presented separately they fall in their own respective headings (e.g., purifiers **in heading 84.21**).

Emphasis in original.

Thus, the 84.05 EN defines "water gas" as a mixture of hydrogen and carbon monoxide produced by passing air and steam over burning fuel, and describes a "water gas generator" (of "similar construction" to a "producer gas generator") by its typical features: a self-contained, usually closed-cylinder, apparatus for generating water gas; where air and a spray of water or steam are blown in alternate phases so incomplete combustion takes place over a grate containing a thick bed of burned solid fuel, such as coal and coke; and are often fitted with a purifier or other auxiliary apparatus to clean the water gas of impurities.

The 84.05 EN's definition of a water gas generator largely accords with the common and commercial meaning of that term, as evidenced by reliable scientific authorities and dictionary definitions.  *See Len-Ron Mfg.*, 334 F.3d at 1309; *Warner-Lambert Co.*, 407 F.3d at 1209.  For instance, the *Oxford Definition of Science* (*ODS*), 6th ed. 2010 Oxford University Press, defines "water gas," in part, as "{a} mixture of carbon monoxide and hydrogen produced by passing steam over hot carbon (coke)[.]"  Def. Ex. H, Dictionary Definitions at *ODS*.  *See also id.* at *The Free Dictionary* (*TFD*), citing the *Collins English Dictionary*, 12th ed. 2014 HarperCollins Publishers, which defines "water gas," in part, as "a mixture of hydrogen and carbon monoxide produced by passing steam over hot carbon[.]"; *id.* at *McGraw-Hill Dictionary of Scientific and Technical Terms*, 6th ed. 2003 The McGraw-Hill Companies, Inc., which even though it defines

"water gas" as a mixture of carbon monoxide and methane (as opposed to hydrogen), recognizes that the mixture is produced by "passing steam through deep beds of incandescent coal."

Further, CBP has explained that "water gas generators of heading 8405 serve primarily to produce a mixture of hydrogen and carbon monoxide by forcing air and a spray of water or steam over incandescent carbon, usually coke," and that "{t}he gas generators of heading 8405 appear limited to those which produce gases by the burning of solid fuels."  HQ 088351 (March 26, 1991).

Therefore, a water gas generator is not merely a generator of hydrogen and carbon monoxide, but is one that generates this gas mixture by a specific action: *i.e.,* by incompletely combusting forced air and water or steam over burning solid fuels.

### B.     The PC50 Is Not a Water Gas Generator

The PC50 is not a water gas generator.  Indeed, by itself, the PC50 cannot generate gas or any kind of power, or function whatsoever in its imported state.  The PC50 can only operate when it is part of a functional Model 400, which requires not only the PC50, but also [ ███████ ███████████ ████ ], the FCS, the ESM, the [ ███████████████████████████ ████████████████████████████████████████████████ ███████████ ], to be operational.  Pl. Mot. at 11, 23; Def. Ex. A, 2nd Rogs Resp. at 10; Def. Ex. B, DSM at 70, 100; Def. Ex. C, Kanuri 1 at 23, 145-48; Def. Ex. D, Kanuri 2 at 318-323, 363, 366-67; Def. Ex. E, Kanuri Report at 19; Def. Ex. F, PC50 PPT at 2; Def. Ex. G, R&R Resp. at 1, 2.

Only when all of these components, subsystems, inputs, and outputs are connected, powered, and operational, can the PC50 function within the Model 400 to contribute to the powerplant's production of energy by (1) catalytically reforming natural gas into a hydrogen-rich

fuel for the FCS to convert into electricity, heat, and water; (2) [███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████]; (8) providing structural support

and protection for the PC50's components, and the balance of the Model 400's components that

are not included with the PC50; and (9) containing attachment points for the Model 400's

exterior enclosure. *See supra* at Background.

