UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Information Removed From** |
| TROY A. MILLER, | : | **Pages 2, 4, 6-12, 15, and 17** |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

Of Counsel:

Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

ALEXANDER VANDERWEIDE
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza
New York, New York 10278
Tel. (212) 264-9230 or 0482
Attorneys for Defendants

Dated: June 20, 2023

## TABLE OF CONTENTS

ARGUMENT ..................................................................................................................... 3

I.   THE PC50 IS NOT A WATER GAS GENERATOR OF HTSUS HEADING 8405 ............ 3

    A.  HyAxiom's Classification Analysis Fails To Consider The Imported PC50
    In Its Entirety ........................................................................................................... 3

    B.  Neither The SMR Nor The PC50 Generates A Water Gas ................................ 7

    C.  Water Gas And Synthesis Gas Are Not Synonymous .................................... 11

    D.  Our Interrogatory Response Regarding The SMR Should Be Given No Weight .......... 13

II.  THE PC50 IS A PART OF AN ELECTRIC GENERATOR ............................................. 16

CONCLUSION ................................................................................................................... 17

## TABLE OF AUTHORITIES

### Cases

*Bauerhin Technologies Limited Partnership v. United States*,
    110 F. 3d 774 (Fed. Cir. 1997) ................................................................... 16, 17

*Fidelity & Deposit Co. of Maryland v. Hudson United Bank*,
    653 F.2d 766 (3d Cir. 1981) ............................................................................ 14

*Home Depot U.S.A., Inc. v. United States*,
    435 F. Supp. 3d 1311 (Ct. Int'l Tr. 2020) ...................................................... 14

*Hurtado v. Balerno Int'l Ltd.*,
    408 F. Supp. 3d 1315 (S.D. Fla. 2019) ........................................................... 15

*United States v. Pompeo*,
    43 C.C.P.A. 9 (1955) ....................................................................................... 17

*United States v. Willoughby Camera Stores*,
    21 C.C.P.A. 322 (1933) ................................................................................... 16

### Harmonized Tariff Schedule of The United States

General Rule of Interpretation (GRI) 1 ........................................................ 1, 2, 6, 16

General Rule of Interpretation (GRI) 2(a) ............................................................... 2, 5, 6

Section XVI

Section XVI Note 2(b) ................................................................................................ 16

Chapter 84

  Heading 8405 ........................................................................................................ *passim*

    Heading 8405.10.00 ............................................................................................ 15

Chapter 85

  Heading 8501 .................................................................................................... 16, 17

  Heading 8503 ......................................................................................... 2, 6, 16, 17

**Rules**

FRE 801(d)(2) ............................................................................................................. 14

FRE 801(d)(2)(D) ...................................................................................................... 14

USCIT Rule 33(c) ...................................................................................................... 14

USCIT Rule 36 ........................................................................................................... 14

**Other Authorities**

Rule 30(b)(6) ................................................................................................................. 4

Rule 56.3 ..................................................................................................................... 13

**Miscellaneous**

Explanatory Note to HTS heading 84.05 .............................................................. 3, 5, 8

NY 854572 (July 26, 1990) ....................................................................................... 15

*Feedstock*, ballotpedia.org
  https://ballotpedia.org/Feedstock (last visited May 24, 2023) .................................. 11

*Feedstock*, collinsdictionary.com
  https://www.collinsdictionary.com/us/dictionary/english/feedstock
  (last visited May 24, 2023) ....................................................................................... 11

*Water-gas-shift-reaction*,
  https://www.sciencedirect.com/topics/engineering/water-gas-shift-reaction
  (last visited May 26, 2023) ...................................................................................................... 10

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | **PUBLIC VERSION** |
| | : | |
| Plaintiff, | : | Court No. 21-00057 |
| | : | |
| v. | : | **Business Confidential Information Removed From Pages 2, 4, 6-12, 15, and 17** |
| | : | |
| UNITED STATES OF AMERICA; U.S. CUSTOMS & BORDER PROTECTION; TROY A. MILLER, PERFORMING THE DUTIES OF THE COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants, United States *et al.* (the Government), respectfully submit this memorandum in reply to plaintiff's, HyAxiom, Inc. f/k/a Doosan Fuel Cell America, Inc. (HyAxiom), opposition (Pl. Opp.) to our cross-motion for summary judgment.

