UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Page 11** |
| TROY A. MILLER, | : | |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>ORDER</u>

Upon consideration of defendants' renewed cross-motion for summary judgment and response in opposition to plaintiff's renewed motion for summary judgment, other papers on file, and upon due deliberation, it is hereby

**ORDERED** that defendants' renewed cross-motion for summary judgment is hereby granted; and it is

**ORDERED** that plaintiff's renewed motion for summary judgment is hereby denied; and it is further

**ORDERED** that judgment is entered for defendants.

_____
JUDGE

Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

_____

| | |
|---|---|
| HYAXIOM, INC., F/K/A DOOSAN : <br> FUEL CELL AMERICA, INC., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> UNITED STATES OF AMERICA; : <br> U.S. CUSTOMS & BORDER PROTECTION; : <br> TROY A. MILLER, : <br> PERFORMING THE DUTIES OF THE : <br> COMMISSIONER, : <br> : <br> Defendants. : <br> : | **PUBLIC VERSION** <br><br> Court No. 21-00057 <br><br> **Business Confidential Information** <br> **Removed From Page 11** |

_____

## DEFENDANTS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendants, the United States *et al*., respectfully move for an order granting defendants' renewed cross-motion for summary judgment and denying plaintiff's renewed motion for summary judgment. The reasons for our cross-motion are set forth in the accompanying memorandum, and the parties' joint statement of material facts (JSMF) for which there is no issue to be tried. ECF 71, 72.

WHEREFORE, defendants respectfully request that an order be entered granting defendants' renewed cross-motion for summary judgment, denying plaintiff's renewed motion for summary judgment, entering judgment for defendants, and granting defendants such other and further relief as may be just and appropriate.

<div style="margin-left:40%">

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

</div>

By:    /s/ Justin R. Miller
        JUSTIN R. MILLER
        Attorney-In-Charge
        International Trade Field Office

        /s/ Aimee Lee
        AIMEE LEE
        Assistant Director

Of Counsel:

        /s/ Alexander Vanderweide
Michael A. Anderson        ALEXANDER VANDERWEIDE
Office of the Assistant Chief Counsel    Senior Trial Counsel
International Trade Litigation     Civil Division, U.S. Dept. of Justice
U.S. Customs and Border Protection  Commercial Litigation Branch
        26 Federal Plaza
        New York, New York 10278
        Tel. 202-598-0287
        Attorneys for Defendants

Dated: June 6, 2025

<center>2</center>

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Page 11** |
| TROY A. MILLER, | : | |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT**

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

Of Counsel:

Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

ALEXANDER VANDERWEIDE
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza
New York, New York 10278
Tel. (212) 264-9230 or 0482
Attorneys for Defendants

Dated: June 6, 2025

## TABLE OF CONTENTS

BACKGROUND ....................................................................................................... 1

QUESTION PRESENTED ....................................................................................... 3

SUMMARY OF ARGUMENT ................................................................................ 4

ARGUMENT ............................................................................................................ 5

I.   STANDARD OF REVIEW ....................................................................... 5

II.  THE APPLICABLE LEGAL FRAMEWORK .......................................... 6

    A.  General Rules of Interpretation................................................................. 6

    B.  Section Notes, Chapter Notes, and Tariff Provisions .................................. 7

III. THE PC50 IS CLASSIFIED IN HTSUS HEADING 8479 BECAUSE IT LACKS A
    PRINCIPAL FUNCTION........................................................................... 9

CONCLUSION ...................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................ 5

*Aves. In Leather, Inc. v. United States*,
423 F.3d 1326 (Fed. Cir. 2005)............................................................................ 6

*BASF Corp. v. United States*,
482 F.3d 1324 (Fed. Cir. 2007)............................................................................ 6

*Bausch & Lomb, Inc. v. United States*,
148 F.3d 1363 (Fed. Cir. 1998).................................................................... 5, 13

*Belimo Automation A.G. v. United States*,
774 F.3d 1362 (Fed. Cir. 2014)................................................................ 12, 13, 14

*BenQ Am. Corp. v. United States*,
646 F.3d 1371 (Fed. Cir. 2011)............................................................................ 7

i

*Brookside Veneers, Ltd. v. United States*,
847 F.2d 786 (Fed. Cir. 1988) ............................................................................... 9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................ 5

*Clarendon Marketing, Inc. v. United States*,
144 F.3d 1464 (Fed. Cir. 1998) ............................................................................ 6

