UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| HYAXIOM, INC., F/K/A<br>DOOSAN FUEL CELL AMERICA, INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA;<br>U.S. CUSTOMS & BORDER PROTECTION;<br>TROY A. MILLER,<br>PERFORMING THE DUTIES OF THE<br>COMMISSIONER,<br><br>        Defendants. | Court No. 21-00057 |

**PLAINTIFF HYAXIOM, INC.'S OPPOSITION TO DEFENDANTS' RENEWED
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS
<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

 

Christopher M. Loveland
SHEPPARD, MULLIN, RICHTER &
 HAMPTON LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006-6801
Telephone: 202.747.1900
Facsimile: 202.747.1901
cloveland@sheppardmullin.com

Of Counsel:

J. Scott Maberry
Lisa C. Mays
Jonathan Wang
Dated: July 3, 2025      SHEPPARD MULLIN RICHTER
   & HAMPTON LLP

*Attorneys for HyAxiom, Inc.*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..........................................................................................................................1

SUMMARY OF ARGUMENT .....................................................................................................1

ARGUMENT .................................................................................................................................2

I.    THE PC50 IS NOT MERELY A COLLECTION OF COMPONENTS OF THE MODEL 400 WITH NO PRINCIPAL FUNCTION ..........................................................2

II.   EN 84.05 DESCRIBES THE PRINCIPAL FUNCTION OF THE PC50 ...........................5

III.  DEFENDANTS PROVIDE NO AUTHORITY THAT "CONTEXT OTHERWISE REQUIRES" THAT A NOTE 3 PRINCIPAL FUNCTION ANALYSIS CANNOT RESOLVE THE CLASSIFICATION OF THE PC50 ..................6

IV.  DEFENDANTS FAIL TO DISTINGUISH AUTHORITY SUPPORTING THE PC50'S CLASSIFICATION ACCORDING TO ITS PRINCIPAL FUNCTION OF GAS GENERATION ......................................................................................................7

CONCLUSION ..............................................................................................................................8

CERTIFICATE OF COMPLIANCE ...........................................................................................10

# TABLE OF AUTHORITIES

**Page**(s)

**Cases**

*Belimo Automation A.G. v. United States*
  774 F.3d 1362 (Fed. Cir. 2014)............................................................................7, 8

*BenQ Am. Corp. v. United States*
  646 F.3d 1371 (Fed. Cir. 2011).................................................................................6

*HyAxiom, Inc. v. United States*
  726 F. Supp. 3d 1398 (Ct. Int'l Trade 2024).................................................1, 2, 3, 7

*Keystone Auto. Operations, Inc. v. United States*
  No. 21-00215, 2025 WL 1144820 (Ct. Int'l Trade Apr. 18, 2025) ...........................7

*McKesson Canada Corp. v. United States*
  365 F.Supp.3d 1310 (Ct. Int'l Trade 2019) ............................................................7, 8

**HTSUS**

HTS 8405 ........................................................................................................1, 2, 5, 6, 7, 8

HTS 8479 ...........................................................................................................................8

HTS Section XVI, Note 2 ..................................................................................................3

HTS Section XVI, Note 2(a)..............................................................................................3

HTS Section XVI, Note 3 .................................................................................2, 3, 5, 6, 7

HTS Section XVI, Note 5 ..................................................................................................3

HTS Section XVI, Note 5(b) .............................................................................................6

**INTRODUCTION**

Plaintiff HyAxiom, Inc. ("HyAxiom") respectfully submits this Opposition to the Renewed Cross-Motion for Summary Judgment ("Renewed Cross-Motion") filed by the defendants, the United States, *et al.* (collectively, the "Defendants"), and Reply in Support of its Renewed Motion for Summary Judgment ("Renewed Motion"). As established in the Renewed Motion and as further set forth below, there are no genuine issues of material fact that preclude judgment in favor of HyAxiom because the PC50 supermodule has the principal function of gas generation and should be classified as gas generators under Heading 8405 of the Harmonized Tariff Schedule of the United States ("HTS" or "HTSUS") when the General Rules of Interpretation ("GRI") are properly applied.

**SUMMARY OF ARGUMENT**

Plaintiff's Renewed Motion established that there is no genuine dispute that the PC50 supermodule ("PC50") generates gas for use in the Model 400 powerplant ("Model 400"). Further, there is no dispute that, while the PC50's components perform distinct operations, the components all work together to support the principal function of generating gas.