Even when incorporated into an operational Model 400, the PC50 does not generate or

contribute to the generation of a water gas, *i.e.*, a mixture of carbon monoxide and hydrogen

produced by passing air and steam over burning fuel. Rather, the combined catalytic reactions of

both the SMR and ILS that are required for the FPS to ultimately produce a hydrogen-rich fuel

for the FCS to generate electricity, heat, and water consists of [██████████████████

████████████████████████████████████]. Pl. Mot. at

2, 12, 26-27, 34; Def. Ex. A, 2nd Rogs Resp. at 7-8; Def. Ex. C, Kanuri 1 at 34-35, 70-71, 76-80,

85-86, 92, 107-08, 110-11, 120-21, 130-32, 134-35, 150, 160-63, 165-66, 207; Def. Ex. D,

Kanuri 2 at 294-95, 323, 326-27, 376; Def. Ex. E, Kanuri Report at 9, 15, 24; Def. Ex. G, R&R

Resp. at 4, 6, 7. Thus, unlike water gas, the hydrogen-rich fuel that is [████████████████

██] to generate electricity, heat, and water is [██████  ████████████████████

████████████████████]. This is by design as the [████  ████████████]

[███████████████████████████████████████]. Def. Ex. C, Kanuri 1 at

72, 160-61.

If anything, the hydrogen-rich fuel produced by the FPS for the FCS is more akin to a

synthesis gas (aka syngas) than a water gas. *The Free Dictionary*'s citation to the *Collins*

*English Dictionary* sets forth the following two definitions of a synthesis gas:

> 1. (Chemistry) a mixture of carbon dioxide, carbon monoxide, and
> hydrogen formerly made by using water gas and reacting it with
> steam to enrich the proportion of hydrogen for use in the synthesis
> of ammonia
>
> 2. (Chemistry) a similar mixture of gases made by steam reforming
> natural gas, used for synthesizing organic chemicals and as a fuel

Def. Ex. H, Dictionary Definitions at *TFD*. *See also id.* at the *Oxford English Dictionary's*

citation to the New Scientist, which states that "{s}yn-gas is also made from natural gas [ ] by

the related reaction $CH_4 + H_2O = CO + 3H_2$" (emphasis in original); we note that this description

and formula [████████████████████████████████████████████████████

████████████████████████████████████]. Pl. Mot. at 7, 11, 23;

Def. Ex. A, 2nd Rogs Resp. at 7; Def. Ex. C, Kanuri 1 at 120, 127-30, 155; Def. Ex. D, Kanuri 2

at 351, 356-57, 379-80, 383-85; Def. Ex. E, Kanuri Report at 22, 24; Def. Ex. G, R&R Resp. at

6; *see also* Def. Ex. D, Kanuri 2 at 348 ([████████████████████████████

████████████████]).

Moreover, the components of the PC50, when functioning in a complete Model 400, do

not operate in the manner of HTSUS heading 8405 water gas generators. Water gas generators

burn solid fuel, such as coal or coke, and generate a water gas by regulating alternate phases of

air and steam or water over a grate of the burned solid fuel in an incomplete exothermic

combustion process. But the PC50's FPS [██████████████████████████████



]; it utilizes a catalytic steam reformation process to react [

] to produce a hydrogen-rich fuel.  In addition, [

], takes place in any of the PC50's operations to

produce the fuel for the FCS; rather, the reactions that take place in the FPS are [

].  Pl. Mot. at 27, 31, 33; Def. Ex. A, 2nd Rogs Resp. at 7-8; Def. Ex.

B, DSM at 100-01; Def. Ex. C, Kanuri 1 at 57-58, 65, 93, 106-07, 109, 132, 135, 177; Def. Ex.

D, Kanuri 2 at 273-74, 305, 329-30; Def. Ex. E, Kanuri Report at 5, 13, 19, 22-24; Def. Ex. G,

R&R Resp. at 2, 7.  Furthermore, the PC50 is not closed or a "self-contained apparatus," but is

inherently open-ended by design so that the balance of the components of a Model 400 can easily

connect with the imported PC50 to form a powerplant that ultimately generates and delivers

electricity and heat to customers—applications that exceed mere gas generation.

Thus, the components of an imported PC50, when operational in a functioning Model

400, neither generate a water gas, nor conform to the description of a water gas generator.  We

also note that [

].  Def. Ex. D, Kanuri 2 at 354; *see also* Def. Ex. I, DFCA Web Pages.