HyAxiom's PC50 supermodule (PC50) is an assemblage of multi-functional systems and components that after importation is incorporated into the PureCell® Model 400 (Model 400). In our cross-motion, we demonstrated that, pursuant to General Rule of Interpretation (GRI) 1, the PC50 is correctly classified under Harmonized Tariff Schedule of the United States (HTSUS) heading 8503 as a part of an electric generator (the Model 400).

We also explained that the PC50 is not a water gas generator of HTSUS heading 8405 because it does not generate a water gas.  Instead of passing air and steam over burning solid fuels to make water gas, the PC50, in a complete Model 400, catalytically reforms natural gas

into a hydrogen-rich synthesis gas fuel that is reacted in the Model 400's fuel cell stacks (FCS) to generate electricity, heat, and water.

Further, we showed that, regardless of the type of gas it makes, the PC50 possesses features that substantially exceed water gas generators of HTSUS heading 8405, including: [████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████ ]; providing structural support and protection for the PC50's components, as well as the additional components of the Model 400 that are not included with the PC50; and providing attachment points and support for the Model 400's exterior enclosure.

Moreover, we demonstrated that HyAxiom's classification analysis was fatally flawed because it incorrectly bypassed GRI 1. Instead, HyAxiom considered whether the PC50's steam methane reformer (SMR) alone had the essential character of a complete water gas generator, in contravention of GRI 2(a) and longstanding precedent that goods must be classified in their condition as imported. In accordance with GRI 1, HTSUS heading 8503 describes the subject PC50 as a part of an electric generator in its entirety, and therefore, is the appropriate tariff designation for the PC50.

HyAxiom's opposition to our cross-motion largely retreads the same ground as its opening motion, recycling and amplifying the erroneous contention that the SMR alone determines the PC50's classification. In doing so, HyAxiom again attempts to reduce all the

PC50's operational functions and systems to one thing only: supporting the SMR. *See* Pl. Opp. at 17-18 ("All the other components (*i.e.*, ILS, TMS, water treatment system ("WTS"), air processing system ("APS"), and frame) are clearly suitable for use with the SMR because they perform purifying or other auxiliary functions to support the PC50 supermodule's water gas generation function in accordance with EN 84.05."); *see also id.* at 24 ("each of the PC50 supermodule components support its water gas generating function."). Invariably, by elevating the features and functions of the SMR above the entire PC50, HyAxiom's opposition sets forth an inherently limited, and ultimately immaterial, series of contentions: that the fuel output from the SMR accords with the Explanatory Note to HTS heading 84.05's (84.05 EN) definition of a water gas; that a synthesis gas (aka syngas) is just a water gas put to a specific use; and that we admit that the SMR generates a water gas.

As discussed in further detail below, HyAxiom's contentions miss the mark. The SMR is not the product at issue, the PC50 is. Nor does the SMR or the PC50 produce a water gas. And when considered as a whole, the PC50 does far more than serve the SMR and its alleged "water gas generating function."

## ARGUMENT

## I.     THE PC50 IS NOT A WATER GAS GENERATOR OF HTSUS HEADING 8405

### A.  HyAxiom's Classification Analysis Fails To Consider The Imported PC50 In Its Entirety

In its opposition, HyAxiom continues to center its classification analysis on the SMR, as if that were the subject merchandise before the Court. But the SMR is simply not the imported product at issue, the PC50 is. And the PC50 consists of the FPS (of which the SMR is but one component), Thermal Management System (TMS), and certain components of a Water Treatment System (WTS)—all multi-functional systems that are themselves comprised of

various integral components and subsystems. *See generally* ECF No. 43-1, Pl. Mot.; Def. Ex. A,

Pl. Responses to Def. 2nd Set of Interrogatories (2nd Rogs Resp.); Def. Ex. B, Deposition

Transcript of Pl. Rule 30(b)(6) agent, Dr. Sathya Motupally (DSM); Def. Ex. C, Deposition

Transcript (Vol. 1) of Pl. Rule 30(b)(6) agent, Sridhar Kanuri (Kanuri 1); Def. Ex. D, Deposition

Transcript (Vol. 2) of plaintiff's expert witness, Sridhar Kanuri (Kanuri 2); Def. Ex. E, Expert