*Cummins Inc. v. United States*,
454 F.3d 1361 (Fed. Cir. 2006) ............................................................................ 7

*HyAxiom, Inc., f/k/a Doosan Fuel Cell America, Inc. v. United States*, et al.,
726 F.Supp.3d 1398 (Ct. Int'l Trade 2024) ...................................................... 2, 7

*LeMans Corp. v. United States*,
660 F.3d 1311 (Fed. Cir. 2011) .......................................................................... 13

*Len-Ron Mfg. Co. v. United States*,
334 F.3d 1304 (Fed. Cir. 2003) ............................................................................ 7

*Link Snacks, Inc. v. United States*,
742 F.3d 962 (Fed. Cir. 2014) .............................................................................. 7

*Lonza Inc. v. United States*,
46 F.3d 1098 (Fed. Cir. 1995) ............................................................................ 13

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................ 5

*McKesson Canada Corp. v. United States*,
365 F.Supp.3d 1310 (Ct. Int'l Trade 2019) .................................................. 12, 14

*Nat'l Advanced Sys. v. United States*,
26 F.3d 1107 (Fed. Cir. 1994) .............................................................................. 7

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998) ............................................................................ 6

*Phone-Mate, Inc. v. United States*,
690 F. Supp. 1048 (Ct. Int'l Tr. 1988)
*aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) .................................................................. 5

*Pomeroy Collection, Ltd. v. United States*,
559 F. Supp. 2d 1374 (Ct. Int'l Trade 2008) ............................................................ 6

*Sharp Microelectronics Tech., Inc. v. United States*,
122 F.3d 1446 (Fed. Cir. 1997) ................................................................. 13

*Texas Apparel Co. v. United States*,
698 F. Supp. 932 (Ct. Int'l Tr. 1988)
*aff'd* 883 F.2d 66 (Fed. Cir. 1989), *cert denied* 493 US 1024 (1990) ........................... 5

*United States v. Pan Pac. Textile Group Inc.*,
276 F. Supp. 2d 1316 (Ct. Int'l Tr. 2003) ................................................................. 5

*Warner-Lambert Co. v. United States*,
407 F.3d 1207 (Fed. Cir. 2005) ................................................................. 7

**Harmonized Tariff Schedule of the United States**

General Rule of Interpretation 1 ............................................................ 3, 6, 7, 15

      Explanatory Note to GRI 1 ............................................................ 6

General Rule of Interpretation 2(a) ............................................................ 2

General Rule of Interpretation 3(c) ............................................................ 15

Section XVI

Explanatory Note to Section XVI ............................................................ 15

Note 2 to section XVI ............................................................ 8

      Note 2(a) ............................................................ 2

      Note 2(b) ............................................................ 2

Note 3 to section XVI ............................................................*passim*

Chapter 84

Note 7 to Chapter 84 ............................................................ 3, 5, 8, 15

      Heading 8405 ............................................................*passim*

Explanatory Note 84.05 ................................................................ 10, 12, 13, 14

Subheading 8405.10.00.................................................................. 8

Heading 84.21 ...................................................................................... 13

Heading 8422 ....................................................................................... 12

Heading 84.25 ...................................................................................... 15

Heading 84.30 ...................................................................................... 15

Heading 84.58 ...................................................................................... 15

Heading 84.63 ...................................................................................... 15

Heading 84.70 ...................................................................................... 15

Heading 84.72 ...................................................................................... 15

Heading 8479 ................................................................................ *passim*

Subheading 8479.89............................................................................ 8

Subheading 8479.89.94................................................................. 8, 9, 15

Chapter 85

Heading 8501 .................................................................................... 2, 3

Heading 8502 ....................................................................................... 2

Heading 8503 ....................................................................................... 2

Subheading 8501.10.40................................................................... 12

Subheading 8503.00.95..................................................................... 3

**Rules**

USCIT Rule 56 .................................................................................... 1, 5

USCIT Rule 56(c) ................................................................................... 5

**Other Authorities**

PRINCIPAL, *Webster Dictionary*,
available at https://www.merriam-webster.com/dictionary/principal............................................9

FUNCTION, *Webster Dictionary*,
available at https://www.merriam-webster.com/dictionary/function ............................................9

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Page 11** |
| TROY A. MILLER, | : | |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT), defendants, United States *et al.* (the Government), hereby submit this memorandum in support of our renewed cross-motion for summary judgment and response in opposition to plaintiff's, HyAxiom, Inc. f/k/a Doosan Fuel Cell America, Inc. (HyAxiom), renewed motion for summary judgment. ECF 73, 74.