Defendants attempt to muddy the waters by contending that the PC50 has no principal function. However, the undisputed facts in this case show that the PC50 operates to supply a hydrogen-rich gas to the Model 400 Powerplant, which is the end product into which the PC50 is incorporated after importation. *See* Joint Statement of Material Facts, ECF 71, ("JSMF") ¶ 8. Defendants' newfound emphasis on a purported lack of principal function is a mere reframing of the unavailing argument that they have posed since the beginning of this case, *i.e.*, that the PC50 merely consists of several components of the Model 400 fitted together, all with distinct purposes. *See HyAxiom, Inc. v. United States,* 726 F. Supp. 3d 1398, 1406 (Ct. Int'l Trade 2024). The Court explicitly rejected that argument in its Opinion and Order, finding that despite the

PC50's ultimate use in the Model 400, "the uncontested facts demonstrate that it answers to the description 'machines designed for the purpose of performing two or more complementary or alternative functions'" in Note 3 to Section XVI, HTSUS ("Note 3")), and therefore, it should be classified by its principal function. *Id.* at 1406.

In this case, the PC50's principal function is gas generation, requiring a classification under heading 8405, HTSUS. Accordingly, summary judgment should be entered in favor of HyAxiom on Count I of its First Amended Complaint.

## ARGUMENT

### I.   THE PC50 IS NOT MERELY A COLLECTION OF COMPONENTS OF THE MODEL 400 WITH NO PRINCIPAL FUNCTION

The fact that the PC50's various components are interconnected when incorporated into the Model 400, and have complementary functions that support the efficient operation of the Model 400, does not change the principal function of the PC50. Defendants contend that "given that the PC50 is an intricately multifunctional machine designed to generate electricity and heat for the Model 400's customers, no one action of the PC50 is more consequential than any other." Renewed Cross-Motion at p. 9. That contention, however, is not accurate. The PC50 does not generate electricity and heat. Rather, the PC50 generates a hydrogen-rich gas that is in turn consumed by separately-imported systems. JSMF ¶¶ 8, 22. Only after those separately-imported systems are incorporated together with the PC50 into the Model 400 does the entire finished product create electricity and heat. *Id.* ¶¶ 5, 8, 22. For this reason, the "purpose" of the PC50 is demonstrated in the record of this case as being the generation of a hydrogen-rich gas.

Defendants are correct that all the PC50's systems are necessary for the Model 400 to operate (*i.e.*, to generate electricity). JSMF ¶¶ 4, 21-22, 26, 28, 32, 36. That is because all the PC50's systems are also necessary to support its gas generation function, which is the essential

input for the Model 400's ability to generate electricity. *See* Renewed Motion at p. 6; JSMF ¶ 4. By contending that the PC50 has no principal function because each of its components have a purpose within the Model 400, Defendants still must presume, impermissibly, that a "part" of a larger machine (the Model 400) cannot also be a machine with its own principal function. But, as the Court has already concluded, Notes 2, 3, and 5 to Section XVI, HTSUS, when read together, compel a conclusion to the contrary. *See HyAxiom, Inc. v. United States,* 726 F. Supp. 3d at 1405-1406. As stated in the Court's Opinion and Order, the PC50 is both a part of the Model 400 and a machine in itself. *Id.* ("Defendant is correct that the PC50 is a 'part' and the Model 400 is a 'machine.' But as the court explains below, the PC50, according to the uncontested facts, is also a "machine'"). As such, the classification of the article requires application of the analysis directed in Note 3 to determine the article's principal function. Defendants' bare contention that no principal function exists is contrary to the undisputed facts.

While Defendants contend in their Renewed Cross-Motion that the PC50 supermodule is "more than" (*i.e.*, has features substantially in excess of) gas generation and is designed to be used as a part of a powerplant, their analysis runs afoul of HTSUS Section XVI, Note 2(a). The supermodule components cannot be found "more than" or substantially in excess of gas generation because most of the components in the PC50 support the generation of gas. Indeed, there is no factual dispute that the PC50 components support the reactions necessary to generate its gas output. *See* JSMF ¶¶ 8-35.

While asserting that the PC50 has no principal function, Defendants notably concede that "generating electricity and useable heat in the Model 400 cannot be accomplished by the PC50's gas generating components alone; doing so, requires the functionality of the balance of all the PC50's componentry and systems." Renewed Cross-Motion at p. 10. That statement (perhaps

inadvertently) succinctly proves Plaintiff's point in this case. The function of each PC50 component is necessary, but not sufficient, for the PC50 (and therefore the Model 400 Powerplant) to operate. When all the components of the PC50 (including the Thermal Management System (TMS), Water Treatment System (WTS), Air Processing Systems (APS), and the frame) work in tandem, the gas generation needed for the Model 400 to generate electricity occurs. *See generally* JSMF.