**C.      The PC50 Is Not an Incomplete Water Gas Generator**

Even assuming, for the sake of argument, that the hydrogen-rich fuel produced in the

components of the PC50 is a "water gas," the PC50, as a whole, in its imported state, would still

not be a water gas generator of HTSUS heading 8405 under GRI 1 or GRI 2(a).  HyAxiom,

recognizing that the imported PC50 is unable to function upon entry, contends that the PC50 is

an incomplete water gas generator that must be classified under HTSUS heading 8405 pursuant

to GRI 2(a).  HyAxiom argues that, under GRI 2(a), HTSUS heading 8405, as an *eo nomine*

provision, covers all forms of incomplete or unfinished water gas generators.  Pl. Mot. at 13.

HyAxiom further contends "that the SMR…performs the essential function of generating a water

gas, and thus imparts upon the PC50 supermodule the 'essential character' of a completed water

gas generator."  Pl. Mot. at 23.  HyAxiom's conclusion that the PC50's SMR imparts the

essential character of the imported PC50, and thus warrants classification of the PC50 as an

incomplete water gas generator of HTSUS heading 8405, relies on a misreading of GRI 2(a) and

several untenable premises, and must be rejected.

GRI 2(a) provides, in pertinent part, that "{a}ny reference in a heading to an article shall

be taken to include a reference to that article incomplete or unfinished, provided that, as entered,

the incomplete or unfinished article has the essential character of the complete or finished

article."  GRI 2(a) may thus extend the scope of a heading (*i.e.*, 8405) to cover incomplete or

unfinished articles (*i.e.*, incomplete water gas generators), so long as when entered into the

United States, the incomplete or unfinished article has the essential character of the complete or

finished article (*i.e.*, complete water gas generators).  Therefore, as relevant here, GRI 2(a) may

pertain to the classification of the imported PC50 if (1) the PC50 *itself* is an incomplete or

unfinished article that (2) has the essential character of a complete water gas generator of

HTSUS heading 8405.

In contravention of GRI 2(a) and well-established law, however, HyAxiom applies GRI

2(a) to one discrete component of the imported PC50 only—the SMR—and not to the imported

article itself—the PC50.  But GRI 2(a) does not prescribe nor allow, as HyAxiom advocates, that

one component (the SMR) of one system (the FPS) of an imported article (the PC50) may be

divorced from the article as a whole, and the classification of that lone component be analyzed in

isolation from the imported article.  Doing so would run afoul of the longstanding principle that

merchandise is to be classified in its condition as imported.  *See Pomeroy,* 559 F. Supp. 2d at

1398, fn. 31 ("By focusing solely and exclusively on the glass vessels included as part of the four

pieces of merchandise at issue, and essentially ignoring the candles and other components of

that merchandise as imported, the Government's classification analysis runs afoul of the 'well

settled law that merchandise is classified according to its condition when imported.'")

(quoting *Mita Copystar America v. United States,* 21 F.3d 1079, 1082 (Fed. Cir. 1994), and

citing for the same maxim, *Worthington v. Robbins,* 139 U.S. 337, 341 (1891); *Rollerblade, Inc.*

*v. United States*, 112 F.3d 481, 487 (Fed. Cir. 1997); *Simod Am. Corp. v. United States,* 872 F.2d

1572, 1577 (Fed. Cir. 1989)).

  In *Pomeroy,* 559 F. Supp. 2d at 1385*,* this Court applied GRI 1 and 2(a) in concluding

that certain glass vessels with candles and stones or sand (described as the Geo Table Lighting,

the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives) were classifiable as

lamps of heading 9405, HTSUS, instead of glassware of HTSUS heading 7013.  The Court

articulated that "{p}ursuant to GRI 2(a), then, the merchandise classifiable under heading 9405

includes not only complete, fully-assembled candle lamps, but also (1) 'incomplete' candle

lamps (provided that, as entered, any 'incomplete' candle lamp has the essential character of a

complete candle lamp)…"  *Id.* at 1386.  The Court concluded that "although the St. Tropez CLS,

the St. Tropez Cardinal Bowl, and the Serenity Votives were 'incomplete' as imported, all three

pieces of merchandise had the 'essential character' of the complete candle lamps, as

contemplated by GRI 2(a).  Indeed, to 'complete' the incomplete lamps, users 'just add water.'"