Report of Sridhar Kanuri (Kanuri Report); Def. Ex. F, PC50 Supermodule PowerPoint (PC50

PPT); Def. Ex. G, Pl. Resp. to R&R's Questions (R&R Resp.).  The PC50 also includes a frame,

wiring and other connections, valves, sensors, and piping.  *Id.*  It is all of these components and

systems of the PC50—not merely the SMR—that function within the Model 400 to contribute to

the powerplant's production of energy by:

    (1) catalytically reforming natural gas into a hydrogen-rich fuel for the FCS to convert

into electricity, heat, and water;

    (2) █████████████████████████████████

███████████████████████████████████████████

████████

████████████████████████████████

█████████████████████████████████████

███████████████████████

███████████████████████████████████

████████████████████

██████████████████████████████████████

███████████████████████ ];

(8) providing structural support and protection for the PC50's components, and the balance of the Model 400's components that are not included with the PC50; and

(9) containing attachment points for the Model 400's exterior enclosure.

HyAxiom's myopic focus on the SMR indelibly taints and undermines its central argument that, pursuant to GRI 2(a), the SMR—as opposed to the subject PC50—has the essential character of a water gas generator of HTSUS heading 8405, which as an *eo nomine* heading, includes not just those water gas generators described by the 84.05 EN, but encompasses all forms of water gas generators, whether complete or incomplete, including those that produce a water gas through steam methane reforming.  Pl. Opp. at 12-15.

As explained in detail in our cross-motion, *see* Def. Cross-Mot. at Sec. III. C, even if modern steam methane reforming could conceivably produce a water gas, which it does not (*see infra* at 7-13):

(a) *eo nomine* headings do not encompass goods with features and functions that substantially exceed the common meaning of the tariff provision, such as the PC50, which performs multiple, critical non-gas generating functions (*see supra* at 4-5), is an integral part of an electric generator that produces heat, electricity, and water, and does not generate a water gas;

(b) neither the SMR nor the PC50 share the qualities and characteristics of a water gas generator, as described by the 84.05 EN or otherwise; and

(c) GRI 2(a), to the extent even relevant here, concerns whether the imported PC50—not the SMR—is an incomplete article that has the essential character of a complete water gas generator of HTSUS heading 8405 (which it does not).

Although HyAxiom now apparently concedes that the totality of the PC50 must be considered to determine its "essential character," *see* Pl. Opp. Br. at 17, we reiterate our analysis

from our cross-motion, that a GRI 2(a) essential character analysis is neither warranted nor appropriate here, as pursuant to GRI 1, the PC50 is described by the terms of HTSUS heading 8503 as a part of an electric generator. *See* Def. Cross-Mot. at Sec. IV and below.

Nonetheless, in its opposition, HyAxiom continues to narrowly consider the PC50's systems and components in relation to the SMR, as opposed to evaluating the PC50's numerous functions as a whole. By doing so, HyAxiom discounts or ignores the vital non-gas generating functions that the PC50's components and systems perform, including those components that, in addition to the SMR, constitute the FPS. For instance, without the Integrated Low Temperature Shift Converter (ILS), [███████████████████████████████████]. Pl. Mot. at 2, 12, 26-27; Def. Ex. A, 2nd Rogs Resp. at 8; Def. Ex. B, DSM at 27-28, 35-36, 104; Def. Ex. C, Kanuri 1 at 25-26, 33-34, 36-38, 66-67, 69-70, 76-77, 105-06, 110-11, 132, 207; Def. Ex. D, Kanuri 2 at 304, 322; Def. Ex. E, Kanuri Report at 9, 15, 24, 29; Def. Ex. G, R&R Resp. at 4, 6, 7. And without the ILS, [████████████████████████ ████████████████████████████████████████]. Pl. Mot. at 2, 12, 26-27, 34; Def. Ex. A, 2nd Rogs Resp. at 7-8; Def. Ex. C, Kanuri 1 at 34-35, 70-71, 76-80, 85-86, 92, 107-08, 110-11, 120-21, 130-32, 134-35, 150, 160-63, 165-66, 207; Def. Ex. D, Kanuri 2 at 294-95, 323, 326-27, 376; Def. Ex. E, Kanuri Report at 9, 15, 24; Def. Ex. G, R&R Resp. at 4, 6, 7. Simply put, without the ILS, the PC50 and Model 400 could not operate.