## BACKGROUND

The subject PC50 supermodule (PC50) is an assemblage of systems and components, that after import, is incorporated into HyAxiom's PureCell® Model 400 hydrogen fuel-cell powerplant (Model 400), which generates energy for customer use in equal parts electricity and heat. ECF 71, 72: Joint Statement of Material of Material Facts for Which There Is No Genuine Issue to be Tried (JSMF) ¶¶ 1, 4. In our initial briefing (ECF 49, 50), we contended that because the PC50 is dedicated solely for incorporation into a finished Model 400—an electric generator

of Harmonized Tariff Schedule of the United States (HTSUS) heading 8501—HTSUS Section XVI Note 2(b) instructs that the imported PC50 is to be classified in HTSUS heading 8503 as "Parts suitable for use solely or principally with the machines of heading 8501 or 8502."

In its initial dispositive motion briefing (ECF 43, 44), HyAxiom contended that, in accordance with Section XVI Note 2(a), the PC50 should be classified as a water gas generator of HTSUS heading 8405. Specifically, HyAxiom argued, that pursuant to General Rules of Interpretation (GRI) 2(a), the PC50 is an incomplete water gas generator, of which the PC50's steam methane reformer (SMR) imparts to the PC50 the essential character of a complete water gas generator.

The Court denied the parties' respective motions for summary judgment. ECF 62: *HyAxiom, Inc., f/k/a Doosan Fuel Cell America, Inc. v. United States et al.*, 726 F.Supp.3d 1398 (Ct. Int'l Trade 2024) (*HyAxiom*). Although the Court found that the PC50 is a part suitable for use with an electric generator, the Court could not determine whether the PC50 could also be classifiable under HTSUS heading 8405. *Id.* at 1403-06, 1412-13. In so ruling, the Court held that Note 3 to HTSUS Section XVI—which sets forth a "principal function" analysis of certain machines—applies to the classification of the PC50. *Id.* at 1406, 1412-13. However, because we did not conduct a principal function analysis of the PC50, and because HyAxiom's principal function analysis was flawed in that it analyzed only one component of the PC50 (its SMR) and not the PC50 in its entirety, the Court denied both parties' motions. *Id*. at 1412-13.

In the wake of the Court's decision, the parties agreed to submit a JSMF and renew their dispositive motions to address the imported PC50's principal function, or lack thereof. Following the submission of the JSMF (ECF 71, 72), HyAxiom filed its renewed motion for summary judgment and memorandum in support (ECF 73-1, 74-1: Pl. Memo), in which it

contends that the principal function of the PC50 is to generate a hydrogen-rich gas, and that all other functions of the PC50 complement the gas generation function. HyAxiom thus posits that "by operation of GRI 1, the tariff headings, and Note 3 to Section XVI, the PC50 supermodule is properly classified under HTS 8405 as a gas generator." Pl. Memo at 11.

We disagree with HyAxiom that gas-generation is the principal function of the PC50. As discussed further below, the PC50 is a multi-functional machine, that when incorporated into the Model 400, performs a variety of essential functions, none of which are more principal than any other. In short, the PC50 lacks a principal function. As a result, "context otherwise requires" that a Note 3 to HTSUS Section XVI (Note 3) principal function analysis of the PC50 is not feasible. Instead, because the PC50 lacks a principal function, pursuant to Note 7 to HTSUS Chapter 84 (Note 7), the PC50 is properly classified in HTSUS heading 8479, which provides for "Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof."[1]

Accordingly, our renewed cross-motion for summary judgment should be granted and plaintiff's renewed motion for summary judgment should be denied.

## QUESTION PRESENTED

Whether the imported PC50 is classified as a machine of HTSUS heading 8479 because it lacks a principal function.

---

[1] We do not waive our arguments in our initial and supplemental briefing that the PC50 is classified in HTSUS subheading 8503.00.95 as a part of an electrical generator of HTSUS heading 8501, but we do not repeat them here. In accordance with the Court's decision, this briefing focuses solely on the principal function of the PC50, which—because the PC50 does not have a principal function—renders the subject merchandise a machine of HTSUS heading 8479.