Defendants ask the Court to consider hypothetically that the heat transfer and cooling function of the TMS might be just as important, consequential, and influential, as the gas generation function and could just as easily be construed as the PC50's principal function. Renewed Cross-Motion at p. 14. They argue that if each of the functions of the PC50's components is just as important as any other, there is no one "principal" function. *Id.* However, if the heat transfer and cooling functions of the TMS were just as important as the gas generation function of the PC50, that would present the question of what function the gas generation serves to support the heating and cooling function of the TMS. The undisputed facts do not support the proposition that gas generation supports the heating and cooling functions of the TMS. Rather, as stated unequivocally in Explanatory Note ("EN") 84.05, gas generators are often fitted with "coolers, dryers, reheaters, etc.," describing exactly the role of TMS in the PC50. Such auxiliary apparatus are classified with the gas generators under EN 84.05. Likewise here, the TMS (and the other auxiliary apparatus) must be classified with the gas generator that is the PC50. Consequently, despite Defendants' attempts to confuse the issue (and to ignore the applicable Explanatory Notes), it is clear that none of the components of the PC50 provides its principal function. Rather, the PC50 has only one principal function: generating the hydrogen-rich gas necessary for the Model 400 to function.

## II.  EN 84.05 DESCRIBES THE PRINCIPAL FUNCTION OF THE PC50

To interpret the legal meaning of "principal function," the Court may be guided by the terms of heading 8405, which includes gas-generating machines whether presented "with or without their purifiers." EN 84.05(B) provides helpful guidance on the interpretation of that phrase:

> For certain uses, particularly for supplying gas engines, producer or water gases must be cleaned of impurities such as dust, tars, sulphurous compounds, etc., and sometimes reheated or cooled. For this purpose, the generators are often fitted with purifiers (comprising perforated cones, coke beds, scrubbers, etc.), coolers, dryers, reheaters, etc. Such purifiers and other auxiliary apparatus are classified with the generators when presented therewith, provided they are clearly suitable for use together.

EN 84.05(B).

Defendants never posit that the components of the PC50 are not clearly suitable for use with each other, as described by EN 84.05. Rather, Defendants merely contend that "context otherwise requires" that a Note 3 principal function analysis cannot resolve the classification in this case. Renewed Cross-Motion at p. 15. But, as outlined in Section II.C below, no such context exists. None of the PC50 components by themselves generates a gas, but together the PC50 does generate a gas. And each of the PC50 components falls clearly within the descriptions of "auxiliary apparatus" enumerated in EN 84.05 as examples of apparatus required to be classified with the gas generator. Specifically, the ILS purifies the incoming natural gas (JSMF ¶ 15); the TMS cools the system (*id*. ¶ 23); the WTS purifies water used in the system (*id*. ¶ 30); the APS both supplies process air (a gas) and cools the system (*id*. ¶¶ 31-33); and the frame is a support apparatus clearly suitable for use with the other parts (*id*. ¶ 34). Defendants fail to contend with the fact that the PC50's components are straightforwardly described in EN 84.05,

which further supports the conclusion that the principal function of the PC50 is gas generation. Consequently, the PC50 is properly classified under heading 8405, HTSUS.

**III.    DEFENDANTS PROVIDE NO AUTHORITY THAT "CONTEXT OTHERWISE REQUIRES" THAT A NOTE 3 PRINCIPAL FUNCTION ANALYSIS CANNOT RESOLVE THE CLASSIFICATION OF THE PC50**

Note 3 to Section XVI sets out the "principal function" analysis for articles in that Section, as follows:

> *Unless the context otherwise requires*, composite machines consisting of two or more machines fitted together to form a whole and other machines designed for the purpose of performing two or more complementary or alternative functions are to be classified as if consisting only of that component or as being that machine which performs the principal function.

Note 3 to Sec. XVI, HTSUS (emphasis added). Defendants are drawn to the first phrase of Note 3 as chimerical support for the contention that when the principal function cannot be identified, a principal function analysis is not feasible. That, however, is not the meaning of the phrase "context otherwise requires." The phrase, as used in Note 3, is understood to mean that Chapter and Section notes should not be read to contradict or be incompatible with other provisions. *See BenQ Am. Corp. v. United States,* 646 F.3d 1371, 1380 (Fed. Cir. 2011). For example, a heading should not be read to override another specific note. *Id.* ("It is highly unlikely that the drafters intended to override the specifically tailored Note 5(B), which sets forth the statutory requirements for heading 8471, with Section XVI, Note 3's general analysis… Here, we think that, by reason of the language of Note 5(B), 'the context otherwise requires.'") There are no contradictory terms or provisions relevant to this article, nor do Defendants contend any exist.