*Id*. at 1387.  Crucially, the Court's GRI 2(a) analysis concerned the imported glass vessel candles

as a whole, and whether they had the essential character of completed candle lamps, and did not

focus exclusively on any of the articles' constituent parts in isolation, as HyAxiom does when

31

analyzing the SMR instead of the entire imported PC50.  Indeed, the *Pomeroy* Court criticized the Government for analyzing only the glass vessels and not the candles and other components that constitute the imported merchandise.  *See id.* at 1398, fn. 31; *see also id.* at 1387, fn. 14 ("By any measure, the 'incomplete' *merchandise at issue* in this action had the 'essential character' of 'complete' merchandise.") (emphasis added).

The merchandise at issue in this action is the PC50, not the SMR.  Try as it might, HyAxiom may not substitute the PC50's SMR for the PC50 itself, and conduct a GRI 2(a) analysis solely on the SMR itself.  Even if were able to do so, focusing on the SMR would run afoul of GRI 2(a)'s basic requirement that the product be an incomplete and unfished article.  The SMR is not an incomplete or unfinished article; it is a complete and discrete component of the FPS that does not require further componentry to be "complete" after importation.

Even conducting a GRI 2(a) analysis of the actual imported merchandise (the PC50), the result would be the same, as GRI 2(a) does not support classification of the PC50 under HTSUS heading 8405.  As explained in the previous section, when incorporated into a functional Model 400, the PC50 does not contribute to the generation of a water gas; it generates a hydrogen-rich fuel for the FCS that may be most accurately described as a syngas.  The PC50 also does not satisfy the common and commercial meaning, nor match the 84.05 EN's description, of a water gas generator.  Thus, regardless of whether the PC50 is considered a complete or incomplete article upon entry, the PC50 is not a water gas generator of HTSUS heading 8405.

Moreover, when considering the PC50 as a whole, regardless of whether the hydrogen-rich fuel produced in the components of the PC50 can be considered "water gas" (it cannot), HyAxiom's GRI 2(a) analysis fails because the PC50, as imported, has features far in excess of water gas generators.  Much of HyAxiom's incorrect GRI 2(a) analysis centers on the principle

that HTSUS heading 8405, as an *eo nomine* provision, includes all forms of the named article (*i.e.*, all forms of water gas generators), regardless of their use. Although we do not dispute this general tenet, the Federal Circuit has made clear that "when an article is in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant, it is not properly classified within an *eo nomine* provision." *CamelBak Prod., LLC v. United States*, 649 F.3d 1361, 1365 (Fed. Cir. 2011) (cleaned-up; citations omitted). "'The criterion is whether the item possess[es] features *substantially in excess* of those within the common meaning of the term.'" *Id.* (quoting *Casio, Inc. v. United States,* 73 F.3d 1095, 1098 (Fed. Cir. 1996) (emphasis in original).

Here, the subject PC50 is clearly more than just its SMR, and clearly more than its hydrogen fuel generating components. The PC50 is the entire FPS (of which the SMR is but one component), the entire TMS, much of the WTS, the pipes of the APS, the frame, wiring, and various sensors, valves, pipes, and connections necessary for the operation of the Model 400. Regardless of whether the PC50 aids in the generation of a water gas (which it does not), the PC50 possesses features that are substantially in excess of the common meaning of a water gas generator. As discussed above, in addition to contributing to the generation of the hydrogen-rich fuel for the FCS to convert into electricity, heat, and water, the PC50, when incorporated into a functional Model 400, also [███████████████████████████████]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████ ]; provides structural support and protection for the PC50's components and the additional components of the Model 400; and provides attachment points and support for the Model 400's exterior enclosure.  In "character and function," the PC50 is decidedly "something other than" a water gas generator.

Similar to its *eo nomine* argument, HyAxiom also asserts that CBP's decision not to classify the PC50 as a water gas generator improperly relies on the "more than" doctrine, which has been supplanted by the GRI.  Pl. Mot. at 35-36.  This assertion wildly misses the mark.  CBP classified the imported PC50 in accordance with the GRI, as does our analysis set forth herein; CBP did not classify the SMR only, as HyAxiom attempts to do.  If anything, describing the PC50 as "more than" the SMR and its gas-generating components is an accurate and shorthand way of stating that the actual imported article, the PC50, has features substantially in excess of— and that substantially differ from—water gas generators classifiable in HTSUS heading 8405. The Federal Circuit has long recognized that an imported article is not properly classified within an *eo nomine* provision, pursuant to the GRI, if that article possesses features substantially in excess of those described by the heading.  *See CamelBak*, 649 F.3d at 1365; *La Crosse Technology, Ltd. v. United States*, 723 F.3d 1353, 1359-60 (Fed. Cir. 2013); *Home Depot U.S.A., Inc. v. United States*, 915 F.3d 1374, 1380 (Fed. Cir. 2019).