Likewise, without the TMS and WTS, the entire Model 400 would be unable to [██████ ████████████████████████████████████████ ██████████████]. *See generally* Pl. Mot.; Def. Ex. A, 2nd Rogs Resp.; Def. Ex. B, DSM; Def. Ex. C, Kanuri 1; Def. Ex. D, Kanuri 2; Def. Ex. E, Kanuri Report; Def. Ex. F, PC50

PPT; Def. Ex. G, R&R Resp.  The Model 400's functionality, in other words, depends on the TMS and WTS.

These are vital and integral components and systems ***that are all essential*** to the PC50's operation in a working Model 400.  HyAxiom fails to explain why one PC50 function is more important or essential than another.  Nor can it, because the PC50's components and systems are all vital and essential.  It is just as valid to claim that the SMR supports the ILS's functions, or the TMS's, or any of the components and systems needed for the PC50 to perform its necessary tasks.  All are required for the PC50 and the Model 400 to function, and no one component or system is more essential than the other.

Further, to the extent that it contends that the PC50 itself is an incomplete or unfinished water gas generator, HyAxiom fails to grasp that the various parts and systems that are needed to complete the PC50 after importation, *i.e.,* the FCS, the Electric Systems Module (ESM), █████ ███████████████████████████], etc., do not transform the PC50 into a mere water gas generator of HTSUS heading 8405.  Rather, the product that the additional parts and systems complete is the Model 400, a fully functional electric generator that provides energy in the form of electricity and heat—***not gas***—to HyAxiom's customers.

**B.  Neither The SMR Nor The PC50 Generates A Water Gas**

HyAxiom contends that our focus on the gas output from the dual catalytic reactions taking place in the FPS does not negate HyAxiom's position that the SMR, and the PC50 as a whole, generates a water gas.  Pl. Opp. at 9-11.  As detailed further below, it is nonsensical to evaluate whether the PC50 is a water gas generator of HTSUS heading 8405 based solely on the initial or intermediate gas output from the SMR, as opposed to the PC50's final gas output.  The imported product at issue is the PC50, not the SMR.  In any event, neither the SMR alone nor the

PC50 as a whole generate a water gas.

As we explained in our cross-motion, a water gas generator of HTSUS heading 8405, as that term is commonly and commercially understood, and construed by the 84.05 EN, produces hydrogen and carbon monoxide by passing air and steam over burning solid fuel in an incomplete exothermic combustion process. *See* Def. Cross-Mot. at Sec. III. A.  Although HyAxiom argues that the composition of the gas produced by the SMR is "part and parcel of the definition of a water gas as that term is defined by the EN," Pl. Opp. at 10, neither the SMR alone nor the FPS in an operational Model 400 produce just hydrogen and carbon monoxide by passing air and steam over burning solid fuel in an incomplete exothermic combustion process. Nor do they burn any fuel at all.

Instead, the SMR, as one component of the FPS, [



]. Pl. Mot. at 11, 23-24, 32; Def. Ex. C, Kanuri 1 at 60, 67-70, 79, 85, 129, 150, 169; Def. Ex. D, Kanuri 2 at 365; Def. Ex. G, R&R Resp. at 4, 6-7.  In contrast to the functionality and gas output of water gas generators of HTSUS heading 8405, the SMR employs a catalytic reformation process, resulting in an output that is roughly [        ], a combination that exceeds the definitional confines of a water gas. *See also infra* at 11-13 (discussing water gas and synthesis gas).  Thus, even if we were to limit our analysis to the gas output from the SMR alone, the SMR does not produce a water gas.

Despite this fact, HyAxiom asserts that "there is no genuine dispute that the PC50

supermodule generates a water gas," because in our interrogatory responses, we "admitted" that the SMR "convert[s] steam and natural gas into a water gas," and that "{t}his admission, by itself, is fatal to the Defendants' Cross-Motion."  Pl. Opp. at 1; *see also id*. at 4-5.  But our interrogatory responses are not dispositive on this point (*see infra* at 13-16), and, moreover, we *do dispute* that the product at issue, the PC50, generates a water gas.