## SUMMARY OF ARGUMENT

A working Model 400 generates electrical energy and heat for customer use.  In order to provide this energy output to the customer, the imported PC50 must perform varied and vital functions.  In addition to catalytically reforming natural gas in the Fuel Processing System (FPS) for a fuel that, when reacted in the fuel cell stacks (FCS), generates electricity, heat, and water (JSMF ¶ 22), the PC50 in an operational Model 400 performs the following functions:

(1) provides cooling water to the FPS and FCS (JSMF ¶¶ 19, 23);

(2) collects heat generated by the FCS and makes it available to the Model 400's customers for various applications (JSMF ¶¶ 24, 25);

(3) supports the thermal balance and management of the Model 400 (JSMF ¶¶ 23, 32);

(4) condenses steam into water and maintains the quality of water circulated through the powerplant (JSMF ¶¶ 24, 26, 28-30);

(5) exhausts any excess gasses from the Model 400 (JSMF ¶ 26);

(6) facilitates the flow of process air for the FPS and FCS to function (JSMF ¶¶ 31, 32);

(7) ventilates the Model 400's compartments (JSMF ¶ 33);

(8) contains the valves and sensors that communicate with the powerplant's controller to regulate the Model 400's operations (JSMF ¶¶ 5(c), 32); and

(9) provides structural support and protection for the PC50's components, as well as the additional components of the Model 400 that are not included with the PC50 (JSMF ¶¶ 34-36).

Despite HyAxiom's contention otherwise, these functions are more than mere complements or auxiliary components to the PC50's gas generating function.  Rather, the PC50's various interconnected functions are all necessary for the PC50 and Model 400 to operate.  Consequently, the PC50 lacks a particular principal function, and as a result, "context otherwise

4

requires" that a Note 3 principal function analysis cannot resolve the classification dispute before the Court.  Instead, Note 7 provides that the PC50 is to be classified in heading 8479, HTSUS, as a machine having individual functions.

<div align="center">**ARGUMENT**</div>

## I.    STANDARD OF REVIEW

Under USCIT Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  On a motion for summary judgment, the Court determines whether there are any factual disputes that are material to the resolution of the action.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Tr. 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) (citations omitted).  "The court may not resolve or try factual issues on a motion for summary judgment." *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Tr. 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) (citation omitted).  In determining whether a genuine issue of fact exists, the Court reviews the evidence submitted, drawing all inferences against the moving party.  *See United States v. Pan Pac. Textile Group Inc.*, 276 F. Supp. 2d 1316, 1319 (Ct. Int'l Tr. 2003); *Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This Court may resolve a classification issue by means of summary judgment.  *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  Summary judgment is appropriate where the nature of the merchandise is not in question and the sole issue before the Court is the proper classification of the merchandise.  *See id*.  In the absence of

<div align="center">5</div>

genuine factual issues, the propriety of summary judgment turns on the proper construction of

the HTSUS, which is a question of law.  *See Clarendon Marketing, Inc. v. United States*, 144

F.3d 1464, 1466 (Fed. Cir. 1998).  Here, there are no material facts in dispute to preclude

summary judgment in favor of the Government.  *See generally* JSMF.

## II.    THE APPLICABLE LEGAL FRAMEWORK

### A.    General Rules of Interpretation

Merchandise imported into the United States is classified under the HTSUS.  The tariff

classification of merchandise under the HTSUS is governed by the principles set forth in the

GRIs and the Additional U.S. Rules of Interpretation.  *See Orlando Food Corp. v. United States*,

140 F.3d 1437, 1439 (Fed. Cir. 1998); *BASF Corp. v. United States*, 482 F.3d 1324, 1325-26

(Fed. Cir. 2007).

GRI 1 provides, in relevant part, that "for legal purposes, classification shall be

determined according to the terms of the headings and any relative Section or Chapter Notes and,

provided such headings or Notes do not otherwise require, according to the [remaining GRIs.]"

As interpreted by its Explanatory Note, GRI 1 establishes that "the terms of the headings and any

relative section or Chapter Notes are paramount, *i.e.*, they are the first consideration in

determining classification."  *See also The Pomeroy Collection, Ltd. v. United States*, 559 F.

Supp. 2d 1374, 1385 (Ct. Int'l Trade 2008)*.*  The HTSUS section and chapter notes "are not

optional interpretive rules," but instead have the force of statutory law.  *Aves. In Leather, Inc. v.*

*United States*, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (internal quotation marks omitted).