Defendants argue, with no citation to supporting authority, that when a multi-component machine has interconnected functions, "context" requires that the principal function analysis may not be used to resolve the classification of the article (but rather the heading alone should be

-6-

used). However, this is a strained reading of the phrase "context otherwise requires" that should not be countenanced by the Court. *See, e.g., Keystone Auto. Operations, Inc. v. United States,* No. 21-00215, 2025 WL 1144820, at *2 (Ct. Int'l Trade Apr. 18, 2025) (declining to apply a novel argument, unsupported by legal authority, to read 'unless the context otherwise requires' to create a new standard that supersedes the normal analysis under the GRIs and ARIs usually applied by the court). Rather, as the Court directs in its Order in this case, an analysis of the principal function of the PC50 should be undertaken under Note 3. *HyAxiom, Inc. v. United States,* 726 F. Supp. 3d at 1406. When the undisputed functions of the components of the PC50 are examined, it is clear that gas generation is the principal function of the machine, as understood in Note 3.

### IV. DEFENDANTS FAIL TO DISTINGUISH AUTHORITY SUPPORTING THE PC50'S CLASSIFICATION ACCORDING TO ITS PRINCIPAL FUNCTION OF GAS GENERATION

In their Renewed Cross-Motion, the Defendants fail to distinguish *Belimo Automation A.G. v. United States,* 774 F.3d 1362 (Fed. Cir. 2014) (*Belimo*) and *McKesson Canada Corp. v. United States,* 365 F.Supp.3d 1310 (Ct. Int'l Trade 2019) (*McKesson*), which support the classification of the PC50 under heading 8405, HTSUS. In fact, the position taken by the government in *McKesson*, which was properly rejected, could not be more similar to Defendants' stance here. Like Defendants here, the government in *McKesson* contended that the composite pharmacy system had no single principal function, such that Note 3 was not applicable. *McKesson* at 1318. And just as in *McKesson*, "[t]he government's arguments are unconvincing" because although the components all had separate, enumerable purposes, none of those purposes (such as weighing, measuring, labeling, storing, sorting, and data processing) overrode the article's ultimate function of packaging prescription drugs. *Id.*

Defendants' only effort to distinguish *McKesson* and *Belimo* appears to be their contention that the principal functions of the machines in those cases were "clearly defined," whereas the PC50's is not. Renewed Cross-Motion at p. 12. But beyond that conclusory statement, Defendants fail to explain exactly what is more clearly defined about the components in those cases than in the instant case. The government in *McKesson* was as convinced as Defendants here appear to be that the imported article was a composite grouping of components without a single clear principal function. *McKesson, 3*65 F.Supp.3d at 1318. However, in analyzing the components at issue in *McKesson*, the court disagreed and found the principal function as a prescription packaging machine. *Id.* at 1321. In analyzing the PC50's components, which are established in the record of this case to be complementary to its gas generation function, the Court here should likewise conclude that the PC50 has a principal function easily identified as the generation of gas.

## CONCLUSION

For the foregoing reasons, the subject PC50 supermodule is properly classifiable under HTS 8405; and Defendants' classification of the PC50 supermodule under HTS 8479 is incorrect as a matter of law. Accordingly, HyAxiom's Renewed Motion for Summary Judgment should be granted and the judgment requested in HyAxiom's Proposed Order should be entered.

Respectfully submitted,

/s/ *Christopher M. Loveland*
Christopher M. Loveland
SHEPPARD, MULLIN, RICHTER &
 HAMPTON LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006-6801
Telephone: 202.747.1900
Facsimile: 202.747.1901

Dated: July 3, 2025

Of Counsel:

J. Scott Maberry
Lisa C. Mays
Jonathan Wang
SHEPPARD MULLIN RICHTER
 & HAMPTON LLP

*Attorneys for Plaintiff HyAxiom, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Christopher M. Loveland, counsel on behalf of Plaintiff HyAxiom, Inc., f/k/a Doosan Fuel Cell America, Inc., relying upon the word count feature of the Word processing program used to prepare the foregoing memorandum, certify that this memorandum complies with the word count limitation under the Court's Chambers Procedures, and contains 2,460 words.

/s/ *Christopher M. Loveland*
Christopher M. Loveland