HyAxiom stresses that the 84.05 EN's description of a water gas generator is not the final word as to what may be considered a water gas generator for purposes of HTSUS heading 8405. We agree that the scope of an *eo nomine* heading may not be limited by a contrary Explanatory Note, but HyAxiom has not set forth any workable definition of a water gas generator or offered an explanation as to how the PC50 itself satisfies the criteria of a water gas generator.  Instead, HyAxiom states that the SMR generates a water gas, and then, pursuant to its errant GRI 2(a)

analysis, summarily concludes that the PC50 is an incomplete water gas generator.  But at no point does HyAxiom demonstrate that the SMR or the PC50 accords with the common and commercial meaning of a water gas generator.  Nor does its cogently explain how the SMR or the PC50 could nonetheless be classified as a water gas generator despite not sharing the basic qualities and characteristics of a water gas generator, as described by the 84.05 EN.

Despite these omissions, HyAxiom contends that the balance of the PC50's components beyond the SMR are in fact contemplated by the 84.05 EN "because they support the water gas generating function of the SMR, with which they are presented at entry."  Pl. Mot. at 26.  For instance, HyAxiom asserts that the ILS is akin to the "purifiers and other auxiliary apparatus" specified in the 84.05 EN that clean water gases of "impurities such as…sulphurous compounds" and sometimes reheat or cool the gas.  But this assertion reduces and misstates the ILS's many vital functions.  Like the SMR, the ILS is an integral component of the FPS, that in tandem with the SMR, also generates, via a Water Gas Shift Reaction (WGSR), the hydrogen-rich fuel for the FCS in a functioning powerplant.  It is no more auxiliary than the SMR; rather, it is a crucial component to the PC50 and Model 400.  Moreover, in contrast to the 84.05 EN description, the ILS [



]. *See* Def. Ex. D, Kanuri 2 at 353 ([

]).  The ILS also [

]. The ILS, like the balance of the Model 400's componentry, functions within the powerplant's systems in an efficient loop, where its varied

functions can no more be cast as mere "purifiers and other auxiliary apparatus" than any other major component or system of the PC50 and Model 400.

HyAxiom's attempt to relegate the entire TMS and WTS to mere water gas coolers and reheaters discounts the crucial roles that these systems play in the Model 400's operations, and should be given no credence.  Pl. Mot. at 27, 34.  Without the TMS and WTS, [████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████].  These important and varied functions undermine HyAxiom's tenuous argument that the balance of the PC50's components and systems serve only to "support the water gas generating function of the SMR."  Indeed, [████████████████████

███████

████████████████████████████████████

███████

█████████████████████████

███████]

Def. Ex. C, Kanuri 1 at 167.

Finally, even though HyAxiom has amended its complaint to remove all but the present classification claim, it nonetheless repeatedly invokes NY 854572 (July 26, 1990) in an attempt to construe the PC50 as a water gas generator of HTSUS heading 8405.  But the ruling has no bearing on the classification of the PC50.  NY 854572, issued to Carrier Corporation, concerned "{t}he tariff classification of fuel cell component parts (inverter and gas generator) from Japan."

NY 854572.  The ruling characterized the subject articles as "parts of the PC25 fuel cell," and

were further described as (1) an "Electrical System Assembly module" and (2) a "reformer,"

which "is the unit that converts natural gas and steam into a gas that is mostly Hydrogen.  The

gas is then fed to the fuel cell which generates the DC for inversion to AC."  *Id*.  CBP classified

the Electrical System Assembly (ESA) module under HTSUS subheading 8504.40.0040, and the

reformer under HTSUS subheading 8405.10.0000.  *Id*.