Even though HyAxiom repeatedly conflates the SMR with the PC50 as a whole, what type of gas the SMR alone produces is not determinative of the classification of the imported PC50.  The fuel-generating function of the PC50, in an operable Model 400, does not begin and end with the gas produced in the SMR.  Nor does the SMR operate alone in a vacuum.  It requires a fully functional Model 400 to operate, with its various components, systems, subsystems, inputs, and outputs, some of which are included in the PC50, some of which are not.  And even then, after the initial gas mixture is generated by the SMR, [██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

██████████████████████████].  Pl. Mot. at 2, 12, 26-27, 34; Def. Ex. A, 2nd Rogs Resp. at 7-8; Def. Ex. C, Kanuri 1 at 34-35, 70-71, 76-80, 85-86, 92, 107-08, 110-11, 120-21, 130-32, 134-35, 150, 160-63, 165-66, 207; Def. Ex. D, Kanuri 2 at 294-95, 323, 326-27, 376; Def. Ex. E, Kanuri Report at 9, 15, 24; Def. Ex. G, R&R Resp. at 4, 6, 7.  It is this output, the product of the dual catalytic reactions in both the SMR and ILS, that is required for the FPS to ultimately produce a hydrogen-rich fuel—which is not a water gas—for the FCS to generate electricity, heat, and water.  HyAxiom's focus on the SMR's output alone is simply incorrect.

Yet HyAxiom posits that "without the SMR to generate the water gas in the first place, there could be no water gas shift reaction and no hydrogen-rich water gas."  Pl. Opp. at 5; *see also* Pl. Opp. at 10.  Regardless of whether or not the SMR generates "water gas in the first place," the purpose of the WGSR occurring in the ILS is [███████████████████████████████ ██████████████████████████████████████████████], one of the two compounds required of a water gas.  Def. Ex. B, DSM at 27-28; Def. Ex. C, Kanuri 1 at 34-37, 71, 78, 108, 130-31, 151; Def. Ex. D, Kanuri 2 at 327, 347; Def. Ex. E, Kanuri Report at 13, 15, 24, 25; Def. Ex. G, R&R Resp. at 8; Def. Ex. H, Dictionary Definitions at *Oxford Dictionary of Science*; *see also* https://www.sciencedirect.com/topics/engineering/water-gas-shift-reaction (last visited May 26, 2023) (explaining the WGSR in the context of various processes and applications).  As a result, once the WGSR occurs, there is no so-called "hydrogen-rich water gas."  Instead, the gas produced after the WGSR takes place is, by design, a hydrogen-rich fuel only, devoid of "water gas."[1]

Notably, HyAxiom recognizes the difference between the initial gas mixture from the SMR and the final output created in the FPS for the FCS.  *See* ECF No. 51-5, Pl. Resp. to Def. SOF ¶ 10 ([████████ ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████].

---

[1] Oddly, HyAxiom unsuccessfully attempts to rebut our observation that the company itself does not describe the PC50 as a water gas generator by citing to a confidential Model 400 product guide that describes the gas resulting from the SMR as [████████████████████████ ██████████████████████████] and explains that [████████████████████████████ ██████████████].  Pl. Opp. at 16.  We note that this SMR gas description does not even accord with the definition of a water gas, [███████████████████████████████████████].  Moreover, as explained above, the WGSR operates to create a gas-fuel output that is not a water gas.  Further, in no way does HyAxiom point to any documentation, whether internal or public, that describes the PC50 or Model 400 (or even the SMR) as a water gas generator.

Thus, there can be little dispute that the actual gas made in the FPS as a fuel source for the Model 400's FCS is not the same gas produced during the initial reaction in the SMR.  And it is this final, complete gas product in an operational Model 400 that is relevant to the classification of the PC50, not the intermediate, incomplete gas output from the SMR *that is incapable* of serving as a proper fuel source for the FCS.  *See* Def. Ex. C, Kanuri 1 at 72, 160-61 (explaining that the [███████████████████████████████████████████████████████████████ ███]).

### C.  Water Gas And Synthesis Gas Are Not Synonymous

HyAxiom also takes issue with our conclusion that the combined catalytic reactions that occur in the FPS to produce a hydrogen-rich fuel for the FCS is most accurately described as a syngas.  HyAxiom posits that "{t}he only difference between synthesis gas and water gas is that synthesis gas refers to the subsequent use of water gas in the synthesis of chemicals or feedstock."  Pl. Opp. at 8 (emphasis omitted); *see also id.* at 2, 7.  Syngas is not as limited as HyAxiom contends.