It is well-established that the determination of whether a particular product falls within a

tariff classification is a two-step process: first, the meaning of terms within the provision must be

ascertained, and second, a determination must be made as to whether the merchandise at issue

falls within the description of such terms as properly construed.  *See Nat'l Advanced Sys. v. United States*, 26 F.3d 1107, 1109 (Fed. Cir. 1994).  "When there is no dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'"  *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965-66 (Fed. Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

Where, as here, relevant terms are undefined in the tariff statute, they "are [to be] construed according to their common [and] commercial meanings."  *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (internal quotation marks omitted).  To ascertain the "common [and] commercial meanings" of a particular tariff term the court "may rely on its own understanding of the term as well as upon lexicographic and scientific authorities."  *Len-Ron Mfg. Co., Inc.  v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  That is, the "court may consult dictionaries, scientific authorities, and other reliable information sources."  *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

## B.    Section Notes, Chapter Notes, and Tariff Provisions

In accordance with GRI 1, the terms of the tariff headings and any relative Section or Chapter Notes must be considered.  In its decision, the Court ruled that "the classification issue presented by this case requires determining whether the principal function of the PC50 is, or is not, the gas generation function performed by the machines of heading 8405, HTSUS."  *HyAxiom*, 726 F.Supp.3d at 1413.  Note 3 provides for a principal function analysis of certain machines, and states as follows:

> Unless the context otherwise requires, composite machines
> consisting of two or more machines fitted together to form a whole
> and other machines designed for the purpose of performing two or
> more complementary or alternative functions are to be classified as
> if consisting only of that component or as being that machine
> which performs the principal function.

HyAxiom contends that gas generation is the principal function of the PC50, which therefore makes the PC50 classifiable under HTSUS subheading 8405.10.00, a duty-free provision.  That provision provides as follows:

| 8405 | Producer gas or water gas generators, with or without their purifiers; acetylene gas generators and similar water process gas generators, with or without their purifiers; parts thereof: |
|---|---|
| 8405.10.00 | Producer gas or water gas generators, with or without their purifiers; acetylene gas generators and similar water process gas generators, with or without their purifiers. |

Because the PC50 lacks a principal function, "context otherwise requires" that Note 3 does not resolve the classification dispute.  Instead, Note 7 guides the classification of the PC50 under HTSUS heading 8479.  Note 7 (HTSUS 2018; emphasis added) provides as follows:

A machine which is used for more than one purpose is, for the purposes of classification, to be treated as if its principal purpose were its sole purpose.

Subject to note 2 to this chapter and note 3 to section XVI, a machine the principal purpose of which is not described in any heading *or for which no one purpose is the principal purpose* is, unless the context otherwise requires, to be classified in heading 8479.  Heading 8479 also covers machines for making rope or cable (for example, stranding, twisting or cabling machines) from metal wire, textile yarn or any other material or from a combination of such materials.

In accordance with Note 7, the PC50 is to be classified in HTSUS subheading 8479.89.94, which provides as follows:

| 8479 | Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof (con.):<br>     Other machines and mechanical appliances (con.): |
|---|---|
| 8479.89 |     Other: |

8

8479.89.94                          Other . . . . . . . . . . . 2.5%

III.     **THE PC50 IS CLASSIFIED IN HTSUS HEADING 8479 BECAUSE IT LACKS A PRINCIPAL FUNCTION**

The tariff does not define the phrase "principal function."  To assist in ascertaining the common meaning of a tariff term, the Court may rely upon its own understanding of the term, and may consult dictionaries, lexicons, scientific authorities and other reliable sources as an aid. *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988) (citations omitted). "Principal," when used as an adjective, means the "most important, consequential, or influential : chief."  https://www.merriam-webster.com/dictionary/principal (last visited May 7, 2025). "Function," when used as a noun, means "the action for which a person or thing is specially fitted or used or for which a thing exists : purpose" and "any of a group of related actions contributing to a larger action."  https://www.merriam-webster.com/dictionary/function (last visited May 7, 2025).  Therefore, the "principal function" of a machine is the most important, consequential, or influential action or purpose for which the machine is specially fitted, used for which it exists or when contributing to a larger action.  This definition largely accords with HyAxiom's proffered definition of "principal function."  Pl. Memo at 4.