In its briefing, HyAxiom misleadingly describes the reformer in NY 854572 as a "PC25

reformer module" or "SMR module," even though the ruling itself does not employ these

descriptions.  Pl. Mot. at 8, 24, 28, 35.  Unlike the imported PC50 supermodule—which contains

the FPS, TMS, much of the WTS, piping for the APS, wiring and other connections, valves,

sensors, piping, and a frame to support all of these assembled and interconnected components

(and the addition of other componentry post-import)—the subject of NY 854572 (apart from the

ESA) was a PC25 reformer only.  Indeed, no PC25 supermodules ever existed.  Def. Ex. B, DSM

at 54, 129-30; Def. Ex. C, Kanuri 1 at 140-42.  To the extent the subject article of NY 854572

can be described as a "PC25 reformer module," it merely refers to a PC25 reformer that

contained a frame for transport covering just the perimeter of the reformer, and not a frame for

the entire powerplant.  *Id*.  But the imported PC25 reformer subject to NY 854572 did not

include the balance of components of a supermodule, or even the balance of components in a

FPS (*i.e,* an ILS, [███████████████████████████]).  As such, the

merchandise at issue in NY 854572 is inapposite to the subject PC50, and how CBP may have

classified a standalone reformer over thirty years ago does not bear upon the classification of the

markedly different merchandise at issue.

Nonetheless, HyAxiom speculates that "CBP could have only found the PC25 reformer module classifiable under HTS 8405 as an incomplete or unfinished water gas generator pursuant to a GRI 2(a) analysis." Pl. Mot. at 24.  And similarly: "Thus, even though the PC25 reformer module was not 'self-contained,' CBP had no issue classifying that article under HTS 8405." Pl. Mot. at 35, fn. 23.  These conclusions are pure conjecture.  NY 854572 is devoid of any stated rationale for CBP's classification determination.  The agency may have classified the subject merchandise in accordance with any of the GRI, or in consideration of a number of unstated factual or legal factors.  Regardless of the particulars of NY 854572, the imported PC50 is not a mere standalone reformer; it is an assembly of multi-functional components and systems, that in conjunction with post-import componentry and on-site inputs, generates electricity, heat, and water in an operational powerplant.

Accordingly, for all of these reasons discussed above, the imported merchandise is not an incomplete water gas generator "included" in HTSUS heading 8405, and, as a result, HyAxiom's classification claim must be rejected and its motion denied.

## IV. THE PC50 IS A PART SUITABLE FOR USE SOLELY WITH AN ELECTRIC GENERATOR

Having established that the imported PC50 is not a water gas generator, whether complete or incomplete, and thus is not "included" in HTSUS heading 8405, Section XVI Note 2(b) instructs that the PC50—as a part suitable for use solely or principally with a particular kind of machine (the Model 400)—is "to be classified with the machine of that kind" (*i.e.*, as an electric generator of HTSUS heading 8501) "or in heading…8503…as appropriate…"  For the reasons below, we submit that the PC50 is appropriately classified, pursuant to GRI 1, under HTSUS heading 8503 as "Parts suitable for use solely or principally with the machines of heading 8501 or 8502."

38

The parties do not dispute that a completed Model 400 is an electric generator of HTSUS

heading 8501.  *See* ECF No. 43-25, Pl. Ex. B.8, Protest Memo at 8 ([███████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████ ]); Def. Ex. B, DSM at 127-28, [████████████████████ ];

*see also* NY E84772 (July 20, 1999) (classifying a complete hydrogen fuel-cell powerplant that

generates electricity, heat, and water under HTSUS heading 8501); NY J80297 (February 4,

2003) (classifying a complete solid-oxide fuel cell generator under HTSUS heading 8501).

But the PC50 is not an incomplete electric generator of HTSUS heading 8501 because

CBP has previously ruled that the essential character of a fuel cell electric generator are the fuel

cell stacks.  *See, e.g.,* NY E86434 (September 20, 1999); N276834 (July 14, 2016).  For instance,

in NY E86434, issued to Cinergy Services, CBP decided the tariff classification of merchandise

akin to the Model 400: "The merchandise is a P2B Proton Exchange Membrane Fuel Cell Power

Plant.  The fuel cell power plant makes use of a fuel processor to extract hydrogen from natural

gas.  The hydrogen is then fed into a fuel stack, which generates water, heat and DC electricity.