Even if a water gas could be considered a type of synthesis gas under the broadest definitions of syngas, such as "any of several gaseous mixtures…", Pl. Opp. at 7 (*citing Random House Kernerman Webster's College Dictionary*), or based on its use in synthesizing chemicals or as a feedstock,[2] the definitions cited by the parties make clear that not all synthesis gasses are water gas.  For example, undercutting HyAxiom's contention that the terms are synonymous, the *Collins English Dictionary*, when defining synthesis gas, specifically distinguishes modern

---

[2] Feedstock is defined as: "raw material for industrial processing; often, specif., any of various petroleum products used in making petrochemicals and gasoline." https://www.collinsdictionary.com/us/dictionary/english/feedstock (last visited May 24, 2023); *see also* https://ballotpedia.org/Feedstock (last visited May 24, 2023) (explaining that "{f}eedstock is a general term referring to material that is used to make fuel.").

synthesis gases from those that were once made using water gas:

> 1. (Chemistry) a mixture of carbon dioxide, carbon monoxide, and hydrogen formerly made by using water gas and reacting it with steam to enrich the proportion of hydrogen for use in the synthesis of ammonia
>
> 2. (Chemistry) a similar mixture of gases made by steam reforming natural gas, used for synthesizing organic chemicals and as a fuel

Def. Ex. H, Dictionary Definitions.  We note that these definitions in particular describe the chemical composition of the gas [███████████], as well as the processes undertaken in the SMR to steam reform natural gas into a fuel source.  The *Dictionary of Chemical Engineering*, *see* Pl. Opp. at 7, likewise distinguishes synthesis gas made through steam methane reforming from water gas.  If synthesis and water gas are the same, as HyAxiom maintains, why would they be specifically distinguished when defined?  Indeed, none of the dictionaries, whether those proffered by the Government or HyAxiom, define synthesis gas as water gas or as water gas that has a specific purpose; water gas is only mentioned in the sources to differentiate it from synthesis gas.

Not only does this distinction between gasses evidence that the terms are not synonymous, the definitions also support our argument, explained in detail in our cross-motion, that how a water gas is produced informs whether a given product is classifiable as a water gas generator of HTSUS heading 8405.  *See* Def. Cross-Mot. at Sec. III. A.  Although HyAxiom argues that steam methane reforming is merely the modern way of making water gas, *see, e.g.,* Pl. Opp. at 7, fn. 5, and at 13, the cited definitions do not bear that out.  Instead, the references gathered by the parties demonstrate that, to the extent both types of gases may fall under the general umbrella of synthesis gases, the gasses are nevertheless distinguishable.  Instead of steam methane reforming being a new way to make water gas, the definitions highlight that water gas,

12

if anything, is an obsolete or disfavored form of synthesis gas.

Consequently, because the PC50's constituent parts and systems contribute to the production of a hydrogen-rich syngas fuel in an operable Model 400, the subject merchandise is precluded from classification in HTSUS heading 8405, which specifically covers producer gas or water gas generators only, and does not encompass synthesis gas generators.

### D.  Our Interrogatory Response Regarding The SMR Should Be Given No Weight

Even though the gas output from the SMR alone is not determinative of whether the PC50 is a water gas generator of HTSUS heading 8405, we recognize, as HyAxiom points out, that an interrogatory response of ours stated that the SMR converts steam and methane into a water gas.  *See* Pl. Opp. at 1, 4-5.  To contextualize, this statement was made early in the discovery process, and was based on HyAxiom's representations regarding the PC50 and the limited amount of product information available to U.S. Customs and Border Protection (CBP) at that time.  Yet the extensive documentation, information, and testimony gathered throughout the entire discovery period altered our understanding of the SMR's operations, and established that the SMR does not generate a water gas within the meaning of HTSUS heading 8405.  We acknowledge that we did not amend or supplement our interrogatory responses at the end of the discovery period to remove this reference to water gas.[3]  But we respectfully submit that any failure to do so was inadvertent and harmless to HyAxiom.  HyAxiom has not claimed that it was surprised or prejudiced that our responses to its Rule 56.3 statements of fact state that the SMR does not produce a water gas, but rather, a synthesis gas.  Moreover, the documentation produced by the Government during discovery, along with the fact depositions taken by HyAxiom of CBP's employees, made clear that we disagree with the contention that any part of the PC50

---

[3] If the Court so directs, we will formally amend our responses for accuracy-sake.

generated a water gas.