Undisputably, the PC50 is specially fitted for use in the Model 400, which operates to generate energy in the form of electricity and heat.  Given that the PC50 is an intricately multi-functional machine designed to generate electricity and heat for the Model 400's customers, no one action of the PC50 is more consequential than any other.  All of the PC50's systems are needed to generate energy in an operational Model 400, and without each system, the Model 400 would not function.

9

HyAxiom posits that the gas-generating function is the most important, consequential, and influential of its actions.  Pl. Memo at 5.  But generating electricity and useable heat in the Model 400 cannot be accomplished by the PC50's gas generating components alone; doing so, requires the functionality of the balance of all the PC50's componentry and systems.  Apart from the Fuel Processing System (FPS) (the gas-generating system of the PC50), the PC50 includes three other systems—the Thermal Management System (TMS), Water Treatment System (WTS), and Air Processing Systems (APS)—and a frame.  *See generally* JSMF.

HyAxiom argues that the functions performed by the TMS, WTS, APS, and other componentry of the PC50 are complementary to the PC50's gas generation function: "Thus, the water purification, temperature regulating, air handling, and housing functions all support or complement the gas generation function of the PC50 supermodule, and it is the gas generation function of the PC50 supermodule that generates the fuel (*i.e.*, the hydrogen-rich gas) used in the fuel cells of the finished Model 400 powerplant."  Pl. Memo at 6.  HyAxiom also references the Explanatory Note (EN) to HTS 84.05 to conclude that "when components performing purifying, temperature regulating, or other auxiliary functions are (1) presented with gas generating components, and (2) are clearly suitable for use together with those components, then the subject merchandise is clearly within the meaning of HTS 8405."  *Id*. at 9.

We do not dispute that the FPS performs a gas-generating function that is necessary for the operation of the PC50 and Model 400, but HyAxiom's eclipsed view of all but the gas-generating aspects of the PC50 arbitrarily elevates the primacy of one of its systems—the FPS—over all the other equally important and functionally interconnected systems and components of the PC50.  Put differently, in an effort to construe gas-generation as the principal function of the

PC50, HyAxiom diminishes the importance of the remaining componentry and systems that are required for the PC50 to function.

Far from being a supporting player to the FPS, the TMS removes heat generated by the Fuel Cell Stacks (FCS) and transports it to the Model 400's customers so that it can be used for heating applications. JSMF ¶¶ 24, 25. This usable commercial heat alone comprises half of the powerplant's energy output. JSMF ¶¶ 4, 25. The extraction and transportation of this heat demonstrates that the PC50 exhibits a core, alternative function beyond mere gas generation. The TMS also acts a circulatory system for the entirety of PC50 and Model 400, which via its network of componentry, ensures the thermal balance of the fuel-cell powerplant by circulating cooling water and removing excess heat. JSMF ¶¶ 19, 23. Without the cooling water condensed and managed by the TMS, {█████████████████████████████████████████████ ████████████████████████████████}. JSMF ¶¶ 19, 23, 24, 26. In addition to its essential cooling functionality, the TMS also vents excess gasses, steam, and carbon dioxide from the powerplant, thereby maintaining the necessary balance of substances throughout the Model 400. JSMF ¶ 26.

The WTS operates in concert with the TMS so that the SMR, FCS, and rest of the componentry in a PC50 and Model 400 utilizes the proper water quality. JSMF ¶¶ 28-30. Thus, the WTS ensures that the powerplant's process water is free of impurities and gas air bubbles, and therefore, does not damage the FPS and FCS. *Id.*

Like the TMS, the APS is a multifunctional system in the PC50 and Model 400, that provides process air for the FPS and FCS so that electricity, water, and heat can be generated and fuel burned. JSMF ¶¶ 31, 32. The APS also transports air throughout the powerplant to

maintain its proper temperature, and provides ventilated air, which cools the powerplant's componentry and removes potentially combustible gasses from the Model 400.  JSMF ¶¶ 32, 33.

Finally, the frame supports and protects the PC50, as well as the balance of components installed into the completed Model 400.  JSMF ¶¶ 34-36.

Collectively, the FPS, TMS, WTS, APS, and frame function in concert so that the PC50 contributes to the larger action of the Model 400, *i.e.*, the generation of electricity and useable heat.  No one system of the PC50 functions principally or is necessarily subordinate to the functionality of the other systems.  All are required for the PC50 to operate, and without each system, the Model 400 could not generate electricity and useable heat.