An electrical inverter converts the DC current to 250kW AC current."  But, like with the PC50,

the importer did not make entry of the entire hydrogen-fuel cell power plant.  Rather, "{b}ecause

of the delicacy of the stack, you intend to import the stack and the enclosed unit in separate

importations."  *Id*.  Thus, as incomplete articles, pursuant to GRI 2(a), CBP considered the

essential character of the two articles, and determined that "the stack has the essential character

of the completed fuel cell power plant."  *Id*.  As a result, CBP classified the fuel cell stack as an

incomplete generator of HTSUS heading 8501, and the balance of the powerplant, *i.e.*, the

enclosed unit, under HTSUS heading 8503, as parts of generators of HTSUS heading 8501.  *Id*.

Similarly, because the imported PC50 does not include the FCS, consistent with CBP's rulings,

the PC50 is not appropriately classified, pursuant to GRI 2(a), as an incomplete electric generator of HTSUS heading 8501.

In accordance with GRI 1, HTSUS heading 8503 describes the subject PC50 in its entirety, and therefore, is the appropriate tariff designation for the imported PC50. HTSUS heading 8503 provides for "Parts suitable for use solely or principally with the machines of heading 8501 or 8502." Although the parties agree that Section XVI Note 2 governs the classification of the subject merchandise, which expressly applies to parts of machines, the PC50 also satisfies the criteria of a part set forth by *Bauerhin Technologies Limited Partnership v. United States,* 110 F. 3d 774 (Fed. Cir. 1997).

In *Bauerhin*, the Federal Circuit, drawing from its predecessor court's decisions, proffered multiple tests for what constitutes a part. The first test, quoted from *United States v. Willoughby Camera Stores, Inc*, 21 C.C.P.A. 322 (1933), considers an imported good a part if it is an "integral, constituent, or component part, without which the article to which it is to be joined, could not function as such article." *Bauerhin*, 110 F.3d at 778 (quoting *Willoughby*, 21 C.C.P.A. 322 at 324) (internal quotation marks omitted). The second test, derived from *United States v. Pompeo*, 43 C.C.P.A. 9 (1955), provides that an "imported item dedicated solely for use with another article is a 'part' of that article within the meaning of the HTSUS." *Bauerhin*, 110 F.3d at 779. Under either precedent, the Federal Circuit clarified that an imported article is not a part if it is "a separate and distinct commercial entity." *Id*.

Here, the PC50 satisfies the tests articulated in *Bauerhin*. It is undisputed that the PC50 is an "integral, constituent, or component part," without which, the Model 400 could not function as an electric generator. In addition, as established above, the PC50 is dedicated solely for use with the Model 400, and cannot function unless incorporated into a complete Model 400. *See*

Def. Ex. B, DSM at 115 ([█████████████████████████████████

██████████████████████████████████████████████████████

████████]).  Finally, the PC50 is not a separate and distinct commercial entity, as the [███████

██████████████████]; rather, it is always incorporated into a complete Model 400.

*Id*. at 92-93.  The PC50 is thus a "part" of the Model 400, and is "suitable for use solely or

principally" with the Model 400, a machine of HTSUS heading 8501.  As such, the PC50 is

properly classified in HTSUS heading 8503.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our cross-motion for

summary judgment, deny plaintiff's motion for summary judgment, enter judgment in our favor

and dismiss this action.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    /s/ Justin R. Miller
       JUSTIN R. MILLER
       Attorney-In-Charge
       International Trade Field Office

       /s/ Aimee Lee
       AIMEE LEE
       Assistant Director

Of Counsel:

Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

       /s/ Alexander Vanderweide
       ALEXANDER VANDERWEIDE
       Senior Trial Counsel
       Civil Division, U.S. Dept. of Justice
       Commercial Litigation Branch
       26 Federal Plaza
       New York, New York 10278

Tel. (212) 264-9230 or 0482
Attorneys for Defendants

Dated: March 15, 2023

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

————————————————————————

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN | : | |
| FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Pages 2, 4-19,** |
| TROY A. MILLER, | : | **26-29, 33-37, 39, 41** |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |

————————————————————————

## <u>CERTIFICATE OF COMPLIANCE</u>

I, ALEXANDER VANDERWEIDE, a senior trial counsel in the Office of the Assistant

Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field

Office, who is responsible for the Government's March 15, 2023 cross-motion for summary

judgment and response in opposition to plaintiff's motion for summary judgment, relying upon

the word count feature of the word processing program used to prepare the brief, certifies that

this cross-motion and response complies with the word count limitation under the Court's

chambers procedures, and contains 12,833 words.


<u>/s/ Alexander Vanderweide</u>