Unlike USCIT Rule 36, which expressly addresses binding, conclusive, case-determinative admissions, USCIT Rule 33(c) states that "{a}n answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence."  One such use is discussed in *Home Depot U.S.A., Inc. v. United States*, 435 F. Supp. 3d 1311, 1334 (Ct. Int'l Tr. 2020), which HyAxiom cites in an effort to characterize our interrogatory response as an "admission."  But *Home Depot* is not necessarily the support HyAxiom believes it to be.

In *Home Depot*, plaintiff objected on hearsay grounds to defendant's use of a document during summary judgment briefing that plaintiff produced to defendant in discovery and that it identified when responding to defendant's interrogatories.  435 F. Supp. 3d at 1332-33.  The Court found that it may consider the document, and observed that, under Federal Rule of Evidence (FRE) 801(d)(2), an opposing party's interrogatory answer may be admissible as a party admission or adopted admission so long as it satisfies the rule's requirement that "the statement is offered against an opposing party, and . . .  was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  *Id*. at 1333-34, *quoting* FRE 801(d)(2)(D).  *Home Depot*, however, does not address what weight is to be given to a particular document or statement that may be excluded from hearsay under FRE 801(d)(2), and the Court did not state that such evidence must be treated as binding or determinative in the same way that formal admissions are treated under Rule 36.  *See Fidelity & Deposit Co. of Maryland v. Hudson United Bank*, 653 F.2d 766, 777 (3d Cir. 1981) (holding that interrogatory responses, although admissible as evidence, are not conclusive like judicial admissions).

Our understanding of the PC50 and its components, and the Model 400, was only fully realized as a result of HyAxiom's various document productions (consisting of tens of thousands

of pages), its responses and multiple supplemental responses to two sets of interrogatories, discovery letters, its expert report, and its expert and designated agents' depositions. Given that our initial interrogatory response regarding the SMR was made in the early stages of discovery and was based upon the limited information provided by HyAxiom to us at that time, we believe that our interrogatory response statement regarding the SMR and water gas should be given no weight, especially since it is not accurate.[4] *See, e.g., Hurtado v. Balerno Int'l Ltd.*, 408 F. Supp. 3d 1315, 1329 (S.D. Fla. 2019) (holding that interrogatory answers and deposition statements may be retracted by contrary testimony established at trial). What the SMR alone produces, as well as the PC50's FPS, is a syngas. *See* Def. Ex. H, Dictionary Definitions at the *Oxford English Dictionary's* citation to the New Scientist, which states that "{s}yn-gas is also made from natural gas [ ] by the related reaction $CH_4 + H_2O = CO + 3H_2$" (emphasis in original). This description and formula [███████████████████████████████████]. Pl. Mot. at 7, 11, 23; Def. Ex. A, 2nd Rogs Resp. at 7; Def. Ex. C, Kanuri 1 at 120, 127-30, 155; Def. Ex. D, Kanuri 2 at 351, 356-57, 379-80, 383-85; Def. Ex. E, Kanuri Report at 22, 24; Def. Ex. G, R&R Resp. at 6; *see also* Def. Ex. D, Kanuri 2 at 348 ([█████████████████████████ ████████████████]).

In any event, even if our interrogatory response regarding the SMR and water gas were to

---

[4] HyAxiom also notes that our statement of fact response that the PC25 reformer does not generate a water gas contradicts NY 854572 (July 26, 1990), which ruled, in part, that an imported PC25 reformer was classifiable in HTSUS subheading 8405.10.00. Pl. Opp. at 15-16. Given our newfound understanding of how both the PC25 reformer and PC50 operate, as a result of the extensive discovery conducted in this case, CBP may very well revisit NY 854572 depending on the outcome of this action. But we stress that NY 854572 concerned a different product than at issue here—a standalone reformer—and that ruling is in no way binding of the PC50, which unlike the PC25 reformer, is an imported assembly of multi-functional components and systems, that when included with post-import componentry and on-site inputs, generates electricity, heat, and water in an operational powerplant.

be treated as an admission, the incomplete gas output from the SMR alone, whether it can be considered a water gas or not, is simply not dispositive of whether the imported PC50 as a whole in a functional Model 400 produces a water gas, let alone whether the PC50 satisfies the criteria of a water gas generator of HTSUS heading 8405.