When positing that the gas generating aspect of the PC50 is the machine's principal function, HyAxiom references *McKesson Canada Corp. v. United States,* 365 F.Supp.3d 1310 (Ct. Int'l Trade 2019) (*McKesson*), *Belimo Automation A.G. v. United States*, 774 F.3d 1362 (Fed. Cir. 2014) (*Belimo*), and the EN to HTS 84.05.  Pl. Memo at 4, 7-11.  These cases and the EN describe machines that possess a clearly defined principal function with other incidental functions or auxiliary apparatuses.  But significantly, the cases and EN do not accurately capture the PC50, with its functionally integrated FPS, TMS, WTS, APS, and balance of componentry.

In *McKesson*, the Court rejected the Government's classification of an automated pharmacy system, a composite machine, under HTSUS heading 8479, and instead held that the system was classified under HTSUS heading 8422 as other packing machinery.  The Court found that "[t]he enumerated functions are incidental to the packing function as set forth in the Section, Chapter, and Explanatory Notes."  *McKesson*, 365 F.Supp.3d at 1318.  In *Belimo*, the Federal Circuit affirmed the trial court's decision that the imported actuators were classified as electric motors under HTSUS subheading 8501.10.40.  In so affirming, the Federal Circuit stated that

12

despite the incorporation of a programmed Application Specific Integrated Circuit (ASIC) into the imported merchandise, the "additional functions [contributed by the ASIC] are complementary to the principal function of an electric motor, and all relate to improving the precision and reliability of the motor's operation." 774 F.3d at 1366.

Further, the relevant portion of the EN to HTS heading 84.05[2] cited by HyAxiom provides as follows:

### (B) WATER GAS GENERATORS

These are of similar construction, but are arranged so that air and a spray of water or steam are blown in alternate phases into the apparatus. The gas resulting from the water phase is a mixture of hydrogen and carbon monoxide (water gas) having a higher heating power than producer gas. It may be collected separately from the producer gas obtained during the air phase or the two gases may be mixed.

**Both producer gas and water gas generators** may be adapted for burning many kinds of solid fuel (e.g., coal, coke, charcoal, wood, vegetable or other waste).

For certain uses, particularly for supplying gas engines, producer or water gases must be cleaned of impurities such as dust, tars, sulphurous compounds, etc., and sometimes reheated or cooled. For this purpose, the generators are often fitted with purifiers (comprising perforated cones, coke beds, scrubbers, etc.), coolers, dryers, reheaters, etc. Such purifiers and other auxiliary apparatus are classified with the generators when presented therewith, **provided** they are clearly suitable for use together. When presented separately they fall in their own respective headings (e.g., purifiers **in heading 84.21**).

---

[2] It is long settled that "[w]hile the Explanatory Notes do not constitute controlling legislative history, they do offer guidance in interpreting HTS subheadings." *Lonza Inc. v. United States*, 46 F.3d 1098, 1109 (Fed. Cir. 1995). The Explanatory Notes significantly clarify the reach of the HTSUS subheadings and can manifest legislative intent. *Bausch & Lomb*, 148 F.3d 1363; *Sharp Microelectronics Tech., Inc. v. United States*, 122 F.3d 1446 (Fed. Cir. 1997). The "Explanatory Notes that accompany each Chapter of the HTSUS, while not legally binding, are "persuasive" and are "generally indicative" of the proper interpretation of the tariff provision." *LeMans Corp. v. United States*, 660 F.3d 1311, 1316 (Fed. Cir. 2011) (citation omitted).

Emphasis in original.

*McKesson* and *Belimo* stand for the proposition that a Note 3 composite machine or machine "designed for the purpose of performing two or more complementary or alternative functions"—such as the PC50—may have a principal function for classification purposes while also possessing other functions that are complementary or incidental to that chief function. Relatedly, the EN to HTS heading 84.05 recognizes that producer or water gas generators may be fitted with purifiers and other auxiliary apparatus, that when presented together with the generators, remain classified in HTSUS heading 8405. However, the cases and the EN do not accurately describe machines consisting of multiple systems that are functionally indispensable, such as the PC50.