**II**.    **THE PC50 IS A PART OF AN ELECTRIC GENERATOR**

Despite HyAxiom's attempt to characterize the SMR, and by extension the PC50, as a water gas generator, the correct classification provision for the PC50, when considered in connection with the Model 400, is found in HTSUS heading 8503.  As explained in our moving papers, pursuant to GRI 1, HTSUS heading 8503 describes the subject PC50 in its entirety, and therefore, is the appropriate tariff designation for the imported PC50.  HTSUS Section XVI Note 2(b) instructs that a part suitable for use solely or principally with a particular kind of machine is "to be classified with the machine of that kind" "or in heading…8503…as appropriate…" Heading 8503 provides for "Parts suitable for use solely or principally with the machines of heading 8501 or 8502."  The PC50 is a part of the Model 400, an electric generator of HTSUS heading 8501.  Accordingly, the PC50 falls within heading 8503, HTSUS.

Moreover, as discussed in our moving papers and briefly reiterated here, the PC50 also satisfies the criteria of a part set forth by *Bauerhin Technologies Limited Partnership v. United States,* 110 F. 3d 774 (Fed. Cir. 1997).  Def. Cross-Mot. at Sec. IV.  *Bauerhin* considers whether the imported good is a part if it is an "integral, constituent, or component part, without which the article to which it is to be joined, could not function as such article."  *Bauerhin*, 110 F.3d at 778 (quoting *United States v. Willoughby Camera Stores*, 21 C.C.P.A. 322, 324 (1933)) (internal quotation marks omitted).  Additionally, *Bauerhin* considers whether an "imported item dedicated solely for use with another article is a 'part' of that article within the meaning of the

HTSUS." *Bauerhin*, 110 F.3d at 779 (referencing *United States v. Pompeo*, 43 C.C.P.A. 9 (1955)).  Under either precedent, the Federal Circuit clarified that an imported article is not a part if it is "a separate and distinct commercial entity."  *Id*.

It is undisputed that the PC50 is an "integral, constituent, or component part," of the Model 400 electric generator.  The PC50 is also dedicated solely for use with the Model 400, and cannot function unless incorporated into a complete Model 400.  *See e.g.,* Def. Ex. B, DSM at 115 (████████████████████████████████████████

████████████████████████████████████████ ]).

Nor is the PC50 a separate and distinct commercial entity, as the [████████████████

████████ ]; rather, it is always incorporated into a complete Model 400.  *Id*. at 92-93.  The PC50 is thus a "part" of the Model 400, and is "suitable for use solely or principally with the" Model 400, a machine of HTSUS heading 8501, making the PC50 properly classified in HTSUS heading 8503.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our cross-motion for summary judgment and deny HyAxiom's motion for summary judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:     /s/ Justin R. Miller
        JUSTIN R. MILLER
        Attorney-In-Charge
        International Trade Field Office

        /s/ Aimee Lee

17

AIMEE LEE
Assistant Director

Of Counsel:

/s/ Alexander Vanderweide

Michael A. Anderson                      ALEXANDER VANDERWEIDE
Office of the Assistant Chief Counsel    Senior Trial Counsel
International Trade Litigation            Civil Division, U.S. Dept. of Justice
U.S. Customs and Border Protection       Commercial Litigation Branch
                                         26 Federal Plaza
                                         New York, New York 10278
                                         Tel. (212) 264-9230 or 0482
                                         Attorneys for Defendants

Dated: June 20, 2023

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES OF AMERICA; U.S. CUSTOMS & BORDER PROTECTION; TROY A. MILLER, PERFORMING THE DUTIES OF THE COMMISSIONER, | : |
| | : |
| Defendants. | : |

**PUBLIC VERSION**

Court No. 21-00057

### CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT STANDARD CHAMBER PROCEDURE 2(B)

I, Alexander Vanderweide, a Senior Trial Counsel in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing reply brief, relying upon the word count feature of the word processing program used to prepare this brief, certify that this reply brief complies with the type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 5625 words.

/s/ Alexander Vanderweide