HyAxiom argues that, in line with *McKesson*, *Belimo*, and the EN to HTS heading 84.05, gas-generation is the principal function of the PC50, and the TMS, WTS, APS, and frame are auxiliary apparatus that all complement or are incidental to gas-generation. But the same could equally be true of the TMS, in which its necessary heat transfer and cooling functions provide commercial heat to the Model 400's customers and allow for the balance of components in the powerplant to generate electricity. Could it not also be said that the FPS, WTS, APS, and frame are all auxiliary apparatus that are complementary or incidental to the PC50's principal function imparted by the TMS? The TMS, like the balance of the Model 400's componentry, functions within the powerplant's systems in an efficient loop, where its varied functions can no more be cast as incidental or as mere "purifiers and other auxiliary apparatus" than any other major component or system of the PC50 and Model 400. We submit that the lack of a clear principal function amongst the PC50's intricate systems and componentry renders a principal function analysis inadequate to the task of classifying the PC50.

To that end, the drafters of the tariff statute limited the application of Note 3 by including the phrase "[u]nless the context otherwise requires" at the beginning of the note.  Indeed, the EN to Section XVI recognizes that it may not be possible under Note 3 to classify multifunctional machines:

> Where it is not possible to determine the principal function, and where, as provided in Note 3 to the Section, the context does not otherwise require, it is necessary to apply General Interpretative Rule 3(c); such is the case, for example, in respect of multi-function machines potentially classifiable in several of the headings 84.25 to 84.30, in several of the headings 84.58 to 84.63 or in several of the headings 84.70 to 84.72.

This case presents an instance where the context of the classification dispute and nature of the imported merchandise requires a departure from Note 3.  Because no one component or system performs the principal function of the PC50, the note is not operable to the classification of the merchandise.

In such situations, "context otherwise requires" that Note 7 resolves the dispute.  In relevant part, Note 7 provides that machines "…for which no one purpose is the principal purpose is, unless the context otherwise requires, to be classified in heading 8479."  As established, no one component, or function, is more important or consequential in the PC50 as compared to the next.  If any one system, or constituent component, is removed from the PC50, the Model 400 as a whole would fail.  Because each component and system contributes to, and is integral to, the effectiveness of the overall PC50 and Model 400 to generate heat and electricity, none of the components or systems can be said to be performing the principal function.  As such, GRI 1 and Note 7 directs that the PC50 is appropriately classified in HTSUS heading 8479 as machines "having individual functions, not specified or included elsewhere in this chapter," and more particularly, under subheading 8479.89.94, HTSUS.

## **CONCLUSION**

For these reasons, we respectfully request that the Court grant our renewed cross-motion for summary judgment, deny plaintiff's renewed motion for summary judgment, and enter judgment in our favor.

<div style="margin-left:40%">

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

</div>

By:    /s/ Justin R. Miller
         JUSTIN R. MILLER
         Attorney-In-Charge
         International Trade Field Office

         /s/ Aimee Lee
         AIMEE LEE
         Assistant Director

Of Counsel:

         /s/ Alexander Vanderweide
Michael A. Anderson     ALEXANDER VANDERWEIDE
Office of the Assistant Chief Counsel     Senior Trial Counsel
International Trade Litigation     Civil Division, U.S. Dept. of Justice
U.S. Customs and Border Protection     Commercial Litigation Branch
         26 Federal Plaza
         New York, New York 10278
         Tel. 202-598-0287
         Attorneys for Defendants

Dated: June 6, 2025

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | | |
|---|---|---|
| HYAXIOM, INC., F/K/A DOOSAN<br>FUEL CELL AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | **PUBLIC VERSION** |
| | : | |
| v. | : | Court No. 21-00057 |
| | : | |
| UNITED STATES OF AMERICA; | : | **Business Confidential Information** |
| U.S. CUSTOMS & BORDER PROTECTION; | : | **Removed From Page 11** |
| TROY A. MILLER, | : | |
| PERFORMING THE DUTIES OF THE | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>CERTIFICATE OF COMPLIANCE</u>

I, ALEXANDER VANDERWEIDE, a senior trial counsel in the Office of the Assistant

Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field

Office, who is responsible for the Government's June 6, 2025 renewed cross-motion for

summary judgment and response in opposition to plaintiff's renewed motion for summary

judgment, relying upon the word count feature of the word processing program used to prepare

the brief, certifies that this renewed cross-motion and response complies with the word count

limitation under the Court's chambers procedures, and contains 4937 words.


/s/ Alexander Vanderweide